## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| HERITAGE PHARMACEUTICALS INC., <br><br>            Plaintiff, <br><br>    v. <br><br> JEFFREY A. GLAZER and <br> JASON T. MALEK, <br><br>            Defendants. | COMPLAINT FOR, INTER ALIA, VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ("RICO") ACT, 18 U.S.C. CH. 96 <br><br> JURY TRIAL DEMANDED |

Liza M. Walsh
Marc. D. Haefner
WALSH PIZZI O'REILLY FALANGA LLP
   One Riverfront Plaza
   1037 Raymond Blvd., Suite 600
   Newark, NJ 07102
   (t) (973) 757-1100
   (f) (973) 757-1090


Daniel W. Nelson (*pro hac vice forthcoming*)
William Jeremy Robison (*pro hac vice forthcoming*)
GIBSON, DUNN & CRUTCHER LLP
   1050 Connecticut Ave., N.W.
   Washington, D.C. 20036
   (t) (202) 955-8500
   (f) (202) 467-0539


*Attorneys for Plaintiff Heritage Pharmaceuticals Inc.*

Heritage Pharmaceuticals Inc., by and through its undersigned counsel, alleges as follows:

**<u>INTRODUCTION</u>**

1.      Defendants Jeffrey Glazer and Jason Malek exploited their positions as the two most senior executives at Heritage Pharmaceuticals Inc.  ("Heritage" or the "Company") to orchestrate a long-running criminal conspiracy that severely damaged Heritage.  Before they were fired in August 2016, and over the course of at least seven years, Glazer and Malek looted tens of millions of dollars from Heritage by misappropriating its business opportunities, fraudulently obtaining compensation for themselves, and embezzling its intellectual property.  Glazer and Malek accomplished this brazen theft by creating at least five dummy corporations, which they used to siphon off Heritage's profits through numerous racketeering schemes.  Through one particularly audacious scheme, Glazer and Malek, together with other co-conspirators, secretly arranged deeply discounted sales of Heritage products to their dummy corporations or through complicit third parties willing to act as straw buyers in return for bribes.  Glazer and Malek then illicitly pocketed the profit that resulted when the transaction's true end-purchaser—in each case, one of Heritage's own customers—paid the market price for Heritage's products.

2.      Evidence currently available to Heritage shows that Glazer and Malek stole millions of dollars from Heritage through their racketeering activities—yet the discovery process will undoubtedly reveal that the true impact of their unlawful scheme is much greater.  The magnitude of Defendants' theft is captured in an August 2015 text message exchange, in which Glazer told Malek that their scheme had netted $466,000 in profit that day.  Glazer then told Malek that he planned to "distro $100k each" from this profit and Malek joked whether "[t]hat's it?"  Through their self-congratulatory and casual tone, Glazer and Malek make clear that they felt no compunction about dividing the spoils of an unlawful racketeering enterprise.

| Sender | Message Sent Date/Time (UTC-5:00) | Message |
|---|---|---|
| Jeff Glazer | 08/18/2015 12:59:28 PM | Going to distro $100K each |
| Jason Malek | 08/18/2015 01:02:56 PM | That's it? |
| Jeff Glazer | 08/18/2015 01:05:05 PM | For today, it was $466K profit can send more later after tax discussion |
| Jason Malek | 08/18/2015 01:10:24 PM | Lol, only kidding |

Similarly, during a text message exchange with Malek in September 2015, Glazer spoke boastfully about the "healthy orders" coming into Dorado Pharma, one of their dummy corporations, and his conclusion that they would generate $2.85 million.  Malek later confirmed that his calculations showed profits totaling more than $2.5 million.  Their comments demonstrate Glazer and Malek's callous focus on their own pecuniary interests; Glazer's overt contempt for his fellow Heritage board members, who are from India; and Defendants' complete disregard for their fiduciary duties to Heritage.

| Sender | Message Sent Date/Time (UTC-5:00) | Message |
|---|---|---|
| Jeff Glazer | 09/10/2015 05:56:16 PM | What's the $ per unit to Dorado? Seems like some healthy orders |
| Jeff Glazer | 09/10/2015 06:06:56 PM | $2.85M to Dorado |
| Jason Malek | 09/10/2015 06:06:56 PM | was just plugging it in..... |
| Jeff Glazer | 09/10/2015 06:06:56 PM | Fuck these sand niggers |
| Jason Malek | 09/10/2015 06:13:20 PM | At an even 30 per 100 ft profit, it's 2,565,000 |

3.      Glazer and Malek flagrantly disregarded and breached their fiduciary duty of loyalty to Heritage by repeatedly acting against the best interests of the Company.  As Heritage's CEO and Chairman of the Board of Directors, Glazer occupied a position of great trust and authority.

So did Malek, Glazer's brother-in-law, who was ultimately promoted to serve as Heritage's President.  Glazer and Malek betrayed this trust and used their authority as senior Heritage executives to facilitate their unlawful schemes against the Company.  For instance, Glazer and Malek used their exclusive control and authority over pricing to sell Heritage products for a fraction of their market price to one of their dummy corporations—often at prices below Heritage's wholesale cost.  Glazer and Malek also manipulated their subordinates at Heritage into unwittingly aiding them in processing, repackaging, and shipping the orders flowing through their criminal enterprise. Glazer and Malek subsequently directed Heritage employees to remove these transactions from the Company's internal sales and finance reports. Additionally, when one of Defendants' dummy corporations began to transact directly with Heritage at below-market prices, Malek assigned himself to be the designated Heritage sales representative—ensuring that any inquiries would be routed back to him.  By virtue of this scheme, Glazer and Malek paid and received what amounted to numerous bribes and kickbacks; in the process they deprived Heritage of its intangible right of honest services.

4.      Glazer and Malek also engaged in repeated, fraudulent communications with Heritage employees and customers to facilitate their racketeering activities.  Glazer, for instance, emailed Heritage customers and counterparties from his Heritage email account on several occasions to falsely claim that one of Defendants' dummy companies was affiliated with Heritage, or that Heritage wanted to include one of Defendants' dummy companies in a transaction.  Malek even went so far as to falsely pretend on multiple occasions to be a female customer service representative named "Judy Jones" when communicating with Heritage employees through an email account associated with Dorado Pharma, one of Defendants' dummy corporations.

From: sales@doradopharma.com [mailto:sales@doradopharma.com]
Sent: Thursday, July 23, 2015 10:53 AM
To: ███████
Subject: RE: FW: Send data from MFP07404798 07/22/2015 17:07

Good morning ██████.

Thank you for the information and for sending along your contact information.

Can you also forward the COA's for the products?

Warm Regards,

Judy

5.    Glazer and Malek knew their conduct was unlawful, as evidenced by their extensive efforts to conceal their disloyal behavior from other Heritage employees and directors. Defendants employed elaborate subterfuges to mask their affiliation with the dummy corporations they controlled, including the use of private email servers, fake offices, separate bank accounts, and false online identities, among other deceptive methods. Glazer even purchased domain names for each of Defendants' dummy corporations, such as "doradopharma.com," but masked his ownership of those domain names through a third-party proxy service. Demonstrating their consciousness of guilt, as the discovery of their unlawful activities became inevitable, Defendants undertook additional efforts to hide their self-dealing and disloyalty by attempting to delete hundreds of files related to their scheme from Heritage's network drives and desktop computers. In the end, however, their scheme was discovered, but not before Glazer and Malek inflicted multimillion-dollar injury on Heritage's business and property—injury that continues to this day by virtue of Defendants' wrongful retention and use of Heritage's intellectual property.

6.    To facilitate their racketeering activities, Glazer and Malek managed and controlled a criminal enterprise since at least 2009 that eventually included a minimum of five dummy corporations: Tal Pharma LLC, Dorado Pharma LLC, Element Pharma LLC, VetGen Pharma LLC, and Astor Pharma LLC. Each of these companies was incorporated, operated, and jointly

owned by Glazer and Malek to facilitate their racketeering activities.  Through these dummy companies, Glazer and Malek engaged in numerous schemes that relied on their positions as senior executives at Heritage to steal the Company's profits and property, including:

a.  **Self-Dealing Resales of Heritage Products to Heritage's Own Customers.** Heritage's core business is the sale and distribution of generic pharmaceuticals to retailers, wholesalers, and healthcare institutions throughout the United States.  Glazer and Malek used their relationships with at least two of these Heritage customers to deceive them into ordering products through Dorado Pharma, one of Defendants' illicit companies.  Glazer and Malek then directed Heritage to sell products for these customers to Dorado Pharma, or a straw buyer acting on behalf of Dorado Pharma, for a fraction of their value—sometimes at a loss to Heritage.  Dorado Pharma then immediately resold the products at full market price, with Glazer and Malek pocketing the unlawful profits. This resale scheme ultimately redirected more than $9 million in Heritage sales to Dorado Pharma from 2012 to 2015, and accrued millions of dollars in illicit profits for Glazer and Malek.

b.  **Embezzlement of Heritage's Intellectual Property.**  Some of Heritage's most important assets are its Abbreviated New Drug Applications ("ANDAs").  ANDAs provide regulatory approval from the U.S. Food and Drug Administration ("FDA") for a pharmaceutical company to manufacture and distribute a specific generic pharmaceutical. An ANDA includes the technical analyses required to show bioequivalence with the relevant brand-name drug, detailed descriptions of the generic producer's manufacturing process, and the packaging that will be provided to customers.  Once approved, an ANDA is a valuable form of intellectual property to its holder and can be sold to or

purchased by another pharmaceutical company.  In May 2012, Glazer instructed a Heritage employee to complete an FDA submission transferring the Company's ANDA for the generic drug Ketoprofen to Defendants' company Dorado Pharma—with no compensation of any type to Heritage.  Shortly thereafter, Glazer and Malek entered into contracts for the manufacture and marketing of Ketoprofen through Dorado Pharma, seizing for their own benefit opportunities they, as Heritage officers, were obligated to secure for Heritage.

c. **Kickbacks on Below-Market Sale of Heritage's Asset.**  In February 2016, Glazer sold an ANDA held by Heritage at a below-market price to a close business associate.  In exchange for this favorable sales price, the purchaser agreed to pay kickbacks to Glazer and Malek through Tal Pharma, another one of Defendants' illicit companies, on future profits from sales of the drug.

d. **Diversion of Business Opportunities.**  Despite the duty of loyalty they owed to Heritage, Glazer and Malek repeatedly diverted potential business opportunities to their criminal enterprise.  For example, in 2009, Glazer and Malek arranged for Tal Pharma to manufacture and distribute its own generic pharmaceutical, which they then sold to Heritage customers, sometimes using the assistance of Heritage's salespeople.  In June 2015, Glazer and Malek used another one of their dummy companies, Element Pharma, to begin development of an ANDA for Doxycycline Hyclate—a product that Heritage was planning to develop around the same time.

7.    Glazer and Malek further expanded their criminal enterprise in August 2015, bringing in additional co-conspirators to mask the increasing volume of illicit misappropriations of Heritage's business and property.  Dorado Pharma risked detection as it began to place

increasingly sizable orders with Heritage as part of Defendants' scheme to resell Heritage products.  Glazer and Malek sought to minimize this risk by redirecting their Heritage purchases through a small existing Heritage customer, Cochran Wholesale Pharmaceuticals, Inc. ("Cochran").  Cochran began to place orders with Heritage on behalf of Glazer and Malek in November 2015.  In a text message exchange shortly before Cochran's first order to Heritage, Glazer and Malek discussed the need to maximize their profits by providing Cochran with the lowest possible prices on its purchases, although not so low that it "raised red flags internally." Cochran ultimately ordered more than $3.8 million in products from Heritage over a seven-month period—far more than it had ever ordered in the past—and the orders continued until Glazer and Malek were fired.

8.      Glazer and Malek brought two additional participants into their criminal enterprise to coordinate the Cochran purchases in exchange for bribes and kickbacks.  Co-conspirator Matthew Edelson, at the time a Director of National Accounts at Heritage, joined the racketeering enterprise no later than October 2015 and facilitated Glazer and Malek's purchases through Edelson's close friend, Andre Patton, who served as Cochran's Director of Purchasing. In an October 2015 text message exchange, Malek made explicit the enterprise's structure when he told Edelson that Patton should remember that Glazer and Malek managed the overall criminal enterprise in which he was participating, and they were the bosses; in Malek's words, it was "our show not his."  Edelson quickly assured Malek that "I know who's [sic] show it is money."  Glazer and Malek agreed to pay Patton a $10,000 bribe and 1% of the order volume on each transaction he placed for them, while they would pay a flat $10,000 bribe to Edelson for each order he coordinated through Patton.  Although he was joining a criminal enterprise

operating to steal from his employer, Edelson responded with unbridled excitement at the

additional cash, exclaiming, "That's fucking great!!  Thanks homie!"

| Sender | Message Sent Date/Time (UTC-6:00) | Message |
|---|---|---|
| Matthew Edelson | 10/22/2015 04:28:25 PM | I told Dre I would have something for him today brotha. |
| Matthew Edelson | 10/22/2015 04:28:39 PM | Should I let him know tomorrow? |
| Jason Malek | 10/22/2015 04:29:01 PM | This is our show not his, 10k to him and 1% to Cochran.  10k to you |
| Matthew Edelson | 10/22/2015 04:30:21 PM | I know who's show it is money. That's fucking great!!  Thanks homie! |

9.      As their unlawful enterprise expanded, Glazer and Malek abandoned any semblance

of loyalty to Heritage.  Indeed, in an August 2015 text message exchange with Glazer, Malek

proposed having Dorado Pharma file an ANDA for one of Heritage's best-selling products.

Glazer responded that they could steal the "complete ANDA electronically" from Heritage's

files, "but it would be risky to do a submission prior to getting [the] fuck out of here."  Glazer

then admitted that he had already stolen much of Heritage's intellectual property, commenting

that he "basically ha[s] every original ANDA on CD at my house."  As Glazer knew, these

ANDAs form the core of Heritage's business and are its most valuable assets.  Heritage entrusted

Glazer and Malek with this intellectual property as officers of the Company, and their breach of

that trust now represents a grave competitive threat to Heritage's future.

| Sender | Message Sent Date/Time (UTC-6:00) | Message |
|---|---|---|
| Jason Malek | 08/24/2015 11:21:23 AM | why are we not submitting a tetracycline anda for dorado? |
| Jeff Glazer | 08/24/2015 11:23:22 AM | And you think I'm nuts lol |
| . . . | | |
| Jeff Glazer | 08/24/2015 11:27:10 AM | We can probably get the complete ANDA electronically but it would be risky to do a submission prior to getting to [sic] fuck out of here |
| Jason Malek | 08/24/2015 11:27:39 AM | true. |
| Jeff Glazer | 08/24/2015 11:34:10 AM | I basically have every original ANDA on CD at my house but need to get some of the new ones and the USV ones.  We should Doxy DR it also! |
| Jason Malek | 08/24/2015 11:57:52 AM | Agreed |

10.    Since Glazer's termination in August 2016, Heritage has repeatedly sought the return of its ANDAs and other misappropriated property, yet Glazer and Malek have refused to comply. They have not returned the Company's ANDAs that they stole nor have they returned other Company property.  Instead, within one week of their terminations, Glazer and Malek created yet another corporation, Astor Pharma LLC, registered the "astorpharma.com" domain name, and filed a trademark application related to Astor Pharma.  Based on their recent outreach to individuals within the generic pharmaceutical industry, Glazer and Malek now appear to be taking steps to capitalize on the intellectual property embezzled from Heritage and to thereby further undermine Heritage's business.

## JURISDICTION AND VENUE

11.    This action arises under the laws of the United States, including 18 U.S.C. Chapter 96, and the laws of the state of New Jersey.  The Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964 and 28 U.S.C. §§ 1331, 1367.

12.     Venue is proper in this District pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391, because Defendants are subject to personal jurisdiction in this District.

## THE PARTIES

13.     Plaintiff Heritage Pharmaceuticals Inc.  ("Heritage") is a Delaware corporation with its principal place of business at 12 Christopher Way, Suite 300, Eatontown, New Jersey 07724. Heritage engages in the acquisition, licensing, development, marketing, sale, and distribution of generic pharmaceutical products for the U.S. prescription-drug market.

14.     Defendant Jeffrey A. Glazer is a resident of Marlboro, New Jersey and an attorney licensed by the New Jersey State Bar Association (Attorney ID 031701998).  Glazer served as the Chief Executive Officer of Heritage and a member of the Company's Board of Directors from its founding in 2005 until August 2016.  In October 2015, Glazer became Chairman of Heritage's Board of Directors.  He previously served as General Counsel and Executive Vice President for Corporate Development at Glenmark Pharmaceuticals, Inc., in Princeton, New Jersey.  Prior to these roles, Glazer received his law degree from Seton Hall University and worked for two New York-based law firms in their respective Intellectual Property and Life Science practice groups.

15.     Defendant Jason T. Malek is a resident of Ocean, New Jersey.  Malek joined Heritage in 2008 as the Director of Sales Operations and received repeated promotions from Heritage's Board of Directors: Senior Director of Commercial Operations in 2010, Vice President in May 2011, Senior Vice President in April 2013, and ultimately the President of Heritage from October 2015 until August 2016.  Prior to working at Heritage, Malek held a variety of roles in the telemarketing industry.

## ALLEGATIONS OF FACT

### I.  Heritage Pharmaceuticals

#### 1.  Formation and Acquisition

16.     Glazer founded the Company, which was originally incorporated as Radius Pharmaceuticals Inc., in late 2005, and he served as its President, CEO, and a director on its three-person Board of Directors.  Over the next several years, investors poured millions of dollars into Heritage, diluting Glazer's ownership and control of the Company.  By 2008, Glazer held just 12% of Heritage's shares and thus the vast majority of any eventual profits earned by Heritage would not accrue to his benefit.

17.     In April 2011, Heritage was acquired by Emcure Pharmaceuticals Ltd. ("Emcure"), an Indian company that develops, manufactures, and markets generic pharmaceuticals.  Since its founding in 1981, Emcure has grown into one of the largest generic pharmaceutical companies in India.  Although successful in India and several other countries, Emcure did not have distribution and marketing operations in the United States at that time.  Heritage thus provided an opportunity for Emcure to enter the U.S. market.  On February 25, 2011, Heritage and Emcure signed a final binding Merger Agreement; the acquisition closed on April 29, 2011.

18.     Among Heritage's most valuable assets was its executive team's extensive experience in the U.S. generic pharmaceuticals industry.  Most important among this team was Glazer.  Glazer's soaring vision for Heritage was matched by his apparent credentials: a licensed attorney with intellectual property experience in the generic pharmaceuticals industry, multi-generational family ties to the generic pharmaceuticals industry, and an extensive network of customer relationships.

19.     Accordingly, in conjunction with the merger, Heritage's Board negotiated a lucrative five-year employment contract with Glazer to ensure that he would remain dedicated to the success of Heritage.  Heritage also entered into a generous three-year employment agreement with Malek, who was at that time Vice President of Commercial Operations.  Heritage and Glazer executed his five-year employment contract on May 2, 2011, and renewed the agreement on February 24, 2016.  Heritage and Malek executed his employment contract on March 23, 2011, extended it on March 4, 2014, and renewed it again on February 24, 2016.

### 2.     Terms of Employment for Glazer and Malek

20.     Glazer and Malek were viewed as "key employees" who were critical to the Company's success.  Heritage made significant concessions to secure long-term contracts with Glazer and Malek, even allowing Glazer to draft the agreements himself.  Although Heritage was a relatively small, unprofitable company at the time of its acquisition, Glazer proposed generous terms for himself and Malek.

21.     Glazer's proposed terms were accepted with just one change: an assurance that both he and Malek would remain loyal to Heritage.  The initial contracts that Glazer drafted included unequivocal language demanding that he and Malek "devote substantially all of [their] business time and skills to the performance of [their] Duties" to Heritage and, in Glazer's case, "exert his best efforts . . . in good faith so as to promote the business and interests of the Company."  The only substantive change to Glazer's proposed contracts was to insert language allowing Heritage to terminate Glazer or Malek if either of them (i) "failed or refused . . . to appropriately perform his Duties," including acting in good faith to promote the business and interests of the Company, or (ii) "engaged or assisted in any knowing material misrepresentation to the Company."  Believing that Glazer and Malek intended to comply with the terms of the contracts, Heritage's

newly constituted Board approved the lucrative employment contracts to retain Glazer and Malek a short time later. Glazer and Malek were immediately entrusted them with broad authority and near-complete autonomy. The degree of trust and confidence that existed was conveyed to Glazer and Malek in a November 2, 2012 email from the India-based Chairman of Heritage's Board to Glazer and Malek, in which he told them, "[y]ou all are part of my extended family."

22.     Glazer's initial post-acquisition contract provided for a five-year term with a base salary of $420,000 and a $210,000 annual bonus payable upon Heritage's achievement of certain milestones. Glazer's salary and bonus automatically rose 5% per year, providing for a base salary of $536,000 and a potential bonus of $268,000 by the end of the contract's term in 2016. Glazer also received a lucrative benefits package, which included a generous monthly automobile cash allowance, a $2 million term life insurance policy, and a key-man life insurance policy reflecting his critical role at Heritage.

23.     Glazer's employment agreement also provided him with a contractual right to participate in a new Stock Appreciation Rights ("SARs") Plan. The SARs Plan provides an opportunity for employees to accumulate profit-sharing units that vest over time, which can then be exercised to receive a cash payment based on Heritage's most recent fiscal-year earnings. In the following years, with the infusion of resources from Emcure, Heritage enjoyed a period of tremendous growth and profitability that allowed Glazer to benefit handsomely from his participation in the SARs Plan.

24.     Following the conclusion of Glazer's initial five-year contract term, Heritage's Board sought once again to retain Glazer. In February 2016, Glazer and Heritage renewed his employment agreement for an additional five years with an increase in base salary to $700,000

per year and a $560,000 bonus if Heritage met certain goals for the year. By the end of the renewed term, with the benefit of the automatic 5% increases, Glazer had the potential to earn more than $1.6 million in cash compensation per year. Glazer's renewed employment agreement also provided for a 50% increase in his monthly automobile allowance, a 50% increase in his life insurance policy, and a 25% increase in his yearly paid vacation time.

25.    Glazer's cash compensation paled in comparison to his potential payouts from the SARs Plan as Heritage generated substantial profits. Since 2011, the Board granted Glazer additional SARs units each year (with the exception of 2015) that vested incrementally over the five years after being awarded. Glazer chose to exercise the vast majority of his vested SARs units in April 2016, perhaps as he sensed that his racketeering conspiracy with Malek risked being discovered. Indeed, in a September 2015 text message exchange, Glazer told Malek that he was "probably taking a large chunk [of vested SARs units] off the table so they can't fuck with me." Heritage calculated Glazer's exercised SARs units, as of April 2016, to be worth more than $22.5 million and the Company has already made cash payments to Glazer totaling nearly $11.3 million.

| Sender | Message Sent Date/Time (UTC-4:00) | Message |
|---|---|---|
| Jason Malek | 09/02/2015 12:40:32 PM | Are you definitely doing it? |
| Jeff Glazer | 09/02/2015 12:41:30 PM | 4/15/16 is the date to provide notice of SAR exercise – fully vests on 5/17/16 and have to pay first installment within 30 days of notice and second payment within 210 days – gets us into Dec16/Jan17 time frame for first grant to be realized |
| Jeff Glazer | 09/02/2015 12:45:04 PM | We have time to think about it but I'm probably taking a large chunk off the table so they can't fuck with me |

26.     Malek received a similarly generous compensation package and, based on Glazer's recommendations to the Board, it became substantially more lucrative over time.  Malek's initial three-year employment contract granted him a base salary of $190,000 and a potential bonus of $57,000, with automatic 5% annual increases.  Upon renewal of his contract in 2014, Malek's base salary increased significantly to $300,000 per year, while his potential annual bonus rose to $105,000.  His most recent employment contract—a five-year pact signed in February 2016—provided Malek with $450,000 in base salary and a $225,000 potential annual bonus; these terms represented a 50% increase over his prior employment contract.  Malek's employment contracts also provided for a generous benefits package that included a monthly automobile cash allowance and a $1 million life insurance policy, both of which increased significantly over the course of his employment at Heritage.  By the time of his third employment agreement, Malek's automobile allowance had increased by 50% and his Company-provided life insurance policy had doubled in value.

27.     In addition to his substantial compensation package, Malek earned vastly more through Heritage's SARs Plan.  Consistent with Glazer's actions, Malek chose to exercise the majority of his vested SARs units in April 2016, just two months after entering his renewed five-year employment contract.  Heritage calculated Malek's exercised SARs units, as of April 2016, to be worth nearly $6 million, and the Company has already made cash payments to him totaling nearly $3 million.

### 3.     Glazer's and Malek's Expanding Roles and Responsibilities

28.     Glazer and Malek were not only enriched; they were entrusted with Heritage's future and empowered with the means to manage the Company.  During their tenure with Heritage, the

Board promoted them, greatly increased their authority, and gave them increasingly more responsibility for the Company's operations.

29.     On May 17, 2011, the Board (which included Glazer as one of its three members) empowered Glazer to take major financial actions on behalf of Heritage.  He could open or close bank accounts at his sole discretion and sign checks or send wire transfers of up to $300,000 without further approval; the Board even increased that amount to $500,000 in July 2013.  On June 1, 2014, Glazer was promoted to also be the CEO of Heritage Pharma Labs, a New Jersey-based affiliate that developed and manufactured generic pharmaceuticals.  In October 2015, Glazer ascended to the role of Chairman of the Board for the first time.  The outgoing Chairman of the Heritage Board of Directors and CEO of Emcure emailed Glazer shortly after his promotion to congratulate him, saying, "I consider you and Jason as an integral part of our family."

30.     Malek had a similar upward trajectory at Heritage.  In May 2011, shortly after Heritage's acquisition was finalized, the Board approved Malek's promotion to Vice President. In April 2013, the Board again promoted Malek to Senior Vice President.  Acting on Glazer's recommendation, the Board approved Malek's promotion to President on October 2, 2015 and, the following month, provided him with signature authority up to $100,000 for the Company's bank accounts.

31.     Glazer and Malek centralized Heritage's decision-making authority in themselves and exercised an authoritarian management style over Heritage's other employees, thereby cultivating an ideal atmosphere in which to conduct and conceal their unlawful conduct.  For example, Heritage's marketing and finance teams were not authorized to approve pricing changes of any magnitude for Heritage's customers; instead, all pricing authority resided with

Malek.  Glazer and Malek also cultivated a siloed environment in which cross-team communication was discouraged, strict hierarchies were enforced, and information was shared only on a need-to-know basis.  As a result, other Heritage employees had little involvement in the overall business of the Company, and they had virtually no contact with Glazer whatsoever.  Instead, Glazer and Malek met in private for multiple hours each day and made all substantive decisions by themselves.

32.     Glazer and Malek adopted similarly restrictive measures with respect to Heritage employees' interaction with the Company's board members.  When Heritage Board members traveled from India to visit the Eatontown, New Jersey office, Glazer and Malek ensured that employees interacted with them only in tightly scripted environments.  On multiple occasions, Malek promised various employees an opportunity to meet with and present work projects to the India-based Board members.  These employees spent countless hours preparing for the promised meetings and presentations, only to have Glazer or Malek deny the opportunity at the eleventh hour.  Glazer and Malek routinely ushered the India-based Board members into a closed-door conference room immediately adjacent to the main entrance of Heritage's office, purposely foreclosing their ability to walk the office and interact with Heritage staff.  During one of these trips, the visiting board members attended a carefully choreographed dinner with Heritage's sales team.  To limit the possibility for the India-based Board members to have direct contact with the Heritage employees, Glazer and Malek instructed the salespeople not to hand out their business cards at the dinner.

33.     At the time, Glazer and Malek's actions could be attributed to a quirky management style or their close familial tie (as brothers-in-law) and a professional relationship that made them hesitant to rely on outsiders.  With the benefit of hindsight, however, it is now clear that

these measures to limit communication and curtail information flow were a key component of Glazer and Malek's multi-year racketeering scheme.

## II.   **Tal Pharma LLC**

### 1.      **Formation**

34.      On May 6, 2009, Glazer and Malek took the first of many steps in their criminal scheme by incorporating Tal Pharma LLC.  The two shared ownership of Tal Pharma, with Glazer serving as the Managing Member.  Within a matter of days, Glazer applied for and secured a Federal Employment Identification Number, appointed a regulatory agent, and engaged a graphic designer to develop a corporate logo.  In the weeks and months that followed, Glazer acquired the "talpharma.com" web domain, established a private email server, leased virtual office space, opened separate bank accounts, registered the "Tal" trademark, and, by the end of 2009, secured an FDA "labeler code" for Tal Pharma to market drugs under its own label.

35.      Glazer and Malek initially used Tal Pharma as a conduit for self-dealing in ANDAs. The same day he incorporated the new dummy corporation, Glazer used his Heritage email account to contact another company about purchasing two of its ANDAs for Tal Pharma. Although Glazer had previously expressed interest in purchasing those same ANDAs in Heritage's name, after the creation of Tal Pharma, he sought to negotiate on behalf of what he described as "a related entity named Tal Pharma."  During a separate ANDA purchase negotiation, Glazer wrote to the ANDA seller on Heritage letterhead and falsely represented that Heritage was "Tal's affiliate." He then signed on behalf of both companies.



## 2.   Manufacturing and Distribution of EEMT

36.   By mid-2010, Tal Pharma expanded into the distribution of generic pharmaceuticals. In August, Glazer entered into an agreement with Intermax-Syntho Pharmaceutical, Inc. to manufacture a generic product called Esterified Estrogens and Methyltestosterone ("EEMT") for Tal Pharma.





37.     Despite their positions as officers of Heritage, Glazer and Malek marketed EEMT to Heritage's customers with the unwitting assistance of Heritage salespeople.  To facilitate these sales, Glazer falsely asserted to customers that "Tal Pharma LLC is a subsidiary label of Heritage Pharmaceuticals Inc."  Within weeks, Glazer secured a deal with one of Heritage's largest customers to purchase EEMT from Tal Pharma.  Glazer continued to use his Heritage email account to market Tal Pharma's product and, by January 2011, he secured deals for Tal Pharma to sell EEMT to two additional Heritage customers.

38.     Glazer and Malek added a new co-conspirator as Tal Pharma's illicit sales grew. Defendants brought Mark Malek, the brother of Jason Malek, into their criminal conspiracy no later than February 2012 to serve as the General Manager of Tal Pharma.  In his role, Mark Malek negotiated EEMT-related licensing and manufacturing agreements, completed financial analyses of additional product opportunities that could be diverted from Heritage, and helped to market Tal Pharma's EEMT to one of Heritage's largest customers.

39.     EEMT was lucrative for Glazer, Malek, and Tal Pharma.  Tal Pharma's accounting records indicate that it had approximately $2.2 million in total sales in 2010, and—despite the loss of a significant contract in early 2011—nearly $1.4 million in sales in 2011, and $270,000 in 2012.  Glazer personally reported more than $250,000 in personal income from Tal Pharma on his IRS Schedule K-1 for 2011.  At a time when Heritage was losing millions of dollars per year,

Glazer and Malek stole business opportunities from the Company and earned hundreds of thousands of dollars in illicit profits that rightfully belonged to Heritage.

### 3.   Misappropriation of Heritage's Resources

40.     Glazer and Malek's success in distributing EEMT through Tal Pharma was made possible by their misappropriation of Heritage's confidential business analyses, salespeople, and licenses.  Glazer and Malek directed Heritage's sales team to request usage and pricing data for EEMT from Heritage's customers in order to analyze the potential profitability of the product. Data from fourteen Heritage customers was used to build internal EEMT product forecasts that were labeled "Heritage Pharmaceuticals Inc. . . . Confidential Information."  The forecasts revealed that EEMT was expected to generate more than $1 million annually in net profits.

41.     As soon as Tal Pharma secured a supply of EEMT, Glazer and Malek recruited the entire Heritage sales team to sell the product to *Heritage's own customers*.  Glazer and Malek told the salespeople that Heritage had created Tal Pharma to sell a subset of products under a new private label.  The Heritage sales team then fanned out to their respective customers to seek EEMT sales opportunities and, repeating Glazer and Malek's fraudulent representation to them, told Heritage's customers that EEMT would be sold "under our Tal label."  Emails from one of Heritage's largest customers also reflect the customer's understanding that Tal Pharma was affiliated with the Company, such as when it referred to the Heritage salesperson as working for "Tal (Heritage)."  The Heritage salespeople even represented Tal Pharma in sales meetings; on at least one occasion, a salesperson conducted back-to-back meetings with a Heritage customer— one on behalf of Heritage and the other on behalf of Tal Pharma.

42.     Despite telling the sales team that Tal Pharma was an affiliate of Heritage, Glazer and Malek instructed them not to discuss or disseminate Tal Pharma information to other Heritage

employees.  One salesperson received a warning from Malek after mistakenly copying a Heritage colleague on an email concerning an EEMT order for Tal Pharma.  The salesperson replied to explain that "I get so confused about who gets what; Tal gives me anxiety!!!!  I knew [Heritage's customer service team] didn't get it so I threw [Heritage's Associate Director of Pricing and Contracts] in there!!!  LOL.  Tell [Glazer], [that I] said OK, and not to voodoo doll me."

43.     Although several of Heritage's customers agreed to purchase EEMT from Tal Pharma, there was one last hurdle: Tal was not licensed by New Jersey or Florida to conduct pharmaceutical sales.  Glazer and Malek circumvented this problem by having Tal Pharma use Heritage's state licenses to complete its EEMT sales.

### 4.     Illicit Kickbacks on the Sale of Heritage's Hydroxyzine ANDA

44.     Glazer also used Tal Pharma to facilitate illegal kickbacks from Defendants' below-market sale of Heritage's intellectual property.  In 2010, Heritage purchased an ANDA for Hydroxyzine from a company run by John Copanos, an industry acquaintance of Glazer.  Copanos eventually left that company and founded a new company, ECI Pharmaceuticals LLC ("ECI").  Following a failed attempt to partner with ECI on a marketing agreement for Hydroxyzine in June 2015, Glazer suggested that ECI purchase the Hydroxyzine ANDA from Heritage outright at a below-market price in exchange for future kickbacks.  In a text message on July 4, 2015, Glazer wrote to Copanos that "I'm thinking $250K wouldn't raise any eyebrows . . . and you can sell and kick me a profit share . . . so I have a basis when I'm done at Heritage."

| Sender | Message Sent Date/Time (UTC-4:00) | Message |
|---|---|---|
| Jeff Glazer | 07/04/2015 03:29:12 PM | Market is higher for ANDAs now then back then but I'm thinking $250K wouldn't raise any eyebrows – I'll partner with you on price and you can sell and kick me a profit share or some future marketing rights so I have a basis when I'm done at Heritage – let's chat Monday |
| John Copanos | 07/04/2015 03:35:06 PM | On same page.  You and I will always think alike and work together, so let's finalize this Monday. |

45.     In February 2016, Glazer completed the sale of Heritage's Hydroxyzine ANDA to ECI for just $200,000—even lower than the price that Glazer initially proposed.  Glazer signed the contract for this transaction on behalf of Heritage, as its CEO and Chairman.  The document did not mention that 30% of future profits on sales of the product would be redirected to Tal Pharma as a kickback to Glazer.

### III.  Dorado Pharma LLC

#### 1.     Formation

46.     After successfully using their dummy company Tal Pharma to amass illicit profits and elude detection for several years, Glazer and Malek conspired to significantly expand their racketeering activities with a new business entity: Dorado Pharma LLC.  Beginning in January 2012, four months prior to Dorado Pharma's formal incorporation, Glazer obtained a domain name ("doradopharma.com"); secured virtual office space in Freehold, NJ; commissioned a logo design; ordered an endorsement stamp; hired an accountant; and appointed a regulatory agent for filings with the FDA on Dorado Pharma's behalf.

47.     With the necessary foundational measures in place, Glazer and Malek incorporated Dorado Pharma in May 2012 as an entity separate from and unaffiliated with Heritage.

Defendants thereafter folded Dorado Pharma into their unlawful enterprise and used it to expand their racketeering scheme.

### 2.    Embezzlement of Heritage's Ketoprofen ANDA

48.    On its first day of Dorado Pharma's existence, Glazer and Malek used the dummy company to embezzle Heritage's intellectual property and misappropriate a Heritage business opportunity for Ketoprofen, a generic pharmaceutical used for pain management.

49.    Heritage, through its predecessor Radius Pharmaceuticals, purchased an ANDA for Ketoprofen in 2006.  Several years later, on December 7, 2011, Glazer was approached by KLE2 Pharmaceuticals ("KLE2"), which proposed an exclusive Ketoprofen marketing arrangement with Heritage.  Heritage was not manufacturing or marketing Ketoprofen at that time, so Glazer began contacting potential manufacturers and directed the Heritage sales team to gather data about market pricing for the product from customers.

50.    Over the next five months, Glazer negotiated with KLE2 and Shasun Pharmaceuticals ("Shasun"), a contract manufacturer that could develop and produce Ketoprofen.  From the start, Glazer made it clear that KLE2 and Shasun would contract with Heritage directly.  Glazer never discussed the participation of Dorado Pharma.

51.    On May 4, 2012, as Heritage's discussions with KLE2 and Shasun neared closing, Glazer incorporated Dorado Pharma and then used it to embezzle Heritage's Ketoprofen ANDA. Glazer instructed Heritage's Associate Director of Regulatory Affairs to transfer Heritage's Ketoprofen ANDA to "a different entity."  Although the Heritage employee questioned Glazer about the details of the proposed transfer, Glazer rebuffed her inquiries and directed her to sign the necessary paperwork to transfer the ANDA to Dorado Pharma.  At Glazer's direction, the

transfer of the Ketoprofen ANDA to Dorado Pharma was submitted to the FDA the same day. Heritage did not receive any consideration for its Ketoprofen ANDA.

52.     After Dorado Pharma became the owner of Heritage's Ketoprofen ANDA, Glazer worked to redirect the proposed business deal with KLE2 and Shasun to Defendants' criminal enterprise.  As the negotiations progressed and appeared to near completion, Glazer sent an email from his Heritage account on May 16, 2012, instructing Shasun to "please put the revised project proposal in the name of Dorado Pharma LLC," although Glazer offered no explanation for the change.  Similarly, when KLE2 inquired about Heritage's precise role in the transaction, Glazer side-stepped the question and offered to call them to discuss; shortly thereafter, Dorado Pharma was substituted for Heritage in all of the transactional documents.

53.     Despite his fiduciary duties to Heritage, Glazer executed the Ketoprofen agreement between KLE2 and Dorado Pharma on June 27, 2012, signing the contract as the Managing Director for Dorado Pharma.  The contract required KLE2 to pay Dorado Pharma advance licensing fees and a fixed sales price per unit sold.  Heritage was not included as a party or beneficiary to the contract.  Shortly after, on June 29, Glazer also signed on behalf of Dorado Pharma in executing the final agreement with Shasun to manufacture the Ketoprofen required under the KLE2 contract.

IN WITNESS WHEREOF, the parties have caused this Technology Transfer, Supply and Marketing Agreement to be executed by their respective duly authorized officers as of the date first above written.

By: _____     By: _____

Name: Jeffrey A. Glazer     Name: Kevin Laxer
Title: Managing Director     Title: CEO
DORADO PHARMA LLC     KLE2

IN WITNESS WHEREOF, the parties have caused this Technology Transfer, Supply and Marketing Agreement to be executed by their respective duly authorized officers as of the date first above written.

DORADO PHARMA LLC

By: _____

Name:   Jeffrey A. Glazer

Title:   Managing Member

SHASUN PHARMACEUTICALS LTD.

By: _____   June 29, 2012

Name:   Jitesh Devendra

Title:   President

54.    KLE2 and Dorado Pharma immediately began to make the payments required under the contracts.  KLE2 sent its first wire transfer totaling $50,000 to Dorado Pharma's checking account on June 27, 2012, the same day KLE2 signed its contract with Dorado Pharma.  By September 2013, KLE2 made at least three additional transfers to Dorado Pharma totaling more than $112,000.  Dorado Pharma, in turn, sent at least four wire transfers to Shasun between October 2012 and July 2013 totaling more than $80,000 for the technical work required before manufacturing the Ketoprofen.

### 3.    Resale of Heritage Products to a California-based Customer

55.    Shortly after embezzling Heritage's Ketoprofen ANDA and misappropriating the Company's business opportunity, Glazer and Malek embarked on a daring expansion of their racketeering scheme: using Dorado Pharma to resell Heritage's products to Heritage's own customers.

56.    In May 2012, a California-based distributor of generic pharmaceuticals approached Heritage about distributing its products.  These discussions gained traction in August 2012, and Malek began to interact extensively with the customer's senior executives.  Over the next three

months, Malek repeatedly met and spoke with the California-based customer to negotiate the deal's terms.

57.     As the negotiations neared completion, Glazer and Malek secretly plotted to divert a portion of the new customer's business through Dorado Pharma.  To further this goal, on October 10, 2012, Glazer obtained a comprehensive financial analysis conducted by Heritage personnel analyzing the volume and profitability of sales to the potential new customer.  By October 14, Malek had reworked this financial analysis to assess how much profit he and Glazer could earn if a portion of those sales were directed to Dorado Pharma, instead of Heritage.

58.     Within a month, Glazer and Malek had developed a comprehensive scheme to divert the customer's purchases into their racketeering enterprise.  On November 13, 2012, Malek emailed Glazer a spreadsheet explaining that Heritage would sell Nimodipine to Dorado Pharma at a small fraction of its market value; Dorado Pharma would then immediately resell the product to the new customer at a price seven times higher.  Yet, in practice, the scheme was even more devious, ensuring that Dorado Pharma never even had to take possession of the product:

- the customer would submit a purchase order to Dorado Pharma, rather than Heritage, for the necessary quantity of Nimodipine at the prevailing market rate;

- Dorado Pharma would then submit a purchase order to Heritage for the same quantity of Nimodipine, *but at a severely discounted rate* and with a request that Heritage ship directly to the customer;

- the customer would pay Dorado Pharma, at the full market rate, within 30 days;

- Dorado Pharma would pay Heritage, at its significantly discounted rate, within 60 days; and

- the resulting profits to Dorado Pharma would be split between Glazer and Malek.

59.    On December 6, 2012, the California-based customer entered an agreement to purchase two products.  Under the subject line "HERITAGE-AGREEMENTS," Malek sent the customer two separate contracts from his Heritage email account: one for the purchase of Methimazole from Heritage and another for the purchase of Nimodipine from Dorado Pharma. The customer signed and returned both agreements the next day.

60.    Four days later, unbeknownst to anyone at Heritage other than Glazer and Malek, the customer submitted its first purchase order to Dorado Pharma for Nimodipine.  The same day, Dorado Pharma submitted a purchase order to Heritage for the same quantity of Nimodipine at the discounted prices that Glazer and Malek had agreed upon the previous month.  Malek wrote the purchase order on behalf of Dorado, "submitted" it to himself at Heritage, and approved the discounted price on behalf of Heritage.  When Malek forwarded the Dorado Pharma purchase order to the Heritage employee in charge of customer service, he simply referred to Dorado Pharma as a new customer without any indication that he and Glazer were its true owners.  The Dorado Pharma purchase order directed Heritage to ship the Nimodipine directly to the California-based customer, even though Dorado Pharma was the nominal purchaser.

61.    The initial transaction went undetected and inspired confidence in Defendants' expanded racketeering activity.  Indeed, Glazer and Malek amassed profits totaling nearly $250,000 on their first deal, all of which would otherwise have gone to Heritage.

62.    On October 15, 2014, Malek emailed the California-based customer to discuss selling another generic pharmaceutical, Calcitriol, offered by Heritage.  Malek and the customer quickly negotiated a deal, and the customer sent Malek a contract for his signature on October 17, 2014.

63.    Malek waited five days to respond and then wrote back from his Heritage email account that they "[n]eed to change to Dorado Pharma."  The customer appeared perplexed,

responding that "[t]he letter of commitment references you [Heritage] as our supplier, since we will be buying from you. Same reasoning for Heritage being listed on the price agreement." Malek responded that this was the "[s]ame process we covered for Nimodipine. We have Dorado in the agreement for re-pack items." The customer then amended the terms to include Dorado Pharma and both parties signed the deal.

64.     Glazer and Malek profited handsomely from redirecting the customer's Calcitriol orders through their unlawful enterprise. Indeed, a text message exchange between Glazer and Malek on July 16, 2015 shows that Defendants made more than $50,000 in profit on a single order.

| Sender | Message Sent Date/Time (UTC-4:00) | Message |
|---|---|---|
| Jeff Glazer | 07/16/2015 03:52:39 PM | What's the profit on the order for [the California-based customer's] Calci? |
| Jason Malek | 07/16/2015 03:58:19 PM | 52k |

The increasing volume of orders through Dorado Pharma led Glazer and Malek to fear that someone might detect their racketeering enterprise. For example, Malek texted Glazer on August 3, 2015, suggesting that "we should bill [the California-based customer] for the calcitriol through Heritage and nix Tal/dorado this round." Notably, Malek conflated the two dummy companies in his text message because, in his mind, both companies were part of a single enterprise that he and Glazer could use to divert profits rightfully due to Heritage whenever they pleased.

| Sender | Message Sent Date/Time (UTC-4:00) | Message |
|---|---|---|
| Jason Malek | 08/03/2015 02:12:58 PM | I think we should bill [the California-based customer] for the calcitriol through Heritage and nix Tal/dorado this round. thoughts? |

65.     Glazer and Malek expanded their self-dealing yet again in August 2015.  After negotiating a deal for the California-based customer to purchase another Heritage product, Doxycycline Hyclate, Delayed Release ("Doxy DR"), Glazer and Malek again redirected the purchases through Dorado Pharma.  On August 28, Heritage shipped an initial order of Doxy DR from Dorado Pharma, totaling nearly 750,000 capsules, directly to the address of the California-based customer.  Once again, Heritage did all the work and Dorado Pharma kept the profits.

66.     According to evidence currently available to Heritage, Glazer and Malek continued to divert the California-based customer's orders for Heritage products through Dorado Pharma until at least August 2015.  These misappropriated business opportunities resulted in more than $1 million in stolen profits from Heritage.  The full extent of Glazer and Malek's racketeering activity with regard to the California-based customer's purchases is yet to be discovered because Defendants concealed much of their conduct from Heritage through the use of private email servers, virtual offices, and the falsification and deletion of corporate records.

### 4.     Resale of Heritage Products to an Arizona-based Customer

67.     As illicit sales to the California-based customer grew, Glazer and Malek identified another opportunity to divert profits away from Heritage to their unlawful enterprise.  On October 22, 2014, Malek received an inquiry on behalf of an Arizona-based company that marketed generic dermatological pharmaceuticals: the company was interested in purchasing large quantities of Doxy DR that could be repackaged under its private label.  The following day, the potential customer proposed to Malek that it would pay Heritage an upfront licensing fee, an initial purchase price for each unit shipped, and an ongoing profit-sharing payment on the resulting Doxy DR sales.

68.     Malek and executives from the Arizona-based company engaged in detailed discussions over the following week.  On October 30, 2014, Malek reached an agreement in principle with the customer that largely reflected their initial proposal, although several details remained unresolved.

69.     Later that day, Malek emailed Glazer the proposed terms.  With a one-word response—"Dorado?"— Glazer asked Malek if the new customer's purchases could be redirected to Dorado Pharma, as they had previously done with the California-based customer.

70.     For the next four months, Malek continued to negotiate with the customer to reach an agreement on the deal's remaining terms.  By January 2015, Glazer was actively involved in the negotiations, as well.  On January 14, 2015, the Arizona-based customer informed Glazer of its intention to request 21,000 bottles of Doxy DR in its first purchase order.  Glazer spoke with Heritage's Associate Director of Commercial Operations to assess whether this quantity would be feasible, but was told that "[w]e are about 2k short of hitting 21k."

71.     In February 2015, Glazer proposed a solution to the shortfall by having the customer agree to accept "short-date" Doxy DR, which Heritage possessed in large volume.  So-called "short-date" pharmaceuticals are those with an expiration date within 12 months, which some customers will not accept for their orders.  As a result, short-dated pharmaceuticals often, but not always, have lower prices to entice customers to buy them.  Glazer reported to Malek in a February 18, 2015 text message that the Arizona-based customer had agreed to accept short-date Doxy DR, although he asked to discuss the details with Malek "off email," apparently to attempt to hide their misconduct.

72.     Glazer and Malek had already considered redirecting the Arizona-based customer's purchases to Dorado Pharma, but the sale of short-dated Doxy DR created an irresistible

opportunity.  Over the following weeks, Glazer and Malek discussed how they could manipulate Heritage's discounted pricing for short-dated products to achieve massive profits for Dorado Pharma.  Multiple text messages in February and March 2015 show that Glazer and Malek ultimately concluded that they could sell Heritage's short-dated Doxy DR to Dorado Pharma "at cost" without attracting undue attention.  Through this arrangement, Glazer and Malek positioned themselves to profit handsomely at the expense of Heritage: Dorado Pharma could purchase Doxy DR from Heritage and immediately sell it to the Arizona-based customer at a 343% markup.

73.     Glazer and Malek turned next to developing a covert process for diverting the customer's orders through Dorado Pharma.  On March 5, 2015, Glazer and Malek discussed via text message how best to structure Dorado Pharma's purchases from Heritage to minimize the possibility of detection.  Malek proposed in the text message exchange that "Dorado places the order at cost and Heritage ships to [the customer]," but Glazer cautioned him that he "[j]ust want[s] to be careful" and suggested that the Doxy DR sales "go [from Heritage] to Dorado [with] no trail to [the customer]" that might expose their scheme to anyone at Heritage.

| Sender | Message Sent Date/Time (UTC-5:00) | Message |
|---|---|---|
| Jeff Glazer | 03/05/2015 12:41:28 PM | So that's an immediate sale at $133 but how do we get it to Dorado? |
| Jeff Glazer | 03/05/2015 12:42:13 PM | We could move it all out on consignment as short date but where would it go for warehouse? |
| Jason Malek | 03/05/2015 12:42:19 PM | same trade.  Dorado places the order at cost and Heritage ships to [the Arizona-based customer]. |
| Jeff Glazer | 03/05/2015 12:43:04 PM | I think it has to go [Heritage] to Dorado no trail to [the Arizona-based customer |
| Jason Malek | 03/05/2015 12:43:24 PM | how? |
| Jeff Glazer | 03/05/2015 12:44:20 PM | Not sure |
| Jeff Glazer | 03/05/2015 12:44:32 PM | Just want to be careful |

| Sender | Message Sent Date/Time (UTC-5:00) | Message |
|---|---|---|
| Jason Malek | 03/05/2015 12:44:32 PM | [The Arizona-based customer] is supposed to pick it up right as per the incoterms?  this way, Heritage never has to ship. |
| Jeff Glazer | 03/05/2015 12:46:37 PM | I think that's right b/c its ex works but how are we placing Dor[ado] in b/w? |
| Jason Malek | 03/05/2015 12:48:48 PM | [The Arizona-based customer] orders from Dorado…Dorado orders from Heritage.  Heritage releases inventory to dorado and [the Arizona-based customer] picks it up.  unless…dorado picks it up and drops off to [the Arizona-based customer]. |
| Jeff Glazer | 03/05/2015 12:55:12 PM | D[orado] should handle shipping and bill [the Arizona-based customer] with the invoice |
| Jason Malek | 03/05/2015 12:55:12 PM | No problem.  we have a Tal account with Freighquote and can set up shipment under that account and invoice from D[orado]. |
| Jeff Glazer | 03/05/2015 12:57:20 PM | I'd have a D[orado] acct separately |
| Jason Malek | 03/05/2015 12:57:20 PM | need to set it up, shouldn't be an issue. |

74.     Glazer and Malek were also careful to disguise the nature of Dorado Pharma's participation from the customer.  On March 4, 2015, the Arizona-based customer and Heritage signed a Term Sheet that permitted Glazer and Malek to sell them Doxy DR via Dorado Pharma without ever mentioning the name; the Term Sheet simply stipulated that the customer "will purchase from Heritage, *or its designated repackager*."

75.     Within days of the Term Sheet being signed, Glazer and Malek informed the Arizona-based customer that Dorado Pharma was the "designated repackager" from which it would purchase Doxy DR.  However, Glazer and Malek concealed their affiliation with Dorado Pharma when communicating with the Arizona-based customer, as evidenced by a text message exchange between Glazer and Malek from March 6-7, 2015.  Shortly after processing the first order from the Arizona-based customer, Glazer and Malek debated whether to send the resulting

Dorado Pharma invoice from their "doradoparma.com" email server or from a Gmail account

they had previously established for Dorado Pharma.  Glazer expressed concern about using the

"doradopharma.com" accounts because "we only set up jay@ and jeff@ which is a little to [sic]

obvious."  Shortly after this exchange, Glazer and Malek established a new

"sales@doradopharma.com" email address to ensure their anonymity.

| Sender | Message Sent Date/Time (UTC-5:00) | Message |
|---|---|---|
| Jeff Glazer | 03/06/2015 07:57:36 PM | Did you send invoice? |
| Jeff Glazer | 03/07/2015 10:06:18 AM | ? |
| Jason Malek | 03/07/2015 10:06:40 AM | No.  It's done.  Who am I sending to?  Can I use a dorado email address? |
| Jeff Glazer | 03/07/2015 10:08:00 AM | I guess it should go to [Arizona-based customer's CEO] and/or [Arizona-based customer's COO] who is listed as CFO |
| Jason Malek | 03/07/2015 10:08:48 AM | Would rather send from a dorado email and not gmail |
| Jason Malek | 03/07/2015 10:08:48 AM | Either one is good |
| Jeff Glazer | 03/07/2015 10:09:18 AM | I don't know if our @doradopharma.com emails are active.  The gmail is doradopharma@gmail.com but that looks weird |
| Jeff Glazer | 03/07/2015 10:10:06 AM | we only set up jay@ and jeff@ which is a little to [sic] obvious |
| Jeff Glazer | 03/07/2015 10:10:20 AM | I can make a sales@ or cs@ email but I have to set it up at godaddy |

76.     Glazer and Malek conducted all of their communications on behalf of Dorado Pharma

with the Arizona-based customer through this new email alias.  For example, on March 10, 2015,

the customer's Chief Operating Officer emailed its federal controlled substances registration

certificate to the "sales@doradopharma.com" email address, which Malek then forwarded to his

Heritage email account.

77.     Once Glazer and Malek had designated Dorado Pharma as the designated repackager for Heritage's sales, Doxy DR orders from the Arizona-based customer began flowing to Dorado Pharma later that month.  Between March and August 2015, Dorado Pharma submitted five purchase orders to Heritage for the exact quantity of Doxy DR sought by the Arizona-based customer.  Based on information currently available to Heritage, the racketeering activities by Glazer and Malek on these purchases diverted more than $1.1 million in profits from Heritage into Defendants' unlawful enterprise.  The profitability of their scheme is confirmed in a July 17, 2015 text message in which Glazer reported to Malek that they made a $280,000 profit that day, which otherwise would have gone to Heritage.

| Sender | Message Sent Date/Time (UTC-5:00) | Message |
|---|---|---|
| Jeff Glazer | 07/17/2015 09:23:57 AM | [The Arizona-based customer's] payment received |
| Jeff Glazer | 07/17/2015 09:25:25 AM | $280K in profit |
| Jason Malek | 07/17/2015 10:02:58 AM | Received to [Heritage]? |
| Jeff Glazer | 07/17/2015 10:03:27 AM | No Dorado |

78.     Malek also endeavored to conceal the racketeering enterprise by leading the Arizona-based customer to believe that Dorado Pharma was an unrelated entity with which Heritage contracted for repackaging.  Shortly after the customer submitted its first order, its Chief Executive Officer emailed Malek to request shipment tracking details.  Malek replied that he "just checked with Dorado," which supposedly told him that the "[s]hipment was dispatched" earlier that day and that Dorado Pharma "will sent [sic] the tracking and packing list for the shipment" the following day.  In the course of this short communication, Malek made at least two significant misrepresentations: first, he claimed to have "checked with Dorado," suggesting

that Dorado Pharma was an unaffiliated third party and, second, when he implied that Dorado

Pharma had coordinated the shipment's logistics when it had, in fact, been handled by Heritage.

### 5.    Racketeering Activities Through Cochran

79.    Dorado Pharma's purchases from Heritage, on behalf of the Arizona-based customer,

grew significantly during 2015 and began to attract attention within Heritage, despite Glazer and

Malek's efforts to conceal their unlawful activities.  For example, Heritage's then-Senior Vice

President of Finance emailed both Glazer and Malek separately in August 2015 to request

information about the unconventional marketing deal with the Arizona-based customer, since he

needed to "make sure we account for the licensing fee, the profit share we receive, and any

inventories properly."  A short time later, Glazer and Malek discussed via text message how to

address this inquiry and ensure their relationship to Dorado Pharma remained concealed.

| Sender | Message Sent Date/Time (UTC-5:00) | Message |
|--------|-----------------------------------|---------|
| Jason Malek | 08/05/2015 12:29:52 PM | yes, will have analysis to review tomorrow.  p.s.  [Heritage's Senior Vice President of Finance] emailed me again asking for [the Arizona-based customer's] backup. |
| Jeff Glazer | 08/05/2015 12:34:38 PM | He already has the agreement - should I just send the report? |
| Jason Malek | 08/05/2015 12:34:08 PM | yes, just need to explain the cogs if he asks. |
| Jeff Glazer | 08/05/2015 12:36:02 PM | So do we say he's buying through a wholesaler - we should set up through Cochrane - or would we have to say its Dorado? |
| Jason Malek | 08/05/2015 12:36:16 PM | Dorado is the wholesaler that brokered the deal and will handle the repack. |
| Jeff Glazer | 08/05/2015 01:20:29 PM | What's ETA of revised sales budget after IA |
| Jeff Glazer | 08/05/2015 01:38:08 PM | Forwarded [Heritage's Senior Vice President of Finance] follow up email - LMK how you'd respond |

80.    Eager to continue their scheme, but concerned that their illicit activities would be

discovered, Glazer and Malek restructured their criminal operations in late 2015 to better conceal

the Dorado Pharma transactions.  In doing so, they expanded their racketeering enterprise to include Cochran, a small wholesaler of generic pharmaceuticals and an existing Heritage customer.  Glazer and Malek planned to have Cochran order the Doxy DR required by the Arizona-based customer from Heritage and then resell it to Dorado Pharma; however, Dorado Pharma would continue to interact directly with the Arizona-based customer.  Glazer summarized the new plan in an August 25, 2015 text message to Malek stating, "Sales need to go to Cochrane or Masters first and then from Dorado to [the Arizona-based customer]."

81.     Glazer and Malek brought two additional co-conspirators, Matthew Edelson and Andre Patton, into their unlawful scheme to facilitate the Doxy DR purchases flowing between Dorado Pharma, Cochran, and Heritage.  Glazer and Malek initially recruited Edelson, who served as a Director of National Accounts at Heritage at the time and was Heritage's designated salesperson for Cochran.  At Glazer and Malek's direction, Edelson then recruited Patton who served as Cochran's Director of Purchasing, a position that allowed him to place the required Doxy DR orders with Heritage.  Edelson had developed a close relationship with Patton stemming from their frequent professional interactions when Patton was previously employed by another Heritage customer, which made Edelson the ideal intermediary to coordinate the straw purchases with Cochran.  In a text message exchange on August 25, 2015, Glazer and Malek discussed the inclusion of their new co-conspirators and the initial efforts to reach out to them.

| Sender | Message Sent Date/Time (UTC-5:00) | Message |
|---|---|---|
| Jeff Glazer | 08/25/2015 09:40:16 PM | Sales need to go to Cochrane or Masters first and then from Dorado to [the Arizona-based customer] – decide who you trust and we'll give them a % |
| Jason Malek | 08/25/2015 09:42:24 PM | Had the conversation with Matt yesterday. |
| Jeff Glazer | 08/25/2015 09:53:04 PM | You should do it direct – we give them a quarterly fee and keep going – how often do you think they'll have that order? |
| Jason Malek | 08/25/2015 09:55:12 PM | Will know in September what post November will look like.  Need to include Matt, I don't want to deal with Andre |
| Jeff Glazer | 08/25/2015 09:57:20 PM | Cleaner if you deal direct |
| Jeff Glazer | 08/25/2015 09:57:20 PM | But we can discuss and decide |

82.     In exchange for their services, Malek and Glazer paid Edelson and Patton bribes for each order they facilitated.  In an October 22, 2015 text message exchange, Malek instructed Edelson that he and Patton would each receive $10,000 per order, with Patton receiving an additional 1% of the total order amount.  Edelson eagerly responded, "That's fucking great!! Thanks homie!" In the same conversation, Malek made it clear to Edelson that, despite the purchases going through Cochran, the enterprise would be controlled by Glazer and Malek—in Malek's words: "[t]his is our show not his."  Edelson wrote back, "I know who's [sic] show it is money."

| Sender | Message Sent Date/Time (UTC-6:00) | Message |
|---|---|---|
| Matthew Edelson | 10/22/2015 04:28:25 PM | I told Dre I would have something for him today brotha. |
| Matthew Edelson | 10/22/2015 04:28:39 PM | Should I let him know tomorrow? |
| Jason Malek | 10/22/2015 04:29:01 PM | This is our show not his, 10k to him and 1% to Cochran.  10k to you |
| Matthew Edelson | 10/22/2015 04:30:21 PM | I know who's [sic] show it is money.  That's fucking great!! Thanks homie! |

83.     Around the time that Cochran joined Glazer and Malek's criminal enterprise, Heritage had depleted its supply of short-dated Doxy DR and, thus, Defendants' short-dated pricing scheme would no longer work.  In order to maximize their own profits, Glazer and Malek needed to continue to minimize Cochran's purchase price from Heritage.  In a text message exchange on October 27, 2015, Glazer and Malek agreed that Heritage would sell the Doxy DR to Cochran at $85.00 per unit after assuring themselves that they "don't think [the price] raises red flags internally" at Heritage.  The agreed-upon sales price to Cochran was a mere fraction of the market price at which Heritage otherwise could have sold its Doxy DR.

| Sender | Message Sent Date/Time (UTC-5:00) | Message |
|---|---|---|
| Jason Malek | 10/27/2015 11:31:57 AM | ok.  which model should we go with? need Cochran to place the order. |
| Jason Malek | 10/27/2015 11:34:24 AM | I think it's fine if we say we have to go to that level because it's for a branded repack project and it adds profitable volume that we never would have. |
| Jeff Glazer | 10/27/2015 11:34:36 AM | I think $85 if you don't think it raises red flags internally |
| Jeff Glazer | 10/27/2015 11:35:39 AM | Plus cost of repack – not sure we'd ever have that conversation but price has been going down.  Let's lock it at $85 and move forward. |
| Jason Malek | 10/27/2015 11:35:53 AM | done |

84.     Within weeks of finalizing the details of their new scheme, Glazer and Malek began to use Cochran to disguise their orders to Heritage for Doxy DR.  The complex structure required the Arizona-based customer to order from Dorado Pharma, which would then direct Cochran to place the order with Heritage.  In essence, Cochran served as a straw buyer to obfuscate Dorado Pharma as the true purchaser of Heritage's Doxy DR.

85.     The new arrangement with Cochran proved successful and lucrative.  Cochran had been among Heritage's smallest customers, never having placed an order for more than a couple

thousand dollars; yet after becoming part of Glazer and Malek's scheme, Cochran began

submitting million-dollar orders.  Cochran placed its first order, at the behest of Glazer and

Malek, in November 2015; at least four additional orders followed through June 2016.  During

this seven-month period, Cochran ordered nearly 4.5 million Doxy DR tablets.  Based on

evidence currently available to Heritage, the purchases from the Arizona-based customer that

Glazer and Malek redirected through Cochran stole more than $2 million in profits from

Heritage.

### IV.   **Element Pharma LLC and VetGen Pharma LLC**

86.     In July 2014, Glazer incorporated Element Pharma LLC, Defendants' third dummy

corporation.  In support of this new component of the enterprise, Glazer commissioned a logo

design, obtained an Employer Identification Number, and applied for a trademark.

87.     Glazer initially used Element Pharma to manufacture and distribute Doxycycline

Hyclate ("Doxy Hyclate"), a product that Heritage was pursuing around the same time.  Just days

after incorporating Element Pharma, Glazer began negotiating with Finoso Pharma to produce

Doxy Hyclate for Element Pharma.  Glazer finalized the production deal in June 2015,

positioning Element Pharma to bring Doxy Hyclate to market in the near future—in direct

competition with Heritage—despite the duties he owed as an officer and director of Heritage.

88.     Additionally, Glazer and Malek incorporated at least one other dummy corporation to

divert potential Heritage business opportunities to their racketeering enterprise.  Heritage has

worked successfully in recent years to expand its presence in the veterinary pharmaceuticals

market.  In April 2015, at the same time that Heritage focused on this market, Glazer formed yet

another company, VetGen Pharma LLC.  VetGen Pharma offered Glazer and Malek a

mechanism for self-dealing in this lucrative market and allowed them to compete directly against

Heritage.  Indeed, Glazer filed a trademark application on behalf of the new company stating that VetGen Pharma intended to offer a "full line of prescription and over the counter veterinary pharmaceuticals."

89.    Glazer and Malek appear to have involved Edelson in their plans for at least one of these additional companies.  Days after Glazer incorporated Defendants' dummy company VetGen Pharma, Edelson cautioned Malek that "there is another company called vetgen. Veterinary Genetic Services."

## V.    Theft of Heritage Property

90.    Glazer and Malek embezzled real and intellectual property from Heritage that had been entrusted to them in their roles as officers of the Company.

91.    Glazer and Malek embezzled Heritage's most sensitive and valuable intellectual property—its portfolio of ANDAs containing the trade secrets upon which its entire business is founded.  Each ANDA details the highly technical manufacturing processes and specifications required to produce the pharmaceutical.  The ANDAs collectively reflect tens of millions of dollars that Heritage has invested in acquiring intellectual property or developing its own manufacturing processes.  As such, if a competitor were to obtain Heritage's ANDAs, they would avoid the need to make a similar investment and could proceed with filing for their own ANDA on an expedited timeline.

92.    In his text message communications with Malek, Glazer admitted to accessing Heritage's computer system to copy Heritage's ANDAs and to keeping electronic copies of the ANDAs at his personal residence.  Specifically, on August 24, 2015, Glazer texted Malek saying, "I basically have every original ANDA on CD at my house but need to get some of the new ones."  This statement is particularly concerning in the context of their overall discussion,

-41-

which focused on "getting [the] fuck out of [Heritage]" and leveraging their unlawful enterprise to compete directly against Heritage in the future.  Glazer had other conversations around this same time that also reflect his efforts to ensure Defendants' criminal schemes would endure even after they departed from Heritage.  For example, in a text message on July 4, 2015, Glazer negotiated the sale of Heritage's Hydroxyzine ANDA at a below-market price in exchange for "a profit share . . . so I have a basis when I'm done at Heritage."

93.     Heritage's concerns about the use of its stolen intellectual property are heightened by Glazer's incorporation of Astor Pharma LLC in September 2016, following his termination by Heritage.  Based on information and belief, Glazer is presently contacting manufacturers and suppliers within the generic pharmaceutical industry about partnering with Astor Pharma in order to capitalize on the intellectual property he embezzled from Heritage.  Heritage has repeatedly demanded that Glazer return all copies of the intellectual property that he stole, yet he has refused.

94.     Shortly after his termination from Heritage, Glazer also embezzled more than six million Membership Rewards points from the Company's American Express account.  As the primary cardholder for Heritage's account, Glazer had sole access to these points and the ability to transfer or redeem them at his sole discretion.  Based on information and belief, Glazer has converted these Membership Rewards points accrued by the Company, with an estimated value of $60,000, for his own personal benefit.

95.     Since being terminated by Heritage, Glazer and Malek have also refused Heritage's repeated demands that they return any other Company property in their possession, including phones, tablets, and laptop computers.  Glazer, for instance, received multiple Apple devices from Heritage, including an iPhone 5, iPhone 6, iPhone 6s, iPhone 6 Plus, and iPad Air.  Glazer

still possesses at least some of these Company devices.  Similarly, Malek received—but now refuses to return—an array of Apple devices during his employment, including an iPhone 3GS, iPhone 4, iPhone 5, iPhone 5S, iPhone 6, iPad Mini, iPad Pro, MacBook Pro (13"), and MacBook Air.  Based on information and belief, Plaintiff alleges that Glazer and Malek are avoiding the return of this Company property because the devices contain further evidence of their racketeering and other unlawful conduct against Heritage.

## VI.  Concealment from Heritage's Employees, Directors, and Customers

96.     Glazer and Malek facilitated their years-long racketeering scheme by deceiving and misrepresenting their activities to Heritage's employees, directors, and customers.  The extensive measures that Glazer and Malek employed to conceal their conduct reflect their awareness that their conduct was unlawful and a flagrant disregard of the duties they owed to Heritage.

### 1.     Falsifying Internal Heritage Reports

97.     Glazer and Malek attempted to conceal their racketeering activities by directing Heritage employees to remove references to Dorado Pharma from various Heritage reports and records.  For instance, on August 6, 2014, Malek directed Heritage's Associate Director of Pricing and Contracts to remove lines denoting Malek's sales to Dorado from a Heritage sales report.  Similarly, on November 30, 2015, Heritage's Director of Pricing and Contracts told his subordinate that Malek had instructed them to remove lines from Heritage's direct sales report related to Doxy DR sales by Dorado Pharma and Cochran.



98.     On July 13, 2016, Glazer asked Heritage's Director of Pricing and Contracts to prepare a report showing Heritage's historical sales by product, month, and customer between 2011 and 2015.  On July 18, 2016, Heritage's Director of Pricing and Contracts provided the requested document.  A few hours later, Heritage's Director of Pricing and Contracts sent Glazer a second version of the report, at Glazer's direction, that included sales numbers that specifically excluded sales to Dorado Pharma and Cochran.

### 2.     Renting Separate Office Space

99.     Glazer and Malek signed an agreement in August 2010, on behalf of Tal Pharma, for a "virtual" office space at 12 Christopher Way, Suite 200, in Eatontown, NJ.  Glazer and Malek used the address associated with this virtual office space for all correspondence related to Tal Pharma, in an effort to conceal their association with the company.  In March 2013, Defendants secured an additional "virtual" office for Dorado Pharma at 4400 Route 9 South, Suite 1000, in Freehold, NJ—a short distance from Glazer's residence.

100.    In October 2013, Heritage moved its headquarters into the same building as the "virtual" Tal Pharma office used by Glazer and Malek, just one floor above.  Co-locating Heritage and Tal Pharma in the same building caused considerable confusion.  In fact, mail addressed to Tal Pharma was often delivered to Heritage's office by mistake, which increased Glazer and Malek's anxiety about detection.  For example, on November 24, 2015, Glazer texted Malek: "Fucking mailman keeps bringing Tal [mail] to [Heritage]."  Malek replied immediately that he would "grab it" to avoid detection and then went downstairs to Suite 200 to check the mail for Tal Pharma.  Malek then asked Glazer whether they were going to begin using the "virtual" office space in Freehold, New Jersey, for both Tal Pharma and Dorado Pharma, but Glazer explained the importance of waiting to change the address until both companies' state business licenses were renewed.

| Sender | Message Sent Date/Time (UTC-5:00) | Message |
|---|---|---|
| Jeff Glazer | 11/24/2015 03:10:50 PM | Can you check my mail to make sure there is nothing from Main Office Suites in it? |
| Jeff Glazer | 11/24/2015 03:11:08 PM | Fucking mailman keeps bringing Tal to us – our NJ wholesaler license was mailed. |
| Jason Malek | 11/24/2015 03:11:22 PM | I'll grab it |
| Jason Malek | 11/24/2015 03:11:31 PM | Aren't we moving to freehold |
| Jeff Glazer | 11/24/2015 03:28:48 PM | Didn't want to switch until after license renewal – let me know if anything is there |

### 3.    Misrepresentations to Heritage's Employees and Vendors

101.    Glazer and Malek repeatedly lied to and deceived Heritage's employees to facilitate their racketeering scheme.  Indeed, these misrepresentations were critical to the conspiracy and allowed their unlawful enterprise to operate without detection.

102.    For instance, on February 21, 2013, Malek emailed a Heritage customer service representative to alert her that Dorado Pharma was "a new customer for . . . Nimodipine" and attached a purchase order from Dorado Pharma.  This order was, in fact, the initial shipment in a multi-year scheme to divert Heritage's orders from a California-based customer through an unlawful enterprise operated by Glazer and Malek.

103.    Heritage's customer service team regularly communicates with Heritage's customers about the routine details of their transactions.  In order to hide its true nature, when Heritage employees needed to interact with Dorado Pharma, Malek told them to email a fictitious Dorado Pharma employee named "Judy Jones" at sales@doradopharma.com.  In fact, Malek managed this email account on the "doradopharma.com" server and adopted Judy Jones as a fraudulent alter ego for these interactions.  Malek engaged in fraudulent email correspondence on several occasions with his Heritage subordinates under the guise of "Judy Jones" from Dorado Pharma.

**From:** sales@doradopharma.com [mailto:sales@doradopharma.com]
**Sent:** Thursday, July 23, 2015 10:53 AM
**To:** ▮▮▮▮▮▮
**Subject:** RE: FW: Send data from MFP07404798 07/22/2015 17:07

Good morning ▮▮▮▮▮,

Thank you for the information and for sending along your contact information.

Can you also forward the COA's for the products?

Warm Regards,

Judy
--------- Original Message ---------
Subject: FW: Send data from MFP07404798 07/22/2015 17:07
From: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Date: 7/22/15 2:17 pm
To: "sales@doradopharma.com" <sales@doradopharma.com>

Hello Ms. Jones,

I hope this email find you having a good day. My name is ▮▮▮▮▮▮ and I handle the Logistics here are Heritage Pharmaceuticals. I wanted to let you know that the product that Heritage has packaged for you has shipped from Aphena and is on the way to the warehouse. Expected ETA will be Monday or Tuesday. Attached is the packing slip and the BOL for your reference. I have been in touch with your receiving team at the warehouse and they are expecting the shipment. I will notify you when the shipment arrives.

Please do not hesitate to let me know if you have any further questions. All of my contact information is below.

Thank you ,

▮▮▮▮▮▮
Manager, Global Logistics

104.    The Heritage employee who exchanged emails with "Judy Jones" even copied Malek on her response to the request from Dorado Pharma in order to keep him informed.

| | |
|---|---|
| **From:** | ▮▮▮▮▮ (/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ECDDD6766F8947E3BF15B13E4B0C13CE-▮▮▮▮▮) |
| **To:** | sales@doradopharma.com |
| **CC:** | Jason Malek |
| **BCC:** | |
| **Subject:** | RE: FW: Send data from MFP07404798 07/22/2015 17:07 |
| **Sent:** | 07/23/2015 03:18:35 PM -0400 (EDT) |
| **Attachments:** | GSMS COA 7 23 15.pdf; |

Hello Judy,

As promised , attached are the COA that you requested. I will advise you once the order has arrived at your warehouse.

Please let me know if you need anything else or have any further questions.

Have a good afternoon.

Best ,

Manager, Global Logistics
HERITAGE PHARMACEUTICALS INC.
12 Christopher Way, Suite 300 • Eatontown, NJ 07724

Email: ▮▮▮▮▮ @heritagepharma.com

**Heritage**

105.    Malek also used the Judy Jones moniker for correspondence with Dorado Pharma's shipping vendor Globaltranz.  Malek listed "Judy Jones" as the relevant contact person when filling out a Globaltranz credit application form.  Malek then signed his own name under the form's warranty clause, thereby falsely swearing that all information it contained was true.

106.    Glazer and Malek also occasionally faced probing questions from Heritage employees that they diffused by asserting their positions of authority within the Company.  For example, Heritage's then-Senior Vice President of Finance emailed Malek in August 2015 asking for "a little background on this [Doxy DR] deal" with the Arizona-based customer because he needed to "make sure we account for the licensing fee, the profit share we receive, and any inventories properly."  Unsure how to respond, Malek texted Glazer that the Senior Vice President "emailed me again asking for . . . backup."  Glazer was also initially unsure how to proceed, asking Malek "do we say he's buying through a wholesaler - we should set up through Cochrane - or would we have to say its Dorado?"  Malek suggested that they explain that "Dorado is the wholesaler that

brokered the deal and will handle the repack."  Compounding the problem, at about the same time, the Senior Vice President also emailed Glazer, asking for "help [to] clarify the arrangement that we have with [the Arizona-based customer] . . . [because] I'm not sure of the path followed for the 6,287 units [of Doxy DR] sold by [the customer]."  Ultimately, Glazer decided against mentioning either Cochran or Dorado Pharma, instead telling the Senior Vice President that "[the customer] buys from wholesale (not Heritage)."

107.    Further, Glazer and Malek referred to Dorado Pharma as a discrete business entity in discussions with Heritage employees.  In May 2012, when Glazer was arranging for the transfer of Heritage's Ketoprofen ANDA to Dorado Pharma, he emailed Heritage's Associate Director of Regulatory Affairs, saying, "We are transferring Ketoprofen to a different entity . . . named Dorado Pharma LLC," and requested that she draft a transfer of ownership form.  Neither Glazer nor Malek ever disclosed that they jointly controlled Dorado Pharma, nor did they explain that Heritage was not receiving any compensation for its ANDA.

108.    Despite their successful efforts to conceal their racketeering activities, Glazer and Malek remained ever vigilant about the risk of being caught.  For instance, in September 2015, Malek texted Glazer to remind him that Dorado Pharma should pay Heritage for shipping products to one of Dorado Pharma's customers; Glazer responded, "Won't that set off alarms?"

109.    Glazer and Malek also chose to avoid certain actions in connection with Dorado Pharma for fear of detection.  For example, in August 2015, Malek asked Glazer why Dorado Pharma was not submitting an ANDA for Tetracycline Acid to challenge Heritage's position as the sole provider of the product.  Glazer replied that they could "probably get the complete ANDA electronically," indicating their unrestricted ability and willingness to steal Heritage's intellectual property whenever necessary.  However, Glazer cautioned that, "it would be risky to

do a submission prior to getting [the] fuck out of here."  Malek replied, "true."  Not only does

this exchange reflect an acknowledgment of their wrongdoing in connection with Dorado

Pharma, it also foretells their ultimate intention to steal Heritage's intellectual property, leave the

Company, and inflict long-term harm on its business interests.

| Sender | Message Sent Date/Time (UTC-6:00) | Message |
|---|---|---|
| Jason Malek | 08/24/2015 11:21:23 AM | why are we not submitting a tetracycline anda for dorado? |
| Jeff Glazer | 08/24/2015 11:23:22 AM | And you think I'm nuts lol |
| | . . . | |
| Jeff Glazer | 08/24/2015 11:27:10 AM | We can probably get the complete ANDA electronically but it would be risky to do a submission prior to getting to fuck out of here |
| Jason Malek | 08/24/2015 11:27:39 AM | true. |

### 4.    Domain Names and Private Email Servers

110.    Glazer and Malek created Gmail accounts, through Google's email service, for at

least four of their dummy companies: talpharmallc@gmail.com, doradopharma@gmail.com,

elementpharmallc@gmail.com, and vetgenpharma@gmail.com.  In order to appear more

credible, Glazer anonymously purchased domain names associated with each of the dummy

corporations at the time of their respective incorporations.  Glazer and Malek then created and

maintained separate email servers associated with the specific domain names for Tal Pharma and

Dorado Pharma, which provided the ability to create several email aliases, such as

sales@doradopharma.com.  Defendants regularly used these email accounts to hide their

affiliation with the dummy companies and to conceal communications related to their

racketeering enterprise from Heritage, as reflected in a July 2015 text from Glazer to Malek.

| Sender | Message Sent Date/Time (UTC-4:00) | Message |
|---|---|---|
| Jeff Glazer | 07/18/2015 09:46:31 AM | Can you email me to jeff@talpharma all of the Dorado invoices sent to [the Arizona-based customer] – first one was March |

111.     In a reflection of the impunity with which they operated their scheme, both Glazer and Malek continued to sporadically use their Heritage email accounts for Tal Pharma- and Dorado Pharma-related business.  This crossover occasionally caused concern that their activities would be detected by others at Heritage.  For example, on March 21, 2011, Malek accidentally attached a Tal Pharma financial document to an email he sent to Glazer on his Heritage email account, to which Glazer responded, "You attached TAL Accrual Summary – be careful." Malek replied, "Saw that after the fact…my bad."

112.     In addition, in 2014, Glazer and Malek deleted Tal Pharma's website after realizing that it displayed the company's corporate address, which was located in the same building as Heritage in Eatontown.  Glazer and Malek recognized the potential for others to associate them with Tal Pharma based on this connection.  On July 1, 2014, Malek texted Glazer saying, "Need to take down the TAL pharma website.  It shows this as our address."

| Sender | Message Sent Date/Time (UTC-5:00) | Message |
|---|---|---|
| Jason Malek | 07/01/2015 08:05:20 AM | Need to take down the TAL pharma website.  It shows this as our address p |

### 5.     Use of Separate Bank Accounts

113.     Glazer and Malek maintained separate bank accounts for at least two of their dummy corporations, with Tal Pharma holding checking and savings accounts at Bank of America, since at least January 2010, and Dorado Pharma holding a checking account at JPMorgan Chase Bank, since at least June 2012.  Defendants also maintained debit cards connected to the checking

account for each company, which they used to pay various business expenses.  All of these accounts initially used Glazer's home address in Marlboro, New Jersey, as their mailing address, although the Tal Pharma statements were later redirected to Glazer and Malek's "virtual" office space in Eatontown, New Jersey.




114.    Glazer and Malek used these bank accounts to conduct financial transactions in furtherance of their criminal enterprise.  Bank records for the Tal Pharma and Dorado Pharma bank accounts show check deposits and incoming wire transfers reflecting the proceeds of the business dealings Glazer and Malek misappropriated from Heritage.  For instance, the first deposit in the Dorado Pharma checking account is a $50,000 incoming wire transfer on June 27, 2012, from KLE2 Pharmaceuticals in conjunction with its agreement to purchase Ketoprofen from Dorado Pharma.

| | DEPOSITS AND ADDITIONS | |
|---|---|---|
| DATE | DESCRIPTION | AMOUNT |
| 06/27 | Fed Wire Credit Via: First Republic Bank, A Bank IN/321081669 B/O: Kle 2 Inc Los Angeles,CA 90034- Ref: Chase Nyc/Ctr/Bnf=Dorado Pharma Llc Marlboro NJ 077462148/Ac-000000004750 Rfb=O/B Fst Rep Bk S Obi=Ref: Kle 2 Dorado Payment Bbi=/Time/Imad: 0627L1B78H1C001680 Trn: 5842009179Ff | $50,000.00 |
| 06/27 | Deposit    1037116592 | 100.00 |
| **Total Deposits and Additions** | | **$50,100.00** |

115.    The bank accounts were also frequently used to pay for other products and services rendered to their criminal enterprise, such as the virtual office space leased by the various

dummy corporations, legal bills, state corporation filing fees, freight services, financial services consultants, accounting fees, collection agency services, and business formation specialists they consulted each time they created a new entity.  Further, Glazer and Malek sent payments to Heritage from the Dorado Pharma checking account to pay for the Heritage products they purchased at below-market prices and resold to Heritage's own customers.  For example, Dorado Pharma sent a $221,103.95 wire transfer to Heritage on October 28, 2015 to pay an outstanding invoice for a sizable Doxy DR order.



116.    Defendants also used the dummy companies' bank accounts to distribute their respective shares of the profits from their criminal scheme to their personal bank accounts.  In March 2013, for instance, they distributed $90,000 to each of their personal bank accounts from the Dorado Pharma account.

**ELECTRONIC WITHDRAWALS**

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 03/28 | 03/28 Chips Debit Via: Bank of America, N.A./0959 A/C: Jeffery Glazer Ssn: ▮▮▮▮ Trn: 4111000087Es | $90,000.00 |
| 03/28 | 03/28 Chips Debit Via: Bank of America, N.A./0959 A/C: Jason Malek Ssn: ▮▮▮▮ Trn: 4107300087Es | 90,000.00 |
| **Total Electronic Withdrawals** | | **$180,000.00** |

Similarly, in May 2010, they transferred $50,000 to the personal account of Malek's father to

repay money he loaned them during the initial stages of Tal Pharma's formation.

| | Withdrawals and Debits | | |
|---|---|---|---|
| | **Other Debits** | | |
| Date Posted | Amount ($) | Description | Bank Reference |
| 05/27 | 50,000.00 | Wire Type:Book Out Date:100527 Time:1014 Et Trn:2010052700150096 Related Ref:01100527000680Nn Bnf:Jeffrey A Glazer OR ID:▮▮▮▮ | 903705270150096 |
| 05/27 | 50,000.00 | Wire Type:Book Out Date:100527 Time:1027 Et Trn:2010052700155584 Related Ref:01100527000844Nn Bnf:MLPF&S - Wire Account ID:6550113516 Pmt Det:Fo R Final Credit To George Malek Acct ▮▮▮▮ | 903705270155584 |
| 05/27 | 25.00 | Wire Transfer Fee | 903705270149210 |
| 05/27 | 25.00 | Wire Transfer Fee | 903705270149113 |

117.    The bank statements for these accounts offer a small glimpse into the staggering

profits Glazer and Malek realized from the business they conducted through Tal Pharma and

Dorado Pharma.  By February 2011, for example, less than two years after its incorporation, Tal

Pharma's checking account balance had already exceeded $1 million.

| | Daily Ledger Balances | | | | |
|---|---|---|---|---|---|
| Date | Balance ($) | Date | Balance ($) | Date | Balance ($) |
| 02/01 | 1,303,199.69 | 02/16 | 1,139,968.84 | 02/28 | 1,145,034.38 |
| 02/11 | 985,085.84 | 02/23 | 1,146,503.38 | | |
| 02/14 | 1,140,038.84 | 02/25 | 1,146,384.38 | | |

In total, Glazer and Malek deposited over $3 million into the Tal Pharma and Dorado Pharma

bank accounts between January 2010 and December 2014.

118.    The use of separate bank accounts for the various dummy companies allowed Glazer and Malek to conceal their affiliation with the racketeering activities of their criminal enterprise. As a result, the customers interacting with their criminal enterprise never realized they were transacting directly with Glazer and Malek.  Similarly, the Heritage employees processing the incoming payments from Dorado Pharma were precluded from knowing that Heritage's own executives were actually submitting the payments.  Without the anonymity granted by the dummy companies' bank accounts, Glazer and Malek's criminal activity would likely have been uncovered years earlier.

### 6.    Document Deletion

119.    Glazer and Malek took steps over the last 18 months to delete documents from Heritage computers and devices related to their involvement with Tal Pharma and Dorado Pharma.

120.    Glazer and Malek deleted all text messages from their Heritage iPhones that were sent or received before December 9, 2015, and significant portions of the text messages that followed.  Some of these text messages have been recovered, yet many remain lost.  As expected, many of the deleted texts that have been recovered pertain directly to Defendants' operation of Tal Pharma and Dorado Pharma.

121.    Heritage has also determined that Glazer deleted hundreds of documents from Heritage's server and that he scrubbed his desktop computer the night before his termination by emptying his "Recycle Bin" and deleting his browser bookmarks and Internet history.  An initial analysis suggests that at least some of these documents pertained to Tal Pharma and Dorado Pharma.

122.     Similarly, after Heritage terminated Malek's employment on August 24, 2016, Heritage engaged a technical team and imaged Malek's company laptop.  The imaging included Malek's "Recycling Bin," in which Heritage discovered several deleted documents regarding Tal and Dorado Pharma business, including Malek's personal K-1 filings as a partner at Tal Pharma and Dorado Pharma.

## VII.  Indicia of Additional Racketeering Activity

123.     As reflected above, Heritage has amassed voluminous evidence related to the criminal enterprise that Glazer and Malek controlled and managed during and after their employment with Heritage.  This evidence clearly demonstrates that Glazer and Malek, along with their co-conspirators, engaged in numerous criminal schemes that stole millions of dollars of profits and property from Heritage.

124.     The evidence also suggests that Defendants likely engaged in other criminal schemes that Heritage has yet to uncover. For example, Glazer purchased at least 28 additional domain names for potential pharmaceutical companies while employed at Heritage, including Athena Pharma, Berkley Pharma, Fortress Pharma, and Valhalla Pharma.  Any of these domain names may be associated with an operational corporate entity that participated in Defendants' criminal enterprise, but which has not yet been discovered by Heritage.

125.     Glazer and Malek also entered a manufacturing agreement to launch a second product, Isoxsuprine HCl, through Tal Pharma in November 2010.  Glazer and Malek relied on Heritage's sales team to gather usage and pricing information about the product from Heritage's customers, in order to assess its profitability and volume.  Defendants' efforts to market Isoxsuprine HCl appear to have reached advanced stages, as illustrated by the production of Tal

Pharma labels for the product, and sales of the product may have occurred shortly after sales began for Tal Pharma's first product, EEMT.



126.    Glazer and Malek discussed numerous additional schemes that could also be undertaken through their criminal enterprise.  For example, Glazer and Malek exchanged text messages in May 2015 about the possibility of reselling Heritage's Metronidazole through Tal Pharma to one of Heritage's customers.

| Sender | Message Sent Date/Time (UTC-4:00) | Message |
|---|---|---|
| Jeff Glazer | 05/14/2015 03:56:54 PM | Need to load metro with Altro through TAL/MHC – let's make Denny an offer and run the model at cost out to Masters for repack to MHC |
| Jason Malek | 05/14/2015 04:12:45 PM | Need to chat on it. |

127.    In another text message exchange with Malek during July 2015, Glazer expressed his intention to purchase an ANDA for Desipramine—an opportunity he owed to Heritage as a director and officer of the Company.  Glazer sent a profit-loss analysis of the proposed deal to Malek's personal email address and explained that Defendants would be able to sell the product to one of Heritage's largest customers "without a sales team."  Glazer concluded that with the new ANDA purchase, combined with their other criminal schemes, they were "in the game."

| Sender | Message Sent Date/Time (UTC-4:00) | Message |
|--------|-----------------------------------|---------|
| Jeff Glazer | 07/17/2015 02:51:13 PM | Desipramine from Indicus got a TAD of Jan. '16 - he only wants $300K for it |
| Jason Malek | 07/17/2015 02:59:00 PM | That may be a good call spending on cogs estimate |
| Jeff Glazer | 07/17/2015 02:59:59 PM | I'm buying it - I have a PL done what email do you want me to send it to?  We can sell direct to [one of Heritage's largest customers] only without a sales team |
| Jason Malek | 07/17/2015 03:03:28 PM | Jason.malek@me.com |
| Jason Malek | 07/17/2015 03:03:28 PM | Only 1 real API SUPPLER |
| Jason Malek | 07/17/2015 03:29:04 PM | Time for the call |
| Jeff Glazer | 07/17/2015 04:19:45 PM | Sent the PL |
| Jason Malek | 07/17/2015 04:51:32 PM | Just saw it |
| Jeff Glazer | 07/17/2015 04:54:30 PM | Bolt on that and Hydroxy licensing with Keto pending and Doxy DR we in the game |
| Jason Malek | 07/17/2015 05:07:12 PM | Yes sir.  Keep in mind working capital, coupled with payment terms and advanced profit sharing. |
| Jeff Glazer | 07/17/2015 05:09:20 PM | Well just make all the terms so we are always net cash positive |

128.     Glazer and Malek also discussed via text message a potential opportunity to sell

Achromycin through Dorado Pharma in March 2015.  Glazer and Malek evidently secured a

supply of the product and were sufficiently advanced in the process to design packaging labels.

The communication also reflects Glazer and Malek's ongoing efforts to conceal their criminal

scheme, here by using a printer for the packaging labels that was "outside our network."

| Sender | Message Sent Date/Time (UTC-4:00) | Message |
|--------|-----------------------------------|---------|
| Jeff Glazer | 03/07/2015 10:50:41 AM | We also need to get ACHROMYCIN labels drafted outside our network - i have all the information from Crown Labs and we should also make him pay in advance to repack - he needs 500 of each to start and we need to set a reasonable transfer price plus outbound pricing to Dorado?? |

## CLAIMS FOR RELIEF

## COUNT I

### (Federal Civil RICO, 18 U.S.C. § 1962(c))

(Against All Defendants)

129.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

130.    Defendants violated the federal Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), by conducting the affairs of a criminal enterprise through a pattern of racketeering activity to the injury of Heritage's business and property.

131.    At all relevant times, Plaintiff was a person, as that term is defined in 18 U.S.C. §§ 1961(3) and 1964(c).

132.    At all relevant times, each Defendant was a person, as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c).

133.    Defendants Glazer and Malek and their co-conspirators are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Complaint; namely, to defraud and steal from Heritage.  Since the incorporation of Tal Pharma in 2009, there has been a continuous association-in-fact among Glazer, Malek, and the evolving cast of corporate entities that they created from 2009 through the present.  Defendants established these corporate entities (including Tal Pharma LLC; Dorado Pharma LLC; Element Pharma LLC; VetGen Pharma LLC; and Astor Pharma LLC) for the purpose of defrauding and stealing from Heritage.  In approximately 2015, Defendants expanded their criminal association to include co-conspirators Edelson and Patton.  Defendants' criminal enterprise remains active today and continues to

inflict harm on Heritage through its numerous forms of racketeering activity.  This association-in-fact is an enterprise within the meaning of RICO, 18 U.S.C. § 1961(4).

134.    At all relevant times, the enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).  The enterprise sold generic pharmaceutical products to customers throughout the United States.

135.    At all relevant times, Defendants have been associated with and central to the operation of their enterprise.  Because they operated and managed the enterprise, they were integral to its success.  While the criminal enterprise has grown over time and its members may have performed different roles at different points in time, the criminal enterprise has generally been structured to operate as a unit to accomplish the goals of Glazer and Malek's criminal scheme.  Glazer has acted as the head of the enterprise, responsible for the formation of each new corporate entity and high-level business negotiations, such as ANDA acquisitions.  Malek has acted to lead the enterprise's day-to-day operations and logistics, including the submission and processing of Dorado Pharma's orders through Heritage.  Defendants planned and directed the enterprise's undertakings, personally implemented the enterprise's criminal schemes, and expanded the enterprise's membership through both the creation of additional corporate entities to achieve the enterprise's illegal purposes and the enlistment of additional co-conspirators such as Edelson and Patton to better conceal Defendants' own involvement.  Defendants have directly participated in the affairs of the enterprise, and at all times they have done so willfully and purposely.

**Pattern of Racketeering Activity:  Multiple Instances of Mail Fraud and Wire Fraud in Violation of 18 U.S.C. §§ 1341, 1343, 1346**

136.    Defendants conducted and participated, directly or indirectly, in the conduct, management, or operation of the enterprise's affairs through repeated acts of racketeering

activity amounting to a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5).

137.    "Racketeering activity" is defined in 18 U.S.C. § 1961(1) to include, among other crimes, violations of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).  Anyone "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" is prohibited from making use of "mail" (including interstate shipments through public and private mail carriers) or "the wires" "for the purpose of executing such scheme or artifice or attempting so to do" under 18 U.S.C. §§ 1341 and 1343, respectively. "For purposes of this chapter, the term 'scheme or artifice to defraud' includes[, but is not limited to,] a scheme or artifice to deprive another of the intangible right of honest services."  18 U.S.C. § 1346.

### *Multiple Instances of Wire Fraud*

138.    Glazer and Malek relied upon and utilized electronic communications to plan and execute their schemes to divert Heritage business and property to their enterprise through deception and misrepresentation.  Indeed, notwithstanding Defendants' attempts to hide their unlawful activities by destroying emails and text messages, Plaintiff has already uncovered hundreds of examples of electronic transmissions made by Defendants in furtherance of their racketeering activity.  Examples of these transmissions are detailed in Appendix A, attached hereto.

139.    Glazer and Malek regularly used text messages (communicating between iPhones and other Apple devices connected to the internet or cellular signals) in furtherance of their racketeering activity.  For example, in March 2015, as Glazer and Malek developed their plan to defraud Heritage of profits from sales to a customer based in Arizona by inserting Defendants'

dummy company Dorado Pharma as an intermediary in the transaction, their scheme developed in part by text message.  On March 5, 2015, Glazer sent a text message proposing the structure of the fraudulent transaction to Malek: "[Customer in Arizona] orders from Dorado...Dorado orders from Heritage.  Heritage releases inventory to dorado and [Customer in Arizona] picks it up. unless... dorado picks it up and drops off to [Customer in Arizona]."  Two days earlier, Glazer also used the wires in furtherance of Defendants' scheme to defraud Heritage, writing, "No problem.  we have a Tal account with Freighquote [sic] and can set up shipment under that account and invoice from D."  These are but two examples among many demonstrating Defendants' use of text messaging to further their illegal schemes.

140.    Communication by email was also essential to the execution of Defendants' criminal plans, such as those involving Dorado Pharma's transactions with Heritage on behalf of two customers in Arizona and California.  Such communication ranged from Malek's submission of Dorado Pharma orders by email to his email correspondence with Heritage employees such as the fictitious Dorado Pharma employee Judy Jones in order to further the Dorado ruse.

141.    Defendants also made extensive use of the internet in furthering their schemes.  In addition to establishing Tal Pharma and Dorado Pharma websites, as alleged above, Glazer and Malek used internet-based platforms to submit documents to the Government in furtherance of their illegal conduct.  For example, the transfer-of-ownership letters transferring the Ketoprofen ANDA from Heritage to Dorado Pharma (without compensation) and the Hydroxyzine ANDA from Heritage to ECI as part of a deal involving a kickback to Tal Pharma were both submitted to the FDA online, either by Defendants personally or by their regulatory agents at Defendants' direction.

142.    In furtherance of this scheme, Glazer and Malek utilized the wires to pay and receive what amounted to numerous bribes and kickbacks, in the process depriving Heritage of its intangible right of honest services.

143.    In all instances, Defendants acted with knowledge and fraudulent intent.

144.    In committing these acts, Defendants committed wire fraud in violation of 18 U.S.C. § 1343, and their acts amount to racketeering activity under 18 U.S.C. § 1961(1).

### *Multiple Instances of Mail Fraud*

145.    Though less dependent on mail than electronic communications, Defendants also made extensive use of interstate mail by sending mail, receiving mail, and causing mail to be sent.  These mailings were made or caused intentionally and in furtherance of Defendants' scheme to defraud Heritage of its rightful profits as well as its intangible right of honest services. Examples of these transmissions by mail are detailed in Appendix A, attached hereto. This conduct amounts to mail fraud in violation of 18 U.S.C. § 1341 and therefore also constitutes additional instances of racketeering activity as defined under 18 U.S.C. § 1961(1).

146.    Defendants' scheme to resell Heritage products through Dorado Pharma and Cochran reflects repeated use of the mail in furtherance of their racketeering activities.  For instance, Cochran is a small pharmaceutical wholesaler that paid for its Heritage orders by sending handwritten checks by mail.  Glazer and Malek therefore caused Cochran to mail payments to Heritage when they bribed a Cochran employee to purchase products from Heritage on Dorado Pharma's behalf.  Cochran's payment of the invoice resulting from the straw purchase was an essential element of the overall scheme.

147.    Plaintiff is aware of at least two instances when Cochran mailed checks related to and in furtherance of the scheme to resell Heritage products through Dorado Pharma.  Specifically,

on January 21, 2016, Cochran sent Heritage a check, by interstate mail, for $890,970.00 (check #3553) for invoice FF13986 (10,490 units of Doxy DR, which were resold to Heritage's Arizona-based customer on behalf of Dorado Pharma).  The envelope containing this check was post-marked "N.  Metro GA…21 Jan '16" and mailed to "Heritage Pharmaceuticals" at an address in Chicago, Illinois.  It was received at some point on or before January 26, 2016.

148.    Similarly, on April 29, 2016, Defendants caused Cochran to send Heritage a check, by interstate mail, for $850,000.00 (check #3843) for invoice 19803 (10,000 units of Doxy DR, which were also resold to Heritage's Arizona-based customer on behalf of Dorado Pharma).  The postmarked envelope containing this check was addressed to "Heritage Pharmaceuticals" at the same Chicago address, and it was received there on or before May 3, 2016.

149.    Defendants caused the mailing of these payments, which made possible the fraudulent transfer of Heritage products to a Heritage customer through Cochran, on behalf of Dorado Pharma, and to the benefit of Defendants and their co-conspirators.  These clear instances of mail fraud constitute further instances of racketeering conduct under 18 U.S.C. § 1961(1).

**Pattern of Racketeering Activity: Multiple Instances of Commercial Bribery, N.J. Stat. Ann. § 2C:21-10**

150.    Racketeering activity is defined in 18 U.S.C. § 1961(1) to include "any act or threat involving . . . bribery, [etc.], which is chargeable under State law and punishable by imprisonment for more than one year."

151.    Defendants have committed multiple acts of bribery in violation of the New Jersey commercial bribery statute, N.J. Stat. Ann. § 2C:21-10.  These offenses are punishable by imprisonment for more than one year and therefore amount to "racketeering activity" under 18 U.S.C. § 1961(1)(A).

152.     N.J. Stat. Ann. § 2C:21-10(a) establishes that "[a] person commits a crime if he solicits, accepts or agrees to accept any benefit as consideration for knowingly violating or agreeing to violate a duty of fidelity to which he is subject as: (1) An agent, partner or employee of another . . . ."  Subsection (c) further establishes that "[a] person commits a crime if he confers, or offers or agrees to confer, any benefit the acceptance of which would be criminal under this section."  N.J. Stat. Ann. § 2C:21-10(c).

153.     Defendants engaged in commercial bribery as defined by statute by paying to and receiving from each other what amounted to numerous bribes and kickbacks, as described in detail above.

154.     In addition, Glazer and Malek further engaged in commercial bribery by offering to pay—and in fact paying—Matthew Edelson, a National Account Director employed by Heritage, to join their scheme to defraud Heritage.  Edelson breached the duty of loyalty and fidelity that he owed to Heritage each time he accepted a $10,000 bribe from Defendants to facilitate an order through Cochran on behalf of Dorado Pharma; the receipt of this bribe therefore violates New Jersey's commercial bribery statute, N.J. Stat. Ann. § 2C:21-10(a).  As Heritage executives, Defendants were fully aware of the duty of loyalty Edelson owed to Heritage; nevertheless, they solicited Edelson to breach his duty of loyalty and compensated him generously in exchange for doing so, thereby violating N.J. Stat. Ann. § 2C:21-10(c).

155.     Defendants similarly caused Andre Patton, the Director of Purchasing at Cochran, to breach the duty of loyalty he owed to his employer when they paid him bribes to place orders with Heritage through Cochran on behalf of Dorado Pharma.  Patton knowingly breached his fiduciary duty to Cochran by placing orders on behalf of Dorado Pharma in exchange for bribes on each order totaling $10,000 plus 1% of the underlying order amount.  Defendants therefore

caused Patton to violate New Jersey's commercial bribery statute, N.J. Stat. Ann. § 2C:21-10(a). Defendants were fully aware that Patton was an employee of Cochran—indeed, this was the reason for his inclusion in their scheme—and that he therefore owed Cochran a duty of loyalty. Their payment of bribes to Patton therefore constitutes a second act of commercial bribery in violation of N.J. Stat. Ann. § 2C:21-10(c).

156.   Defendants paid repeated bribes to Edelson and Patton, each of which totaled at least $10,000.  Under N.J. Stat. Ann. § 2C:21-10(d), the offer or actual payment of an amount greater than $1,000 but less than $75,000 constitutes a third-degree crime, and the offer or payment of $75,000 or more constitutes a second-degree crime.  Both second- and third-degree crimes are punishable by a maximum of more than one year of imprisonment under N.J. Stat. Ann. § 2C:44-1(f).

157.   Defendants' acts of commercial bribery in violation of N.J. Stat. Ann. § 2C:21-10(c) therefore constitute racketeering activity as defined by 18 U.S.C. § 1961(1).

**Pattern of Racketeering Activity: Money Laundering in Violation of 18 U.S.C. § 1956**

158.   Racketeering activity is further defined in 18 U.S.C. § 1961(1) to include violations of the federal money laundering statute, 18 U.S.C. § 1956.

159.   Under 18 U.S.C. § 1956(a)(1)(A)-(B), a person who knows "that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" is prohibited from conducting a "financial transaction" that involves that property (i) "with the intent to promote the carrying on of specific unlawful activity" or (ii) "knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

160.    A "financial transaction" is broadly defined in 18 U.S.C. § 1956(c)(3)-(4) to include transactions that affect interstate or foreign commerce, such as "a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition," or various transactions affecting interstate or foreign commerce through a financial institution, including "a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument."

161.    The phrase "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include, among other things, "any act or activity constituting an offense listed in section 1961(1)," the RICO statute.

162.    Glazer and Malek repeatedly engaged in money laundering in violation of 18 U.S.C. § 1956(a)(1)(A) by engaging in transactions using bank accounts held by their various dummy corporations at financial institutions to further their racketeering activities.  First, they regularly transacted with Heritage customers, in receiving payments for resales made through Dorado Pharma, and with Heritage itself, in paying for those products prior to resale.  Second, they transacted with creditors of their dummy companies by paying them for the various products and services rendered to Dorado Pharma and Tal Pharma, including monthly rent for their virtual office spaces, legal bills, state corporation filing fees, freight services, financial services consultants, accounting fees, collection agency services, and business formation specialists.  Third, they transacted with themselves by distributing each dummy company's profits via wire and Automated Clearing House (ACH) transfers to their personal bank accounts on a regular basis.  Moreover, Glazer and Malek knew that the funds in these accounts were derived from the unlawful activities of their criminal enterprise, including numerous offenses listed in 18 U.S.C. § 1961(1), as detailed herein.  Indeed, virtually every dollar they deposited into the bank

accounts affiliated with Tal Pharma and Dorado Pharma resulted directly from their unlawful

self-dealing.  As such, they violated 18 U.S.C. § 1956 every time they transacted using the funds

in the Dorado Pharma and Tal Pharma bank accounts over the course of six years.

163.    In addition, Glazer and Malek repeatedly violated 18 U.S.C. § 1956(a)(1)(B) by

engaging in financial transactions through their various dummy corporations with the intent to

conceal or disguise their ownership and control of the proceeds flowing from their unlawful

activities.  All of the proceeds flowing through Tal Pharma, Dorado Pharma, and the other

dummy corporations resulted from the unlawful activities of Glazer and Malek's criminal

enterprise, including numerous offenses listed in 18 U.S.C. § 1961(1), as detailed herein.  Yet,

these corporations existed solely to conceal the true beneficiaries of the illicit proceeds—the

companies had no employees, no facilities, and no legitimate operations.  Accordingly, Glazer

and Malek violated 18 U.S.C. § 1956(a)(1) with every transaction in the bank accounts

associated with their dummy corporations because these financial transactions were intended

solely to conceal their ownership and control of the profits resulting from their racketeering

activities.  Furthermore, they acted with the knowledge that these funds were derived from their

unlawful activities.

164.    Moreover, Glazer and Malek engaged in transactions with the intent to conceal their

affiliation with Dorado Pharma by using Cochran as an intermediary in their transactions with

Heritage, whereby Cochran purchased drug products from Heritage and sold them to Dorado

Pharma, who then resold them to Heritage customers.  Indeed, Glazer and Malek used Cochran

*for the sole purpose* of disguising their control of Dorado Pharma because they had begun to fear

that their profits were substantial enough to draw attention from Heritage employees and

customers.  Thus, each transaction they engaged in with Cochran was also a violation of 18 U.S.C. § 1956(a)(1)(B).

**Pattern of Racketeering Activity: Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity in Violation of 18 U.S.C. § 1957**

165.    According to 18 U.S.C. § 1961(1), violations of 18 U.S.C. § 1957 constitute a predicate act of racketeering activity.

166.    One who "knowingly engages . . . in a monetary transaction in criminally derived property" violates 18 U.S.C. § 1957 if that property is "of a value greater than $10,000 [and] derived from specified unlawful activity."

167.    The statute defines "criminally derived property" as property that constitutes "proceeds obtained from a criminal offense;" it further defines "specified unlawful activity" as the same unlawful activity defined in 18 U.S.C. § 1956, including acts constituting racketeering activity under 18 U.S.C. § 1961(1).

168.    All of Dorado Pharma's income from Ketoprofen sales through KLE2 was derived from Defendants' embezzlement of Heritage's intellectual property in the form of its Ketoprofen ANDA, on which the Dorado Pharma-KLE2-Shasun transactions were built.  This embezzlement of intellectual property constitutes racketeering activity under 18 U.S.C. § 1961(1); it therefore also constitutes "specified unlawful activity" under 18 U.S.C. § 1957.

169.    Relatedly, through the sale of Heritage products to Heritage customers through Dorado Pharma, Defendants committed numerous criminal offenses constituting racketeering activity as detailed herein (including mail fraud, wire fraud, bribery, and others), which also constitute "specified unlawful activity" under 18 U.S.C. § 1957.  Through this conduct, Defendants derived proceeds in the form of Heritage products and money.

170.    As the perpetrators of the criminal activity from which the funds were derived, Defendants knew the money was criminally derived.

171.    By depositing these funds in the Dorado Pharma bank accounts held by an interstate financial institution, Defendants engaged in monetary transactions as defined by 18 U.S.C. § 1957(f)(1).  When Defendants engaged in any subsequent withdrawal, transfer, or exchange of these funds, they engaged in further monetary transactions as defined by 18 U.S.C. § 1957(1).

172.    Most if not all payments to Dorado Pharma from KLE2 and other Heritage customers entailed sums greater than $10,000.  On numerous occasions, Defendants withdrew or transferred portions of these proceeds in excess of $10,000.

173.    Defendants thereby repeatedly violated 18 U.S.C. § 1957, engaging in further racketeering activity under 18 U.S.C. § 1961(1).

**Pattern of Racketeering Activity:  Violation of the Travel Act, 18 U.S.C. § 1952**

174.    Racketeering activity is further defined in 18 U.S.C. § 1961(1) to include violations of the "Travel Act," 18 U.S.C. § 1952, which criminalizes the use of "interstate facilities" to "(1) distribute the proceeds of any unlawful activity; or . . . (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity."

175.    The Travel Act defines "unlawful activity" to include "extortion, bribery, or arson in violation of laws of the State in which committed or of the United States" as well as acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

176.    Through their violations of the New Jersey commercial bribery statute, N.J. Stat. Ann. § 2C:21-10, as alleged in ¶¶ 150-157 above, and their countless money laundering transactions in violation of 18 U.S.C. §§ 1956 and 1957, as alleged in ¶¶ 158-173, Defendants

have engaged in multiple acts of "unlawful activity" as defined by the Travel Act, 18 U.S.C. § 1952.

177.    For purposes of 18 U.S.C. § 1952, "interstate facilities" are defined to include email, mail, telephone calls, text messages, and wire transfers.  Defendants made use of interstate facilities in furtherance of both their crimes of bribery and their crimes of money laundering.

### *Use of Interstate Facilities in Furtherance of Commercial Bribery*

178.    Interstate facilities were central to Defendants' planning and execution of their scheme to pay bribes to Edelson and Patton in violation of New Jersey's commercial bribery statute, N.J. Stat. Ann. § 2C:21-10.  Glazer and Malek engaged in text message communications to identify Edelson and Patton as the necessary co-conspirators to expand their criminal enterprise and to develop a framework to incentivize their participation through the payment of bribes.  While located in New Jersey, Malek then communicated this offer to Edelson, who resides in Florida, via text message on October 22, 2015.  This act of commercial bribery, in violation of N.J. Stat. Ann. § 2C:21-10, occurred entirely through Defendants' use of interstate facilities and thus violates 18 U.S.C. § 1952(a)(3).

179.    Defendants also used interstate facilities to distribute the bribes to Edelson and Patton following the completion of each Cochran-originated purchase from Heritage.  Dorado Pharma received payment in New Jersey for sales to its customer and Defendants then transmitted payment to Edelson in Florida and to Patton in Georgia by means of the mail or electronic transfer.  Defendants' distribution of the bribes to Edelson and Patton through interstate facilities thus constitutes a violation of 18 U.S.C. § 1952(a)(1).

180.    Both directly and through their co-conspirators and agents of the enterprise, Defendants therefore made use of "interstate facilities" to "distribute the proceeds of any

unlawful activity; or . . . otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of [their] unlawful activity" rooted in commercial bribery.  They intentionally engaged in acts of commercial bribery under New Jersey law and did so through interstate channels, in violation of 18 U.S.C. § 1952.

181.    Defendants' multiple violations of the Travel Act constitute further acts of racketeering activity under 18 U.S.C. § 1961(1).

### *Use of Interstate Facilities in Furtherance of Money Laundering*

182.    The use of interstate facilities was similarly central to Defendants' commission of several acts of money laundering.  In committing acts of money laundering, Defendants both sent and received the proceeds of many of their illegal acts to defraud Heritage by means of interstate and sometimes international wire transfers.  Bank statements for Tal Pharma and Dorado Pharma also indicate that Defendants made internet-, telephone-, or mail-based financial transactions using the debit cards associated with the accounts containing their illicit proceeds held by interstate financial institutions.  In many instances these transactions involved out-of-state vendors or business partners, such as Dorado Pharma's payment to the Texas-based virtual office provider Regus in April 2013.

183.    Both to commit acts of money laundering and to facilitate their acts of money laundering, Defendants made use of "interstate facilities" to "distribute the proceeds of any unlawful activity; or . . . otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of [their] unlawful activity."  They intentionally engaged in acts of money laundering through interstate channels, in violation of 18 U.S.C. § 1952 as well as § 1956.  Their conduct thus constitutes racketeering activity in multiple forms according to 18 U.S.C. § 1961(1).

**Pattern of Racketeering Activity: Multiple Instances of Theft of Trade Secrets in Violation of 18 U.S.C. § 1832**

184.    Under 18 U.S.C. § 1961(1), racketeering activity also includes the theft of trade

secrets in violation of 18 U.S.C. § 1832.

185.    18 U.S.C. § 1832 establishes that:

> Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly—
>
> (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;
>
>  (2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;
>
> (3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;
>
> (4) attempts to commit any offense described in paragraphs (1) through (3);
>
> (5) conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy,
>
> [is guilty of theft of trade secrets.]

186.    Heritage's ANDAs constitute "trade secrets" as used in 18 U.S.C. § 1832 and defined

in 18 U.S.C. § 1839.  Heritage goes to great lengths to protect the secrecy of its ANDAs, even

limiting its own manufacturers' access to the Company's full ANDAs.  Furthermore, the

intellectual property contained within the ANDA, including the technical analyses required to

show bioequivalence with the relevant brand-name drug and the detailed descriptions of the

drug's manufacturing process, is economically valuable insofar as this information is not readily

available to those who might use the information for their economic benefit.  Developing and

securing approval of an ANDA is time- and cost-intensive, and the significant cost of purchasing

an existing, approved ANDA reflects the substantial resources that went into its development. Would-be competitors of Heritage must invest the resources necessary in order to develop or acquire an ANDA before they can compete with Heritage and other ANDA holders in the market for a specific generic product.  If this information were freely available to potential competitors, their costs and technical challenges in developing a competing ANDA would be significantly reduced.

187.    Heritage's ANDAs are for generic drugs that are sold in interstate and, in some cases, international commerce.  These trade secrets are therefore protected by 18 U.S.C. § 1832.

188.    Glazer committed multiple acts of trade secrets theft, in violation of 18 U.S.C. § 1832, by misappropriating Heritage's ANDAs.  In 2012, Glazer stole Heritage's trade secrets by orchestrating the transfer of Heritage's Ketoprofen ANDA to Dorado Pharma without compensation to Heritage.  Glazer acted knowingly and with the intent to convert Heritage's trade secret to the economic benefit of Defendants' enterprise, and at the expense and injury of Heritage, when he used his role as an officer and director at Heritage to embezzle the Company's ANDA.  Glazer thereby violated 18 U.S.C. § 1832(a)(1), and engaged in racketeering activity.

189.    Malek also committed theft of trade secrets by conspiring with Glazer to embezzle the Ketoprofen ANDA from Heritage and transfer it to Dorado without compensation.  On the very day that Glazer initiated the uncompensated transfer of the ANDA, the Defendants incorporated Dorado Pharma and were named co-managing members of the entity.  These circumstances clearly suggest unity of purpose and common design between Glazer and Malek in transferring the stolen Ketoprofen ANDA to Dorado to the benefit of Defendants and the harm of Heritage.  These facts implicate Malek in a conspiracy to embezzle trade secrets in violation

of 18 U.S.C. § 1832 (a)(5) and in further racketeering conduct as defined by 18 U.S.C.

§ 1961(1).

190.    Because Glazer and Malek's jointly owned dummy company received and remains in

possession of the embezzled ANDA, both Defendants are also in violation of 18 U.S.C.

§ 1832(a)(3).  Through their sham corporate entity Dorado Pharma, they have possession of the

Ketoprofen ANDA "knowing the same to have been stolen or appropriated, obtained, or

converted without authorization."  This ongoing violation of 18 U.S.C. § 1832(a)(3) also

constitutes ongoing racketeering activity under 18 U.S.C. § 1961(1).

191.    Glazer again violated 18 U.S.C. § 1832 when he knowingly and intentionally

obtained unauthorized copies of nearly all of Heritage's ANDAs on CDs in anticipation of his

future departure from Heritage, in order to benefit himself and his enterprise and to harm

Heritage.  Glazer remains in possession of Heritage's stolen intellectual property and thus

violates this statute through his continued, intentional "possess[ion of] such information,

knowing the same to have been stolen or appropriated, obtained, or converted without

authorization."  18 U.S.C. § 1832(a)(3).  Glazer is thereby engaging in ongoing racketeering

activity as defined by 18 U.S.C. § 1961(1).

192.    Malek, too, continues to engage in ongoing racketeering activity with respect to the

stolen copies of Heritage ANDAs.  After stealing copies of most or all of the Heritage ANDAs,

Glazer made clear his plans that he would hold on to the ANDAs until the two could benefit

from them together after leaving Heritage.  Aware of this objective, Malek has assented to the

ongoing possession of the copied ANDAs and the intellectual property they contain. On

information and belief, Plaintiff asserts that Malek has also acted in concert with Glazer, taking

steps to exploit Heritage's intellectual property in their possession.  Malek has thus conspired to

possess Heritage's trade secrets, "knowing the same to have been stolen or appropriated, obtained, or converted without authorization."  In doing so, he is in violation of 18 U.S.C. § 1832(a)(5) and commits further ongoing racketeering activity under 18 U.S.C. § 1961(1).

**Predicate Acts of Racketeering Activity Amount to a Pattern of Racketeering Activity Under 18 U.S.C. § 1961(5)**

193.    Defendants each committed and/or aided and abetted the commission of at least two or more of these acts of racketeering.  The acts alleged were related to each other by virtue of common participants (Glazer and Malek), a common victim (Heritage), a common method of commission (diversion of Heritage's business opportunities, trade secrets, and other property to dummy companies owned by Defendants), and a common purpose (stealing from and defrauding Heritage to enrich Defendants at Heritage's expense while concealing their unlawful conduct). Defendants engaged in their schemes for at least seven years, and these schemes remain a threat to Heritage given Defendants' theft of Heritage's intellectual property, which Glazer and Malek continue to possess and may be attempting to market.  Defendants' conduct thus constitutes a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5).

194.    As a result of Defendants' pattern of racketeering activity in violation of RICO, Heritage was injured in its business and property, within the meaning of 18 U.S.C. § 1964(c).

195.    As a result of their misconduct, Defendants are liable to Heritage for their losses in an amount to be determined at trial.

196.    Pursuant to RICO, 18 U.S.C. § 1964(c), Heritage is entitled to recover treble damages, plus costs and attorneys' fees, from Defendants.

197.    Heritage is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them from making use of or profiting in any way from Heritage's illicitly obtained and retained

intellectual property, including Heritage's ANDAs, as well as any additional applicable equitable relief that the Court determines is appropriate.

## COUNT II

### (Federal Civil RICO Conspiracy, 18 U.S.C. § 1962(d))

(Against All Defendants)

198.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

199.    Heritage seeks redress for harm it has suffered as a result of Glazer and Malek's illegal conspiracy to defraud Heritage, its employees, and its customers, in violation of federal RICO.

200.    Under 18 U.S.C. § 1962(d), it is unlawful for any person to conspire to violate 18 U.S.C. § 1962(c).  Through their conduct alleged herein, Defendants are liable to Heritage pursuant to 18 U.S.C. § 1962(d).

201.    Defendants agreed, among themselves and with the knowing or unknowing cooperation of others, to violate and continue to violate 18 U.S.C. § 1962(c).  Defendants understood and accepted the objectives of their conspiracy, and they made, at a minimum, an implicit agreement to further those objectives.  Operating through and participating in their enterprise, Defendants implemented and continue to implement a plan and pattern of racketeering activities.  In furtherance of their conspiracy, Defendants committed multiple overt illegal acts that include, but are not limited to, theft, multiple instances of mail and wire fraud, commercial bribery, violations of the Travel Act (18 U.S.C. § 1952), money laundering, and multiple instances of theft of trade secrets.  Each violation on its own constitutes racketeering

activity pursuant to 18 U.S.C. § 1961(1), and together these violations constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

202.    As a direct and proximate result of all of the racketeering activities by Defendants alleged herein, Heritage has suffered injury to its business and property in an amount to be determined at trial.

203.    Pursuant to RICO, 18 U.S.C. § 1964(c), Heritage is entitled to recover treble damages, plus costs and attorneys' fees, from Defendants.

204.    Heritage is further entitled to, and should be awarded, preliminary and permanent injunctions that enjoin Defendants, their assignees, and anyone else acting in concert with them from making use of or profiting in any way from Heritage's illicitly obtained and retained intellectual property, including Heritage's ANDAs, as well as any additional applicable equitable relief that the Court determines is appropriate.

## COUNT III

**(New Jersey Civil RICO, N.J. Stat. Ann. § 2C:41-2(c))**

(Against All Defendants)

205.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

206.    Heritage seeks redress for harm it has suffered as a result of Glazer and Malek's illegal scheme and overt acts to defraud Heritage, its employees, and its customers in violation of New Jersey RICO.

207.    Under N.J. Stat. Ann. § 2C:41-2(c), it is unlawful for any person employed by or associated with any enterprise engaged in or affecting trade or commerce to conduct or

participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity.

208.    Heritage is a person within the meaning of N.J. Stat. Ann. § 2C:41-1(b) because it is an entity capable of holding a legal or beneficial interest in property.

209.    Glazer and Malek and their co-conspirators are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Complaint; namely, to defraud and steal from Heritage. Since the incorporation of Tal Pharma in 2009, there has been a continuous association-in-fact among Glazer, Malek, and the evolving cast of corporate entities that they created between 2009 and the present (including Tal Pharma LLC; Dorado Pharma LLC; Element Pharma LLC; VetGen Pharma LLC; and Astor Pharma LLC). In approximately 2015, Defendants expanded their criminal association to include co-conspirators Edelson and Patton. This association in fact constitutes an enterprise within the meaning of N.J. Stat. Ann. § 2C:41-1(c).

210.    The enterprise is engaged in and affects trade and commerce in New Jersey, within the meaning of N.J. Stat. Ann. § 2C:41-1(h), through its purchase and sale of generic pharmaceutical products within New Jersey.

211.    At all relevant times, Defendants have been associated with and central to the operation of this enterprise that they created. While the criminal enterprise has grown over time and its members may have performed different roles at different points in time, the criminal enterprise has generally been structured to operate as a unit in order to accomplish the goals of their criminal scheme. Glazer has acted as the head of the enterprise, responsible for the formation of each new corporate entity and high-level business negotiations, such as ANDA acquisitions. Malek has acted to lead the enterprise's day-to-day operations and logistics,

including the submission and processing of Dorado Pharma's orders through Heritage. Defendants planned and directed the enterprise's activities, personally implemented the enterprise's criminal schemes, and expanded the enterprise's membership through both the creation of additional corporate entities to carry out the enterprise's illegal purposes and the enlistment of additional co-conspirators such as Edelson and Patton to better conceal Defendants' own involvement.  Their participation in the affairs of the enterprise has been both direct and indirect, and at all times they have participated willfully and purposefully.

212.    Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the enterprise's affairs through repeated acts of "racketeering activity" amounting to a "pattern of racketeering activity" within the meaning of New Jersey RICO, N.J. Stat. Ann. §§ 2C:41-1(a) and 2C:41-1(d).

213.    New Jersey RICO defines "racketeering activity" to include, among other activities, "theft and all crimes defined in chapter 20 of Title 2C of the New Jersey Statutes," § 2C:41-1(a)(1)(n), and "any conduct defined as 'racketeering activity' under Title 18, U.S.C. § 1961(1)(A), (B) and (D)," § 2C:41-1(a)(2).

214.    Through the enterprise, Defendants engaged in numerous acts of "theft and [other] crimes defined in chapter 20 of Title 2C of the New Jersey Statutes."  § 2C:41-1(a)(1)(n).

215.    N.J. Stat. Ann. § 2C:20-3 criminalizes "Theft by Unlawful Taking or Disposition" and establishes that "[a] person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with purpose to deprive him thereof."  Glazer's orchestration of the transfer of Heritage's Ketoprofen ANDA from Heritage to Dorado Pharma without consideration and without the consent of Heritage constitutes an unlawful taking of the ANDA, with the purpose of depriving Heritage of the ANDA and supplying it to Dorado Pharma

to the benefit of Defendants.  As a criminal violation of § 2C:20-3(a), this conduct constitutes an instance of racketeering activity under § 2C:41-1(a)(1)(n).

216.    N.J. Stat. Ann. § 2C:20-8 criminalizes "Theft of Services" and provides that "[a] person commits theft if, having control over the disposition of services of another, to which he is not entitled, he knowingly diverts such services to his own benefit or to the benefit of another not entitled thereto."  In their positions as Chief Executive Officer and President of Heritage, Defendants had managerial authority over the services of Heritage employees in the course of their employment.  Heritage, not Defendants or their dummy companies, was rightfully entitled to the benefit of its employees' services.  Nevertheless, on multiple occasions Defendants diverted the services of unwitting Heritage employees for the benefit of Tal Pharma or Dorado Pharma.  For example, in July 2015, Malek instructed Heritage's Manager of Global Logistics to research and arrange for a refrigerated truck to pick up a Dorado Pharma purchase, a task that under normal circumstances would have been handled by the purchaser.  More egregiously, in recruiting and using Edelson to facilitate fraudulent transactions through Cochran, Defendants denied Heritage the full benefit of Edelson's services to which it was contractually entitled and diverted this benefit to their enterprise and to themselves.  Each of these instances is a crime in violation of N. J. Stat. Ann. § 2C:20-8 and therefore constitute an instance of racketeering activity under N.J. Stat. Ann. § 2C:41-1(a)(1)(n).

217.    Chapter 20 of Title 2C also prohibits computer-related crimes.  Specifically, N.J. Stat. Ann. § 2C:20-25 provides that:

> A person is guilty of computer criminal activity if the person purposely or knowingly and without authorization, or in excess of authorization:
>
> a.  Accesses any data, data base, computer storage medium, computer program, computer software, computer equipment, computer, computer system or computer network;

b.  Alters, damages or destroys any data, data base, computer, computer storage medium, computer program, computer software, computer system or computer network, or denies, disrupts or impairs computer services, including access to any part of the Internet, that are available to any other user of the computer services;

c.  Accesses or attempts to access any data, data base, computer, computer storage medium, computer program, computer software, computer equipment, computer system or computer network for the purpose of executing a scheme to defraud, or to obtain services, property, personal identifying information, or money, from the owner of a computer or any third party; [or]

…

e.  Obtains, takes, copies or uses any data, data base, computer program, computer software, personal identifying information, or other information stored in a computer, computer network, computer system, computer equipment or computer storage medium[.]

218.    In preparation for his departure from Heritage, Glazer obtained from Heritage's computer server copies of most of Heritage's ANDAs for his personal possession and misuse. He did so knowingly, without Heritage's consent, and with the intent to secure this confidential information for his private purposes.  Glazer and Malek may already be using this stolen property and preparing to sell Heritage's trade secrets, or products derived from them, through his other companies.  Accessing the server to select and copy Heritage's most important intellectual property assets for his personal purposes was beyond the scope of his authority. Glazer's conduct therefore constitutes both an unlawful, unauthorized access for the purpose of obtaining Plaintiff's property, in violation of N.J. Stat. Ann. § 2C:20-25(d), and an unlawful, unauthorized obtaining or copying of data, in violation of N.J. Stat. Ann. § 2C:20-25(e).  As violations of Chapter 20 of Title 2C, Glazer's conduct constitutes an instance of racketeering activity under N.J. Stat. Ann. § 2C:41-1(a)(1)(n).

219.    N.J.  RICO also defines "racketeering activity" to include "any conduct defined as 'racketeering activity' under Title 18 U.S.C. § 1961(1)(A), (B) and (D)."  N.J. Stat. Ann.

§ 2C:41-1(a)(2).  As alleged at ¶¶ 136-192, and incorporated herein by reference, Defendants committed multiple instances of mail and wire fraud under 18 U.S.C. §§ 1341, 1343; commercial bribery under N.J. Stat. Ann. § 2C:21-10; money laundering under 18 U.S.C. §§ 1956, 1957; violations of the Travel Act under 18 U.S.C. § 1952; and theft of trade secrets, under 18 U.S.C. § 1832.  Defendants' acts constitute racketeering activity under U.S.C. § 1961(1)(B) and, therefore, they are additional acts of racketeering activity for purposes of New Jersey RICO under N.J. Stat. Ann. § 2C:41-1(a)(2).

220.    Through the schemes alleged herein, each Defendant committed or aided or abetted in at least two incidents of racketeering activity between 2009 and 2016.  Given the seven-year timeframe of Defendants' conduct, the most recent of each Defendant's. incidents of racketeering conduct necessarily occurred within ten years of a prior incident of racketeering activity.  Each Defendant's racketeering acts are interrelated by distinguishing characteristics and are not isolated, sporadic, or disconnected incidents.  The incidents embrace criminal conduct that has either the same or similar purposes, results, participants, victims, or methods of commission.  Therefore, Defendants' multiple overt acts of theft, mail and wire fraud, commercial bribery, violation of the federal Travel Act, and money laundering constitute a "pattern of racketeering activity" within the meaning of N.J. Stat. Ann. § 2C: 41-1(d).

221.    Thus, in "conduct[ing and] participat[ing], directly [and] indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity," Defendants have violated New Jersey RICO, N.J. Stat. Ann. § 2C:41-2(c).

222.    New Jersey RICO provides a civil remedy for any person damaged in their business or property by reason of a violation of the law, under N.J. Stat. Ann. § 2C:41-4(c).

223.    As a direct and proximate result of all of the racketeering activities by Defendants alleged herein, Heritage has suffered injury to its business and property in an amount to be determined at trial.

224.    Pursuant to N.J. Stat. Ann. § 2C:41-4(c), Heritage is entitled to recover treble damages, costs of the investigation and litigation, and attorneys' fees from Defendants.

225.    Heritage is further entitled to, and should be awarded, preliminary and permanent injunctions that enjoin Defendants, their assignees, and anyone else acting in concert with them from making use of or profiting in any way from Heritage's illicitly obtained and retained intellectual property, including Heritage's ANDAs, as well as any additional applicable equitable relief that the Court determines is appropriate.

## COUNT IV

### (New Jersey Civil RICO Conspiracy–Violation of N.J. Stat. Ann. § 2C:41-2(d))

(Against All Defendants)

226.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

227.    Heritage seeks redress for harm it has suffered as a result of Glazer and Malek's illegal conspiracy to defraud Heritage, its employees, and its customers, in violation of New Jersey RICO.

228.    Under N.J. Stat. Ann. § 2C:41-2(d), it is unlawful for any person to conspire to violate N.J. Stat. Ann. § 2C:41-2(c).  Through their conduct alleged herein, Defendants are liable to Heritage pursuant to N.J. Stat. Ann. § 2C:41-2(d).

229.    Defendants agreed, among themselves and with the knowing or unknowing cooperation of others, to violate and continue to violate N.J. Stat. Ann. § 2C:41-2(c).  Defendants

understood and accepted the objectives of their conspiracy, and they made, at a minimum, an implicit agreement to further those objectives.  Operating through and participating in their enterprise, Defendants implemented and continue to implement a plan and pattern of racketeering activities.  In furtherance of their conspiracy, Defendants committed multiple overt acts that include, but are not limited to, theft, countless instances of mail and wire fraud, commercial bribery, violation of the federal Travel Act, and money laundering.  Each violation on its own constitutes racketeering activity pursuant to N.J. Stat. Ann. § 2C:41-1(a)(1)(n) and § 2C:41-1(a)(2), and together these violations constitute a pattern of racketeering activity pursuant to N.J. Stat. Ann. § 2C:41-1(d).

230.     As a direct and proximate result of all of the racketeering activities by Defendants alleged herein, Heritage has suffered injury to its business and property in an amount to be determined at trial.

231.     Pursuant to N.J. Stat. Ann. § 2C:41-4(c), Heritage is entitled to recover treble damages, costs of the investigation and litigation, and attorneys' fees from Defendants.

## COUNT V

### (Breach of Fiduciary Duty of Loyalty)

(Against All Defendants)

232.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

233.     Defendants are liable to Heritage for their egregious breaches of their fiduciary duty of loyalty.

234.     Under New Jersey law, all employees owe their employer a fiduciary duty of loyalty. Employees have an obligation not to compete with their employer during the period of their

employment or act contrary to their employer's interest. This duty is even greater for employees who occupy a position of trust and confidence, such as officers and directors of a company.

235. At all relevant times, Defendants were employees of Heritage and occupied positions of trust and confidence. Glazer, a licensed lawyer, served as Chief Executive Officer and a member of Heritage's Board of Directors, and Malek served as Vice President and, later, President of Heritage. Due to their employment by Heritage and the senior positions they held, Defendants owed Heritage a heightened duty of loyalty. Defendants were obligated not to act contrary to Heritage's interests or compete directly or indirectly with Heritage. Both Glazer and Malek repeatedly and continuously breached their duty of loyalty to Heritage throughout their periods of employment.

236. Defendants' employment agreements show that Heritage had explicit, clear, and high expectations that Defendants would remain loyal to the Company in every aspect of their employment. Their contracts required that Defendants "devote substantially all of [their] business time and skills to the performance of [their] Duties hereunder during the Term [of the contract]" and that they not "solicit or accept any business for any product sold, manufactured or distributed by the Company . . . from any person, firm or corporation that is a customer of the Company . . . ." Defendants' contracts also required that they "not disclose or make accessible to any other person, the Company's products, services and technology, both current and under development, promotion and marketing programs, lists, trade secrets and other confidential and proprietary business information of the Company or any of its clients," "use any such information for himself or others," or "take any such material or reproductions thereof from the Company's facilities." Glazer's employment agreement further required that he "exert his best efforts on behalf of the Company and shall carry out all of his duties in good faith so as to

promote the business and interests of the Company [and] render his services under this Agreement faithfully, to the best of his abilities, and in conformance with all laws and Company rules and policies." Defendants acted contrary to Heritage's interests and in direct contrast to Heritage's express expectations, thereby breaching their duty of loyalty through their wrongful and illegal acts.

237.    Defendants' conduct was in no way mitigated by any knowledge on behalf of, or permission from, Heritage. As alleged previously herein, Defendants went to great lengths to conceal the true nature of their criminal enterprise and to mislead those who came into contact with their dummy companies. The generous compensation and Stock Appreciation Rights packages that Heritage provided to Defendants make abundantly clear that the Company was not aware of Defendants' illegal conduct or their willingness to harm Heritage for their own personal benefit.

238.    Defendants' status within the Company makes the nature of their conduct more egregious. The Company placed great trust in and reliance on both Defendants as Company officers and placed special trust in Glazer as a director of the Company and ultimately Chairman of the Board of Directors. Defendants betrayed not only the ordinary duty of loyalty that every employee owes to his employer, but also the heightened duty of loyalty arising out of the confidence and trust Heritage placed in them as the Company's officers and leaders.

239.    Defendants' conduct was egregious and extraordinary. Defendants deprived Heritage of millions of dollars in potential profits and stole that profit for themselves. Defendants engaged in countless acts of racketeering conduct, stole vast amounts of intellectual property from the Company, bribed a subordinate to breach his duty of loyalty to Heritage, and exploited

the great faith placed in them by so many Heritage employees, whom Defendants used to advance their own interests and criminal schemes.

240. Defendants committed innumerable, unmitigated, and continuous breaches of their fiduciary duty of loyalty to Heritage over at least the past seven years. Defendants' breaches of their duty of loyalty to Heritage started at least as early as 2009 when they formed Tal Pharma to compete with Heritage and deprive Heritage of business opportunities. Defendants' breaches of their fiduciary duty then continued every day until they were terminated in August 2016 through their unlawful schemes to steal from Heritage, deprive Heritage of business opportunities, and engage in other activities to Heritage's detriment as detailed above.

241. Defendants' breaches of their duty of loyalty have caused Heritage significant and substantial damage. Unaware of the ongoing breaches of loyalty, the Company generously compensated the disloyal Defendants in base salary, benefits, bonuses, and Stock Appreciation Rights—even as Defendants engaged in direct competition with Heritage, misused the Company's employees and resources, stole Heritage's property, and siphoned profits from the sale of Heritage products directly into their own entities and, ultimately, their own pockets. Heritage has been denied numerous instances of prospective economic advantage; its intellectual property and ongoing business operations have been jeopardized; and it risks further, ongoing harm from Defendants, as they take steps to further exploit the Heritage trade secrets they have stolen.

## COUNT VI

### (Fraudulent Inducement of Employment Contracts)

(Against All Defendants)

242.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

243.    Glazer and Malek fraudulently misrepresented that they intended to abide by the terms of the employment contracts that they signed on May 2, 2011 and March 23, 2011, respectively.  Glazer also misrepresented his intention to abide by the terms of his employment contract when he signed an extension in February 2016, and Malek misrepresented his intention to abide by the terms of the employment contract when he signed extensions in March 2014 and February 2016.

244.    Because each Defendant knew at the time he entered into his employment agreement that he had no intention of fulfilling its requirements—and indeed was already acting in direct conflict with its terms—each Defendant's agreement was fraudulently induced.  Each Defendant's intention not to fulfill the terms of his contract is illustrated by the fact that, at the time each Defendant entered an employment agreement or extension with Heritage, that Defendant was already egregiously violating its terms by diverting Heritage's corporate opportunities to Defendants' dummy companies, stealing Heritage's trade secrets, and engaging in a racketeering scheme at Heritage's expense.

245.    Glazer and Malek represented their agreement to several noteworthy provisions in their respective employment agreements that assured Heritage of their fidelity.  Each Defendant agreed (1) to  "devote substantially all of his business time and skills to the performance of his Duties hereunder during the Term [of the contract;]" (2) to not "solicit or accept any business for

any product sold, manufactured or distributed by the Company . . . from any person, firm or corporation that is a customer of the Company," and (3) to "not disclose or make accessible to any other person, the Company's products, services and technology, both current and under development, promotion and marketing programs, lists, trade secrets and other confidential and proprietary business information of the Company or any of its clients."  This included a commitment that each executive would not "use any such information for himself or others" or "take any such material or reproductions thereof from the Company's facilities."  Glazer also agreed to "exert his best efforts on behalf of the Company," "carry out all of his duties in good faith so as to promote the business and interests of the Company," and "render his services under this Agreement faithfully, to the best of his abilities, and in conformance with all laws and Company rules and policies."

246.   At the time they signed their employment agreements in the spring of 2011, both Defendants were well aware that they were stealing corporate opportunities and committing other acts of disloyalty and racketeering.  In fact, at that time Defendants were actively engaged in an ongoing scheme to steal Heritage's corporate opportunities through a dummy company, Tal Pharma.  For example, Defendants' scheme included supplying EEMT through Tal Pharma to several of Heritage's customers from late 2010 through mid-2012, the precise period when they negotiated and signed their respective employment agreements.

247.   Malek was aware of his theft of corporate opportunities and other acts of disloyalty and racketeering when he negotiated a renewed employment agreement with Heritage in March 2014.  At the time he signed the agreement, Malek was already actively engaged in an ongoing scheme to steal Heritage's corporate opportunities through a second dummy company, Dorado Pharma.  For example, from at least 2012 to 2015, Defendants' scheme included reselling

Heritage's products through Dorado Pharma to a California-based Heritage customer while retaining the resulting profits for themselves.

248.     Similarly, Glazer and Malek were aware of their theft of corporate opportunities, falsification of corporate records, and other acts of disloyalty and racketeering as they each negotiated renewed employment agreements with Heritage in February 2016.  At the time they engaged in negotiations, Glazer and Malek were actively engaged in—and very deep into—an ongoing scheme to steal Heritage's corporate opportunities through at least four dummy companies.  For example, from at least November 2015 to June 2016, Defendants' scheme included reselling millions of dollars of a Heritage product through their dummy company, Dorado Pharma, to an Arizona-based Heritage customer while retaining the resulting profits for themselves.

249.     When Glazer and Malek entered into employment contracts with Heritage on May 2, 2011 and March 23, 2011, respectively, each Defendant owed Heritage a fiduciary duty of loyalty as an employee, and Glazer owed Heritage fiduciary duties as a corporate director and officer.

250.     When Malek entered into amendments to his employment contract with Heritage in April 2014 and again on February 24, 2016, he owed Heritage a fiduciary duty of loyalty as a company officer (Senior Vice President in 2013 and President by October 2015) and employee.

251.     When Glazer entered into amendments to his employment contract with Heritage on February 24, 2016, Glazer owed Heritage a fiduciary duty of loyalty as a director, company officer (Chief Executive Officer), and employee.

252.     Despite their fiduciary duties to Heritage—including the duty to disclose material facts to Heritage in contractual negotiations with the Company—each Defendant concealed

material facts from Heritage every time he negotiated an employment contract or extension with Heritage.  For example, Defendants concealed their involvement in a scheme to divert Heritage's corporate opportunities to companies that Defendants owned, concealed their theft of Heritage's trade secrets and proprietary business information, and concealed their scheme of racketeering activity designed to divert Heritage's profits and property.

253.   In addition to the duty to disclose created by Defendants' roles at the Company, Defendants owed Heritage a further duty to disclose their conduct while they negotiated employment agreements with Heritage.  Defendants owed Heritage this duty because their positions at Heritage put them in a position of trust where they, and no other directors or executives of Heritage, could be expected to have knowledge of their covert scheme.  Heritage reasonably trusted and relied upon Defendants—Glazer the CEO and a Director; Malek the Vice President and head of the Sales department and, by fall 2015, President at Heritage—not to hide material facts from the Company.  However, Defendants failed to inform Heritage that they were secretly diverting Heritage's corporate opportunities to companies that Defendants owned, stealing Heritage's trade secrets, and engaging in a scheme of racketeering activity at Heritage's expense.

254.   Had Defendants not (i) misrepresented their intent to comply with the terms of the contract and (ii) concealed their wrongful conduct from Heritage, the Company would certainly not have entered into Defendants' employment contracts, extended these agreements, or awarded Stock Appreciation Rights.

255.   The terms of the employment agreements further demonstrate that Heritage would not have entered into these contracts had it known of Defendants' ongoing scheme to steal from the Company.  In their agreements with Heritage, each Defendant agreed to "devote substantially all

of his business time and skills" to Heritage, agreed not to solicit the Company's customers, and agreed not to disclose the Company's trade secrets or take any copies thereof "from the Company's facilities."  Glazer also agreed to "carry out all of his duties in good faith so as to promote the business and interests of the Company," and "render his services under this Agreement faithfully, to the best of his abilities, and in conformance with all laws and Company rules and policies."

256.    Glazer and Malek intended that Heritage rely on their promises in the employment contracts and Heritage's belief that Defendants were acting as fiduciaries.  This intent was made clear by the great lengths Defendants went to in order to conceal from Heritage their theft of the Company's property and trade secrets, diversion of Heritage's business opportunities, falsification of records, and other acts of disloyalty and racketeering.

257.    In entering into employment agreements with Defendants, Heritage did in fact rely on its reasonable belief that Defendants intended to act in the best interest of the Company, as they promised and were required to do as fiduciaries.  At the time Heritage entered into the agreements with Glazer in May 2011 and February 2016, and when it granted Glazer SARs awards, it relied on its reasonable belief that Glazer was not stealing corporate opportunities and trade secrets from Heritage, falsifying corporate records, and engaging in other acts of disloyalty and racketeering.  Similarly, at the time Heritage entered into the agreements with Malek in March 2011, April 2014, and February 2016, and when it granted Malek SARs awards, it relied on its reasonable belief that Malek was not stealing corporate opportunities and trade secrets from Heritage, falsifying corporate records, and engaging in other acts of disloyalty and racketeering.

258.    As a result of Defendants' fraudulent promises and fraudulent concealment, the employment agreements that Heritage entered into with Defendants between 2011 and 2016, and any Stock Appreciation Rights awarded thereunder, were fraudulently induced and are voidable *ab initio* by Heritage.

## COUNT VII

### (Unjust Enrichment)

(Against All Defendants)

259.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

260.    As a result of Defendants' fraudulent inducement of Heritage to enter into contracts with Defendants—contracts that are voidable by Heritage as discussed in Count VI—Heritage paid or granted each Defendant wages, bonuses, benefits, Stock Appreciation Rights, and other generous compensation worth millions of dollars.

261.    These benefits to Defendants came at Heritage's expense and caused damage to Heritage because the Company bore the cost of Defendants' wages and other compensation and granted a portion of its profits to Defendants as Stock Appreciation Rights.

262.    It would be unjust for Defendants to retain these valuable benefits conferred by Heritage.  Heritage's Board of Directors, which included a majority of members from outside the United States, provided generous compensation packages to Defendants in order to incentivize Defendants' dedication and loyalty to Heritage.  But all the while, Defendants were secretly engaged in a scheme to steal Heritage property and trade secrets, to misappropriate Heritage's business opportunities, and to enrich themselves at Heritage's expense through Defendants' unlawful racketeering activity.

263.    Heritage also compensated Defendants in recognition of their duty of loyalty to the Company.  Heritage provided Defendants with compensation commensurate with these expectations, yet Defendants secretly breached these duties throughout their employment.

264.    Heritage suffered damages in paying Defendants wages and other compensation and granting Stock Appreciation Rights while Defendants violated their duty of loyalty to the Company.

## COUNT VIII

### (Breach of Contract—in the Alternative)

(Against All Defendants)

265.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

266.    In the event that any of Defendants' employment contracts are not voidable for Defendants' fraud in inducing Heritage to enter into the contracts, each Defendant materially and repeatedly breached his contractual obligations to Heritage.  For example:

a.    In their employment contracts, each Defendant agreed to "devote substantially all of his business time and skills to the performance of his Duties hereunder during the Term [of the contract]."  Each Defendant breached this provision at and from the time he signed his employment agreement by, *inter alia*, funneling Heritage's business opportunities to dummy companies owned by Defendants.

b.    Each Defendant agreed not to "solicit or accept any business for any product sold, manufactured or distributed by the Company . . . from any person, firm or corporation that is a customer of the Company . . . ."  Each Defendant breached this

provision at and from the time he signed his employment agreement by, *inter alia*, funneling Heritage's business opportunities to dummy companies owned by Defendants.

c.      Each Defendant agreed not to "disclose or make accessible to any other person, the Company's products, services and technology, both current and under development, promotion and marketing programs, lists, trade secrets and other confidential and proprietary business information of the Company or any of its clients," including not to "use any such information for himself or others" or "take any such material or reproductions thereof from the Company's facilities." Each Defendant breached these provisions at and from the time he signed his employment agreement by, *inter alia*, stealing copies of Heritage's trade secrets and proprietary information and transferring a Heritage business license and trade secrets to their dummy companies.

d.      Glazer agreed to "exert his best efforts on behalf of the Company," "carry out all of his duties in good faith so as to promote the business and interests of the Company," and "render his services under this Agreement faithfully, to the best of his abilities, and in conformance with all laws and Company rules and policies." Glazer breached this agreement by, *inter alia*, funneling Heritage's business opportunities to dummy companies owned by Defendants.

267.    Each of the contracts was performed fully by Heritage.

268.    Heritage suffered substantial damages from Defendants' breaches, including the loss of profits and corporate opportunities, the disclosure of its trade secrets, and the loss of its employees' efforts and services which were instead diverted to Defendants' dummy companies. Heritage is entitled to compensation for these damages.

## COUNT IX

### (Theft of Trade Secrets)

(Against Defendant Glazer)

269.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

270.    Heritage seeks redress under the New Jersey Trade Secrets Act, N.J. Stat. Ann. § 56:15-1 *et seq*., and New Jersey common law for the ongoing injury the Company suffers as a result of Defendant's theft of the Company's trade secrets.

271.    Glazer stole copies of many of Heritage's ANDAs, keeping them on a CD stored at his house.

272.    Heritage's ANDAs contain detailed instructions for manufacturing the pharmaceuticals sold by Heritage.  The detailed instructions contained in the ANDAs are valuable because the manufacturing process for creating the chemical formulae for pharmaceuticals often takes years and millions of dollars to perfect to a level where it will be approved by the FDA.  Heritage's ANDAs are among its most valuable assets.

273.    Heritage takes significant precautions to maintain the secrecy of its ANDAs.  It does not disclose the contents of the ANDAs to third parties without taking extensive measures to maintain this secrecy.  For example, when Heritage hires a third party to manufacture pharmaceuticals pursuant to its ANDAs, it requires that the third party sign comprehensive nondisclosure agreements—and even then does not share the entire ANDA with the manufacturer.  Likewise, when Heritage considers selling ANDAs to another company, which is common in the generic pharmaceutical industry, it requires the potential buyer to sign a nondisclosure agreement and then only provides the potential buyer with part of the ANDA.

Other pharmaceutical manufacturers take similar precautions with their ANDAs because they are so valuable.

274.    In text messages exchanged between Glazer and Malek on August 24, 2015, which show their desire to steal from Heritage and conceal their misconduct, Defendants discussed whether they should manufacture and sell Tetracycline, a product sold by Heritage, through their dummy company Dorado Pharma.  Glazer wrote that he could "probably get the complete ANDA electronically" from Heritage but that it would be too risky to file an ANDA for Tetracycline, a major Heritage product, "prior to getting the fuck out of [Heritage]."

275.    In that same text message exchange, Glazer admitted that he had already stolen many of Heritage's trade secrets—and planned to steal more—writing that, "I basically have every original [Heritage] ANDA on CD at my house but need to get some of the new ones and the [ones manufactured by a certain Heritage supplier]."  Glazer did not have permission from Heritage to possess the Company's original ANDAs on a CD at his house.

276.    Additionally, in May 2012, Glazer covertly transferred Heritage's ANDA for Ketoprofen to one of Defendants' dummy companies, Dorado Pharma, without any compensation to Heritage.  This, of course, was outright theft of Heritage's intellectual property.  As a result of Glazer's theft of the trade secrets contained in the ANDA, Defendants reaped substantial profits through their dummy company Dorado Pharma that otherwise would have gone to Heritage.  Heritage has suffered and will continue to suffer lost profits from Glazer's theft of Heritage's Ketoprofen ANDA.

277.    Defendants also appear poised to use the trade secrets they stole from Heritage to compete against it.  Soon after they were fired by Heritage for cause, Defendants started a new company named Astor Pharma LLC for the purpose of selling pharmaceuticals or

pharmaceutical-related intellectual property.  Heritage has repeatedly demanded that Defendants

return all Company property, but Defendants have refused to do so.

278.    The trade secrets Defendants stole from Heritage give Defendants the ability to sell

Heritage's products through their competing businesses companies to Heritage's customers

without going through the costly and time-consuming process of developing their own

manufacturing process.

279.    Any further disclosure or use of Heritage's trade secrets by Defendants would cause

further harm to Heritage by allowing Defendants to sell pharmaceuticals to Heritage's customers

and displace sales that would otherwise be made by Heritage.

## COUNT X

**(Claim for Injunctive Relief for Violations of N.J. Stat. Ann. Title 2C, Chapter 20)**

(Against All Defendants)

280.    Plaintiff re-alleges and incorporates by reference each and every allegation contained

in this Complaint as if fully set forth herein.

281.    New Jersey law provides that "a person alleging injury or loss, may bring an action in

the Superior Court to enjoin violations of chapter 20 of Title 2C of the New Jersey Statutes, or to

enjoin any acts in furtherance thereof."  N.J. Stat. Ann. § 2C:20-21.  Principles of supplemental

jurisdiction under 28 U.S.C. § 1367 grant this Court the authority to hear and decide this claim.

282.    Among Defendants' numerous violations of Title 2C, Chapter 20 of the New Jersey

Statutes that have caused injury to Heritage, two specific violations cause the Company ongoing

injury that could and should be prevented by injunctions against Defendants.

283.    As alleged previously herein, Glazer has in his possession electronic copies of most

or all of the ANDAs held by Heritage.  These ANDAs are stored securely in digital form on the

Heritage server. As Chief Executive Officer, Glazer had access to these ANDAs for legitimate business purposes. Acting knowingly, willfully, and beyond the scope of his authority Glazer abused his security credentials to access the Heritage ANDAs on the Company's server for his personal business interests. He also made digital copies of the ANDAs on CDs for future reference and Defendants' personal use upon leaving Heritage.

284. On information and belief, Plaintiff alleges that Defendants remain in possession of copies of the Heritage ANDAs and the trade secrets these contain. These ANDAs contain valuable intellectual property that Defendants continue to access for unauthorized purposes and to attempt to commercialize or sell to Heritage's competitors. This places Heritage at risk of harm to its business with respect to each and every ANDA in Defendants' possession.

285. Glazer's improper access and copying of Heritage's ANDAs in order to steal the trade secrets contained therein, constitutes "computer criminal activity" in violation of N.J. Stat. Ann. § 2C:20-25. This statute criminalizes the conduct of anyone who, acting without authorization or in excess of authorization,

> a. Accesses any data, data base, computer storage medium, computer program, computer software, computer equipment, computer, computer system or computer network; [. . .]
>
> c. Accesses or attempts to access any data, data base, computer, computer storage medium, computer program, computer software, computer equipment, computer system or computer network for the purpose of executing a scheme to defraud, or to obtain services, property, personal identifying information, or money, from the owner of a computer or any third party; or [. . .]
>
> e. Obtains, takes, copies or uses any data, data base, computer program, computer software, personal identifying information, or other information stored in a computer, computer network, computer system, computer equipment or computer storage medium[.]

Glazer's conduct violates all of these provisions.

286.    Under N.J. Stat. Ann. § 2C:20-21 the Court has broad equitable powers to enjoin acts in furtherance of violations of Title 2C, Chapter 20 at the requests of persons injured by such conduct.  Heritage has been injured by Glazer's unauthorized access and taking of the Company's trade secrets and will be further harmed by Defendants' continued use of the illegal copies when Defendants seek to profit from this information.  Heritage respectfully requests that the Court exercise its broad equitable powers to issue an injunction against Defendants, requiring that Defendants return each and every copy of all Heritage ANDAs in their possession.  Plaintiff further requests that the Court enjoin Defendants from disclosing or using any proprietary information or trade secrets learned from those documents, and from developing an ANDA for any products for which Heritage held an ANDA or was developing an ANDA submission as of the date of Defendants' termination.

287.    In further violation of Chapter 20, Title 2C of the New Jersey Statutes, Defendants have also refused to return Company property that was in their possession when they were terminated.  Specifically, Defendants are in possession of numerous pieces of technological equipment including multiple iPhones, iPads, and MacBook laptops potentially containing information of great value to the Company.  At the time of Defendants' termination, Heritage issued written instructions for the return of all Company property.  When Defendants failed to comply, Heritage reiterated its request in official demand letters dated September 26, 2016.  Heritage still has yet to receive back any of the Company's property in Defendants' possession.  Defendants' conduct constitutes theft by improper taking or disposition in violation of N.J. Stat. Ann § 2C:20-3(a).

288.    Heritage has been deprived not only of its tangible property, but also of the valuable Company information potentially contained therein.  To prevent further injury, Heritage

respectfully requests that the Court issue an injunction under N.J. Stat. Ann. § 2C:20-21 requiring that Defendants return all Company property in their possession.

## PRAYER FOR RELIEF

289.    Plaintiff demands judgment against both Defendants and respectfully requests that this Court grant the following relief, in amounts to be determined at trial, on each count detailed above:

    a.   Compensatory damages for each claim for relief, including treble damages for RICO conduct as provided by 18 U.S.C. § 1964(c) and N.J. Stat. Ann. § 4C:41-4;

    b.   Disgorgement of compensation paid to Defendants during the seven years of their illegal and disloyal conduct, including salaries, bonuses, benefits, and SARs awards;

    c.   Declaratory judgment that Defendants fraudulently induced Heritage to enter into their employment agreements and that those agreements and all benefits thereunder, including the awards of SARs, are therefore voidable *ab initio* at the option of Heritage;

    d.   Injunctive relief

        i.   requiring each Defendant to return every digital and physical copy of a Heritage ANDA in his possession and any notes based thereon, as well as any other Company property in his possession;

        ii.   prohibiting each Defendant from disclosing or using any proprietary information or trade secrets derived from those documents or property; and

       iii.  prohibiting each Defendant from developing an ANDA for any products

            for which Heritage held an ANDA or was developing an ANDA

            submission as of the date of Defendants' termination;

e.  Forfeiture of Defendants' interests in Tal Pharma, Dorado Pharma, Element

     Pharma, VetGen Pharma, and Astor Pharma;

f.  Punitive damages;

g.  Interest, attorney's fees, costs of investigation, costs of suit, and expenses; and

h.  Such other relief as the Court deems just and equitable.

## **DEMAND FOR JURY TRIAL**

290.   Plaintiff demands a jury trial on all issues so triable.

Respectfully Submitted,

Dated: November 10, 2016

By: *s/ Liza M. Walsh* _____

WALSH PIZZI O'REILLY FALANGA LLP

Liza M. Walsh
Marc. D. Haefner
One Riverfront Plaza
1037 Raymond Boulevard, Suite 600
Newark, NJ  07102
lwalsh@walsh.law
mhaefner@walsh.law
(t) (973) 757-1100
(f) (973) 757-1090

GIBSON, DUNN & CRUTCHER LLP

Daniel W. Nelson (*pro hac vice forthcoming*)
William Jeremy Robison (*pro hac vice forthcoming*)
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
dnelson@gibsondunn.com
wrobison@gibsondunn.com
(t) (202) 955-8500
(f) (202) 467-0539

*Attorneys for Heritage Pharmaceuticals Inc.*

<u>**Certification Pursuant to New Jersey Local Civil Rule 11.2**</u>

Pursuant to Local Civil Rule 11.2, we hereby certify that to the best of our knowledge, the matter in controversy is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.  We further certify that we have no knowledge of any contemplated action or arbitration proceeding regarding the subject matter of this action and that we are not aware of any other parties who should be joined this action.

We certify under penalty of perjury the foregoing statements are true and correct.


Respectfully Submitted,

Dated: November 10, 2016                         By: *s/ Liza M. Walsh* _____

WALSH PIZZI O'REILLY FALANGA LLP

Liza M. Walsh
Marc. D. Haefner
One Riverfront Plaza
1037 Raymond Boulevard, Suite 600
Newark, NJ  07102
lwalsh@walsh.law
mhaefner@walsh.law
(t) (973) 757-1100
(f) (973) 757-1090

GIBSON, DUNN & CRUTCHER LLP

Daniel W. Nelson (*pro hac vice forthcoming*)
William Jeremy Robison (*pro hac vice forthcoming*)
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
dnelson@gibsondunn.com
wrobison@gibsondunn.com
(t) (202) 955-8500
(f) (202) 467-0539


*Attorneys for Heritage Pharmaceuticals Inc.*

<u>**Certification Pursuant to New Jersey Local Civil Rule 201.1**</u>

Pursuant to Local Civil Rule 201.1, we hereby certify that the above-captioned matter is not subject to compulsory arbitration in that the plaintiffs seek, *inter alia*, injunctive relief and damages in excess of $150,000.

We certify under penalty of perjury the foregoing statements are true and correct.

Respectfully Submitted,

Dated:  November 10, 2016                    By: *s/ Liza M. Walsh*_____

WALSH PIZZI O'REILLY FALANGA LLP

Liza M. Walsh
Marc. D. Haefner
One Riverfront Plaza
1037 Raymond Boulevard, Suite 600
Newark, NJ  07102
lwalsh@walsh.law
mhaefner@walsh.law
(t) (973) 757-1100
(f) (973) 757-1090

GIBSON, DUNN & CRUTCHER LLP

Daniel W. Nelson (*pro hac vice forthcoming*)
William Jeremy Robison (*pro hac vice forthcoming*)
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
dnelson@gibsondunn.com
wrobison@gibsondunn.com
(t) (202) 955-8500
(f) (202) 467-0539

*Attorneys for Heritage Pharmaceuticals Inc.*

*Heritage Pharmaceuticals Inc. v. Jeffrey A. Glazer and Jason T. Malek* : Complaint Appendix A
18 U.S.C. §§ 1341, 1343 (Mail and Wire Fraud)

| | Participants | Date | Format | Purpose | Description |
|---|---|---|---|---|---|
| 1 | Jeffrey Glazer<br>Terry Fullem | May 6, 2009 | Email | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and misrepresent dummy corporation's affiliation with Heritage. | Glazer sent another pharmaceutical company an offer for the purchase of ANDA assets on behalf of Tal Pharma. Glazer used his Heritage email account and told the other company that Tal Pharma was "related" to Heritage. |
| 2 | Jeffrey Glazer<br>Richard Bell | May 8, 2009 | Mail | Create dummy corporation. | Bell, of Harvard Business Services, Inc., sent Glazer a Recorded Copy of Tal Pharma's Certificate of Formation. |
| 3 | Jeffrey Glazer | October 29, 2009 | Mail | Operate fraudulent enterprise. | Glazer appointed C. Jeanne Taborsky and SciRegs International Inc. as the U.S. Regulatory Affairs Agent for Tal Pharma in the filing of information with the FDA. |
| 4 | Jeffrey Glazer<br>Sujit Sakpal<br>Amit Ghare | November 10, 2009-March 2, 2010 | Email Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and misrepresent dummy corporation's affiliation with Heritage. | Glazer emailed Sakpal and Ghare of Alkem Laboratories to inquire about ANDA acquisitions. Sakpal and Glazer exchanged emails about the possibility of Alkem Laboratories acquiring ANDAs. Glazer referred to Tal Pharma as his "consulting firm." |
| 5 | George Malek<br>Tal Pharma LLC | March 26, 2010 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | George Malek, Jason Malek's father, wired $100,000 to Tal Pharma from his Merrill Lynch account. |
| 6 | Jeffrey Glazer<br>Paul Campanelli | April 7, 2010 | Email | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and misrepresent dummy corporation's affiliation with Heritage. | Glazer sent Campanelli, President of Par Pharmaceutical, an email attachment using Heritage letterhead to negotiate an ANDA purchase. In doing so, he told Campanelli that Tal Pharma was an affiliate of Heritage and signed the agreement on behalf of both Tal Pharma and Heritage. |
| 7 | Tal Pharma LLC<br>George Malek | May 27, 2010 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Tal Pharma wired $50,000 to George Malek to repay money he loaned Glazer and Malek to form the dummy corporation. |

| 8 | Erika Vogel<br>Cheryl Brinkman<br>Jason Malek<br>Jeffrey Glazer | September 7-8, 2010 | Email Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise; misrepresent dummy corporation's affiliation with Heritage; and misappropriate Heritage resources. | In an exchange between Vogel, Heritage's Director of National Accounts, and Brinkman, of McKesson, Vogel used her Heritage email address but acted on behalf of Tal Pharma to discuss state licensing issues. Vogel told Brinkman, "Tal is permitted to distribute products under Heritage's license as they are an affiliate company under common ownership." Malek is copied on the conversation and he forwarded it to Glazer. |
|---|---|---|---|---|---|
| 9 | Jennifer Schneider<br>Jason Malek<br>Jeffrey Glazer | September 9, 2010 | Email | Operate fraudulent enterprise. | Schneider sent Glazer and Malek state licensing information for Tal Pharma and Heritage. |
| 10 | Jeffrey Glazer<br>Erika Vogel | October 15, 2010 | Email | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and misappropriate Heritage resources. | Glazer emailed Vogel to let her know McKesson had already sold a large percentage of the EEMT it had purchased from Tal Pharma and that they needed to discuss replenishment. |
| 11 | Jason Malek<br>Sherri Chase | October 15, 2010 | Email Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and misrepresent dummy corporation's affiliation with Heritage. | Malek emailed Chase, at McKesson, to ask about chargeback dates for two shop keeping units. The subject line of the email is Heritage/Tal Pharma and Malek wrote, "Tal Pharma LLC is a subsidiary label of Heritage Pharmaceuticals Inc." |
| 12 | Erika Vogel<br>Cheryl Brinkman | December 21, 2010 | Email | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and conceal fraudulent scheme. | Brinkman, of McKesson, emailed Vogel to inform her that McKesson had received an unsolicited bid from a new supplier for EEMT. Vogel responded that she would like to offer a competitive price but needed to discuss the details by telephone. |
| 13 | Jason Malek<br>Jeffrey Glazer<br>Erika Vogel | January 5, 2011 | Email Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and misappropriate Heritage resources. | Vogel forwarded the email chain between herself and McKesson representatives regarding EEMT to Glazer and Malek, asking for advice. Malek passed on his recommendation to Glazer without including Vogel in the email chain. |

| 14 | Erika Vogel<br>Jason Malek<br>Jeffrey Glazer<br>Keith Fleming | January 5, 2011 | Email Exchange | Misappropriate Heritage resources and conceal fraudulent scheme. | Vogel sent an EEMT order for Tal Pharma to Glazer, Malek, and Fleming, Heritage's Associate Director of Pricing and Contacts. Glazer told Malek to tell Vogel to only include himself and Malek on Tal Pharma emails. Malek passed on the message to Vogel, who responded, "I get so confused about who gets what; Tal gives me anxiety!!!! I knew [Heritage's customer service team] didn't get it so I threw Keith in there!!! LOL. Tell JG, EV said OK, and not to voodoo doll me." |
|---|---|---|---|---|---|
| 15 | Tal Pharma LLC<br>Syntho Pharmaceuticals, Inc. | January 18, 2011 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Tal Pharma wired $119,274 to Syntho Pharmaceuticals for the manufacture of EEMT. |
| 16 | Tal Pharma LLC<br>Exact-RX, Inc. | February 11, 2011 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Tal Pharma wired $318,088.85 to Exact-RX for a license to sell, market, and distribute EEMT. |
| 17 | Tal Pharma LLC<br>Harvard Business Services, Inc. | March 14, 2011 | Payment via Debit Card | Facilitate transfer of funds for fraudulent scheme | Tal Pharma made a debit card payment of $279 to Harvard Business Services, Tal Pharma's incorporating agent. |
| 18 | Jason Malek<br>Jeffrey Glazer | March 14, 2011 | Email | Operate fraudulent enterprise. | Malek emailed Glazer the 2010 Tal Financial Workbook. |
| 19 | Jason Malek<br>Jeffrey Glazer | March 21, 2011 | Email Exchange | Conceal fraudulent scheme. | Malek accidentally attached a Tal Pharma financial document to an email he sent to Glazer on his Heritage email account. Glazer responded, "You attached TAL accrual Summary - be careful." Malek replied, "Saw that after the fact…my bad." |
| 20 | Tal Pharma LLC<br>Freightquote | April 8, 2011 | Payment via Debit Card | Facilitate transfer of funds for fraudulent scheme. | Tal Pharma made a debit card payment of $756 to Freightquote for freight services. |
| 21 | Tal Pharma LLC<br>Bank Account | April 26, 2011 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Tal Pharma transferred $25,000 to a Bank of America account. |
| 22 | Tal Pharma LLC<br>Bank Account | April 26, 2011 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Tal Pharma transferred $25,000 to a Bank of America account. |
| 23 | Tal Pharma LLC | May 20, 2011 | Online Transfer of Funds | Facilitate transfer of funds for fraudulent scheme. | Tal Pharma transferred $900,000 from its checking account to its savings account. |
| 24 | Tal Pharma LLC<br>Bank Account | May 20, 2011 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Tal Pharma transferred $4,000 to a Bank of America account. |
| 25 | Tal Pharma LLC | June 23, 2011 | Online Transfer of Funds | Facilitate transfer of funds for fraudulent scheme. | Tal Pharma transferred $450,000 from its savings account to its checking account. |

| 26 | Tal Pharma LLC<br>Exact-RX, Inc. | September 27, 2011 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Tal Pharma wired $6,141.18 to Exact-RX for a license to sell, market, and distribute EEMT. |
| --- | --- | --- | --- | --- | --- |
| 27 | Tal Pharma LLC<br>Exact-RX, Inc. | December 29, 2011 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Tal Pharma wired $8,280.36 to Exact-RX for a license to sell, market, and distribute EEMT. |
| 28 | Jason Malek<br>Cheryl Brinkman | February 9, 2012 | Email Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and misrepresent dummy corporation's affiliation with Heritage. | Malek emailed Brinkman at McKesson confirming that Tal Pharma had the opportunity to bid for EEMT. In his email, Malek wrote, "As you know, we launched EEMT in 2010 through our Tal Label." |
| 29 | Jason Malek<br>Mark Malek | February 9-15, 2012 | Email Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and expand the enterprise. | Malek emailed his brother, Mark, to discuss the possibility of Tal Pharma submitting a bid at McKesson for EEMT. They set up a time to discuss over the phone. They continued to discuss in the following days. |
| 30 | Jeffrey Glazer<br>Jason Malek | February 16, 2012 | Email Exchange | Operate fraudulent enterprise. | Glazer emailed Malek to tell him that he registered the domain name "doradopharma.com." |
| 31 | Tal Pharma LLC<br>Exact-RX, Inc. | March 6, 2012 | Payment via ACH Transfer | Facilitate transfer of funds for fraudulent scheme. | Tal Pharma transferred $17,122.97 to Exact-RX for a license to sell, market, and distribute EEMT. |
| 32 | Laya Steve<br>Dorado Pharma LLC | May 4, 2012 | Online Platform | Misappropriate Heritage's intellectual property in furtherance of fraudulent scheme. | At Glazer's direction, Steve, Heritage's Director of Regulatory Affairs, submitted a request via FDA's online platform to transfer Heritage's Ketoprofen ANDA to Dorado Pharma. The transfer was effectuated several days later. |
| 33 | Jeffrey Glazer<br>Laya Steve | May 4, 2012 | Email Exchange | Steal Heritage's intellectual property and conceal ownership of the dummy corporation. | Glazer emailed Steve, "We are transferring Ketoprofen to a different entity … named Dorado Pharma LLC" and requested that she draft a transfer of ownership form. Steve drafted the form, made revisions as instructed by Glazer, and emailed it to Glazer. Glazer did not tell her that he and Malek owned Dorado Pharma or that Heritage would be receiving no compensation for the Ketoprofen ANDA. |

| 34 | Jeffrey Glazer | May 4, 2012 | Mail | Operate fraudulent enterprise. | Glazer appointed C. Jeanne Taborsky and SciRegs International Inc. as the U.S. Regulatory Affairs Agent for Dorado Pharma in the filing of information with the FDA. |
|---|---|---|---|---|---|
| 35 | Jeffrey Glazer<br>Harvard Business Services, Inc. | May 8, 2012 | Mail | Create dummy corporation. | Harvard Business Services, Inc. sent Glazer a Recorded Copy of Dorado Pharma's Certificate of Formation. |
| 36 | Jeffrey Glazer<br>Jitesh Devendra | May 16, 2012 | Email Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and misrepresent dummy corporation's affiliation with Heritage. | Glazer and Devendra of Shasun Pharmaceuticals exchanged emails regarding the Ketoprofen negotiations. Although the negotiations initially began on behalf of Heritage and Shasun, Glazer sent Devendra an email from his Heritage account instructing him to "please put the revised project proposal in the name of Dorado Pharma LLC." |
| 37 | Jeffrey Glazer<br>M. Ganesh<br>Jitesh Devendra<br>Baljali Ramamurthy<br>Chaitanya Devendra<br>Sampathkumar Devarajan | May 23-26, 2012 | Email Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and misrepresent dummy corporation's affiliation with Heritage. | Ganesh of Shasun Pharmaceuticals sent Glazer the final proposal for the Ketoprofen deal but did not change Heritage to Dorado Pharma, as Glazer had previously requested. Glazer responded, "The party needs to be Dorado Pharma, LLC, not Heritage." Ganesh changed the proposal to Dorado Pharma. |
| 38 | KLE 2, Inc.<br>Dorado Pharma LLC | June 27, 2012 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | KLE 2 Pharmaceuticals wired $50,000 to Dorado Pharma in conjunction with its agreement to purchase Ketoprofen. |
| 39 | Tal Pharma LLC<br>CFO Partners, LLC | August 6, 2012 | Payment via ACH Transfer | Facilitate transfer of funds for fraudulent scheme. | Tal Pharma wired $1,850 to CFO Partners for accounting services. |
| 40 | Tal Pharma LLC<br>Bank Account | August 6, 2012 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Tal Pharma transferred $10,000 to a Bank of America account. |
| 41 | Tal Pharma LLC<br>Pharmaceutical Buyers | August 27, 2012 | Payment via Debit Card | Facilitate transfer of funds for fraudulent scheme. | Tal Pharma made a debit card payment of $49.98 to Pharmaceutical Buyers. |
| 42 | Tal Pharma LLC<br>Incorporation Services, Inc. | October 1, 2012 | Payment via Debit Card | Facilitate transfer of funds for fraudulent scheme. | Tal Pharma made a debit card payment of $797 to Incorporation Services, Inc. for its incorporation services. |
| 43 | Tal Pharma LLC<br>Bank Account | October 5, 2012 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Tal Pharma transferred $1,500 to a Bank of America account. |

| 44 | Dorado Pharma LLC<br>Shasun Pharmaceuticals Ltd. | October 19, 2012 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma wired $23,800 to Shasun Pharmaceuticals for the manufacture of Ketoprofen. |
|---|---|---|---|---|---|
| 45 | Dorado Pharma LLC<br>Sciregs International | October 19, 2012 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma wired $7,938.00 to Sciregs International for serving as its U.S. Regulatory Affairs Agent in connection with FDA filings. |
| 46 | Jeffrey Glazer<br>Carol Comins | December 2-11, 2012 | Email Exchange | Aid in the creation of dummy corporation. | Glazer emailed Comins of Paxton Advertising about designing a logo for Element Pharma. |
| 47 | Jason Malek<br>Jeffrey Glazer<br>Sonia Espinoza | December 6, 2012 | Email | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and misrepresent dummy corporation's affiliation with Heritage. | Malek emailed Espinoza of GSMS agreements for two drugs. One agreement was on behalf of Heritage, while the other agreement was on behalf of Dorado Pharma. The subject line of the email was simply "HERITAGE-AGREEMENTS," without any mention of Dorado Pharma. |
| 48 | Jeffrey Glazer<br>Carol Comins | January 4-April 24, 2013 | Email Exchange | Operate fraudulent enterprise. | Glazer emailed Comins of Paxton Advertising about designing a logo for Dorado Pharma. They exchanged emails discussing options for the logo. Glazer ultimately selected one. |
| 49 | Dorado Pharma LLC<br>Sciregs International | February 11, 2013 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma wired $12,937.50 to Sciregs International for serving as its U.S. Regulatory Affairs Agent in connection with FDA filings. |
| 50 | Jason Malek<br>Juliana White | February 21, 2013 | Email | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and conceal fraudulent conduct through misrepresentations. | Malek emailed White, Heritage's Sales and Customer Service Manager, to alert her that Dorado was a "new customer for… Nimodipine" and attached a purchase order from Dorado Pharma. |
| 51 | KLE 2, Inc.<br>Dorado Pharma LLC | February 22, 2013 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | KLE 2 Pharmaceuticals wired $25,000 to Dorado Pharma in conjunction with its agreement to purchase Ketoprofen. |
| 52 | Tal Pharma LLC<br>Harvard Business Services, Inc. | February 26, 2013 | Payment via Debit Card | Facilitate transfer of funds for fraudulent scheme. | Tal Pharma made a debit card payment of $279 to Harvard Business Services, Tal Pharma's incorporating agent. |
| 53 | Tal Pharma LLC<br>Regus | February 26, 2013 | Payment via Debit Card | Facilitate transfer of funds for fraudulent scheme. | Tal Pharma made a debit card payment of $119 to Regus for Tal Pharma's virtual office space. |

| # | Parties | Date | Type | Purpose | Description |
|---|---|---|---|---|---|
| 54 | Jason Malek<br>Jeffrey Glazer<br>Rosemary Tamasi | March 26, 2013 | Email | Operate fraudulent enterprise. | Malek emailed Tamasi at Regus to make changes to Dorado Pharma's Virtual Office Agreement. |
| 55 | Dorado Pharma LLC<br>Jeffrey Glazer | March 28, 2013 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma wired $90,000 to Glazer. |
| 56 | Dorado Pharma LLC<br>Jason Malek | March 28, 2013 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma wired $90,000 to Malek. |
| 57 | Jeffrey Glazer<br>Lee Reingold | March 29, 2013 | Email | Operate fraudulent enterprise. | Glazer sent an email from his Heritage email account to Reingold, Dorado Pharma's accountant. In the email, Glazer summarized Dorado Pharma's arrangement with KLE2 and Shasun and transmitted information for Dorado Pharma's 2013 tax returns. |
| 58 | Dorado Pharma LLC<br>Sciregs International | April 15, 2013 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma wired $26,837 to Sciregs International for serving as its U.S. Regulatory Affairs Agent in connection with FDA filings. |
| 59 | KLE 2, Inc.<br>Dorado Pharma LLC | May 31, 2013 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | KLE 2 Pharmaceuticals wired $25,000 to Dorado Pharma in conjunction with its agreement to purchase Ketoprofen. |
| 60 | Dorado Pharma LLC<br>Shasun Pharmaceuticals Ltd. | July 8, 2013 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma wired $17,850 to Shasun Pharmaceuticals for the manufacture of Ketoprofen. |
| 61 | Dorado Pharma LLC<br>Sciregs International | August 13, 2013 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma wired $30,112.50 to Sciregs International for serving as its U.S. Regulatory Affairs Agent in connection with FDA filings. |
| 62 | Jason Malek<br>Rudy Perez | August 20, 2013 | Email | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Perez of GSMS emailed Dorado Pharma a purchase order for Nimodipine. |
| 63 | Jason Malek<br>Juliana White<br>Rich Smith<br>Kaylie Coppa | August 21, 2013 | Email | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Malek sent Heritage employees a purchase order from Dorado Pharma for Nimodipine. The shipping address for the product was GSMS's office in California. |
| 64 | Jason Malek<br>Rudy Perez | September 3, 2013 | Email | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Malek emailed Perez at GSMS to tell him that the Nimodipine order had shipped and to provide him with an invoice. |
| 65 | KLE 2, Inc.<br>Dorado Pharma LLC | September 10, 2013 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | KLE 2 Pharmaceuticals wired $62,875 to Dorado Pharma in conjunction with its agreement to purchase Ketoprofen. |

| 66 | Dorado Pharma LLC<br>Jeffrey Glazer | September 16, 2013 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma wired $25,785 to Glazer. |
|---|---|---|---|---|---|
| 67 | Jason Malek<br>Jeffrey Glazer<br>Michael Morrish | October 8-9, 2013 | Email Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Malek emailed Morrish at GSMS to ask for a payment update on a Nimodipine invoice. Morrish responded that it had been sent to 12 Christopher Way, Suite 200 Eatontown, NJ. Malek forwarded the conversation to Glazer. |
| 68 | Tal Pharma LLC<br>Tucker, Albin & Associates | January 15, 2014 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Tal Pharma wired $2,179.14 to Tucker, Albin & Associates for debt collection services. |
| 69 | Dorado Pharma LLC<br>Jason Malek | March 5, 2014 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma wired $10,000 to Malek. |
| 70 | Dorado Pharma LLC<br>Jeffrey Glazer | March 5, 2014 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma wired $10,000 to Glazer. |
| 71 | Dorado Pharma LLC<br>Jeffrey Glazer | April 7, 2014 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma wired $5,000 to Glazer. |
| 72 | Dorado Pharma LLC<br>Jeffrey Glazer | April 16, 2014 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma wired $10,000 to Glazer. |
| 73 | Dorado Pharma LLC<br>Jason Malek | April 16, 2014 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma wired $10,000 to Malek. |
| 74 | Dorado Pharma LLC<br>Sciregs International | April 21, 2014 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma wired $175 to Sciregs International for serving as its U.S. Regulatory Affairs Agent in connection with FDA filings. |
| 75 | Jeffrey Glazer<br>Harvard Business Services, Inc. | July 28, 2014 | Mail | Create dummy corporation. | Harvard Business Services sent Glazer a Recorded Copy of Element Pharma's Certificate of Formation. |
| 76 | Dorado Pharma LLC<br>Sciregs International | July 29, 2014 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma wired $1,162.50 to Sciregs International for serving as its U.S. Regulatory Affairs Agent in connection with FDA filings. |
| 77 | Jason Malek<br>Keith Fleming | August 6, 2014 | Email | Conceal fraudulent scheme. | Malek emailed Fleming to instruct him to remove Dorado Pharma from Heritage sales reports. |
| 78 | Tal Pharma LLC<br>NJ State Corporation Filing Agency | August 27, 2014 | Payment via Debit Card | Facilitate transfer of funds for fraudulent scheme. | Tal Pharma made a debit card payment of $50 to the New Jersey State Corporation Filing Office. |

| 79 | Tal Pharma LLC<br>Main Suites, LLC | October 2, 2014 | Payment via Debit Card | Facilitate transfer of funds for fraudulent scheme. | Tal Pharma made two debit card payments of $300 and $110 to Main Suites for Tal Pharma's virtual office space in Eatontown, New Jersey. |
|---|---|---|---|---|---|
| 80 | K.R. Kumar<br>Jeffrey Glazer | October 13, 2014 | Email | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Kumar of Finoso Pharma sent Glazer a project proposal for Element Pharma. |
| 81 | Jason Malek<br>Jeffrey Glazer<br>Sonia Espinoza<br>Chris Henry | October 15-November 6, 2014 | Email Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and misrepresent dummy corporation's affiliation with Heritage. | Malek negotiated a deal for Calcitriol with GSMS. After Espinoza of GSMS sent Malek the signed contract, Malek used his Heritage email account to tell her that they "need to change to Dorado Pharma." When Espinoza questioned the change, Malek said that this was the "[s]ame process we covered for Nimodipine. We have Dorado in the agreement for re-pack items." |
| 82 | Jason Malek<br>Jeffrey Glazer<br>Diana Harbort<br>Sean Lonergan | October 22, 2014-March 4, 2015 | Email Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and misrepresent dummy corporation's affiliation with Heritage. | A PruGen representative reached out to Heritage to inquire about purchasing large quantities of Doxy DR. Over the next few months, Malek negotiated contract terms via email with Harbort of PruGen for the sale of Doxy DR. Although the negotiations originally began on behalf of Heritage, Malek and Glazer redirected the purchases to Dorado Pharma. On March 4, 2015, the final Term Sheet was sent via email for each party to sign. Both parties signed the Term Sheet, which stipulated that the customer "will purchase from Heritage, or its designated repackager." Dorado Pharma was not mentioned. |
| 83 | Jason Malek<br>Jeffrey Glazer | October 30, 2014 | Email Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Malek emailed Glazer a proposed contract with PruGen for the sale of Doxy DR that was initially meant for Heritage. Glazer responded with one word - "Dorado?" - to ask if the new customer's purchases could be redirected to Dorado Pharma. |

| 84 | Jeffrey Glazer Jason Malek | February 18, 2015 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Glazer reported to Malek that PruGen had agreed to accept short-date Doxy DR and they should discuss "off-email." Over nine subsequent text messages, Glazer discussed how they could manipulate Heritage's pricing for short-dated products to achieve significant profits for Dorado Pharma. |
|----|----|----|----|----|----|
| 85 | Jeffrey Glazer Jason Malek | February 18, 2015 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Glazer reported to Malek that PruGen had agreed to accept short-date Doxy DR and they should discuss "off-email." Over nine subsequent text messages, Glazer discussed how they could manipulate Heritage's pricing for short-dated products to achieve significant profits for Dorado Pharma. |
| 86 | Jeffrey Glazer Jason Malek | March 5-6, 2015 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and conspire to conceal fraudulent scheme. | Glazer and Malek discussed the potential structure of fraudulent transactions in order to conceal their association with Dorado Pharma. Malek suggested, "we can ship all of the product tomorrow to the aphena site. Once it arrives, we can ship some of it without packaging and the rest we will leave for re-pack." Glazer replied, "Maybe- I think we should sell all the short date without repack as long as we can - not sure about Aphena storage etc. but might be good." Malek replied, "we can just use them as a middle man." Glazer responded, "Yep and we'll just make it consignment to D[orado] and invoice after its sold out so we in the money." |

| 87 | Jeffrey Glazer<br>Jason Malek | March 6-7, 2015 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and conceal fraudulent scheme. | Glazer asked Malek whether he sent an invoice from Dorado Pharma to PruGen. Malek responded that he had not and said that he "would rather send it from a dorado email and not gmail." Glazer responded, "I don't know if our @doradopharma.com emails are active. The gmail is doradopharma@gmail.com but that looks weird." Glazer then said, "we only set up jay@ and jeff@ which is a little to [sic] obvious . . . I can make a sales@ or cs@ but I have to set it up at godaddy." |
| 88 | Jeffrey Glazer<br>Jason Malek | March 7, 2015 | Text Message Exchange | Conspire to divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Glazer and Malek exchanged text messages about a potential opportunity to sell Achromycin through Dorado Pharma. |
| 89 | Jason Malek<br>Michele Katz<br>Juliana White<br>Patrick Ford<br>Rich Smith | March 9, 2015 | Email | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise; misappropriate Heritage resources; and misrepresent dummy corporation's affiliation with Heritage. | Malek emailed the Heritage Logistics team informing them that Heritage was selling short-date Doxy DR to "[its] re-pack customer Dorado" and asked them to "have the shipment ready for pickup" by the next day. |
| 90 | Jeffrey Glazer<br>Jason Malek | March 9-10, 2015 | Text Message Exchange | Operate fraudulent enterprise. | Glazer sent consecutive text messages to Malek saying, "wire received" and "is shipment going out?" Malek responded, "Will be ready for pickup today but need genrx license asap or we can't process for pickup." Glazer replied, "Call Matt at PruGen." |
| 91 | Matt Raiff<br>Jason Malek | March 10, 2015 | Email Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and conceal fraudulent scheme. | Malek communicated on behalf of Dorado Pharma with PruGen through the sales@doradopharma.com account. Raiff, the Chief Operating Officer of PruGen, emailed PruGen's controlled substance registration certificate to Malek at this address. |
| 92 | Jason Malek | March 10, 2015 | Email | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and conceal fraudulent conduct. | Malek forwarded the email from Raiff regarding PruGen's agreement with Dorado Pharma to his Heritage email account. |

| | | | | | |
|---|---|---|---|---|---|
| 93 | Jeffrey Glazer<br>Margaret Ryan | March 11, 2015 | Email | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and misappropriate heritage resources. | Glazer emailed Ryan, Heritage's Human Resources Coordinator, the PruGen-Heritage Doxy DR Term Sheet. |
| 94 | Jason Malek<br>Jeffrey Glazer | March 14, 2015 | Text Message Exchange | Conspire to divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Glazer and Malek exchanged texts about the possibility of reselling Heritage's Metronidazole through Tal Pharma to one of Heritage's customers. |
| 95 | Jeffrey Glazer<br>Jason Malek | March 16, 2015 | Text Message Exchange | Conspire to divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Glazer and Malek exchanged text messages about potentially selling Propranolol at a "high price" through their "new label," meaning Dorado Pharma. Malek replied that it "may be tough but could work."  Glazer responded, "They always are."  Malek said they would "need dual licenses in many states," to which Glazer responded, "No issue." |
| 96 | Jason Malek<br>Jeffrey Glazer | March 31, 2015 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Malek sent a text message to Glazer saying that a Dorado invoice from Freehold, NJ was sent back as undeliverable, so he had it "emailed to the mailbox." Glazer responded saying, "They draw payment every month - need to call them and look at post office," and asked Malek if he had the right address. Malek replied that he did and said that they "just need to list suite 1000 or it can be sent back." |
| 97 | Matthew Edelson<br>Jason Malek | April 15, 2015 | Text Message | Operate fraudulent enterprise. | Edelson sent a text message to Malek saying, "Not sure if you are aware but there is another company called vetgen. Veterinary Genetic Services." |
| 98 | Juliana White<br>Karen Crutcher<br>Lauren Hillenbrand<br>Christina Steiner<br>Jason Malek<br>Rich Smith<br>Patrick Ford<br>Cara Lapolla<br>Nicole Gouzouassis<br>Idona Conley | April 16, 2015 | Email Exchange | Misappropriate Heritage resources to further unlawful enterprise and divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | White, Heritage's Sales and Customer Service Manager, emailed Crutcher from RXTPL regarding order number 00753 for Dorado Pharma. Crutcher responded that they would have the product ready for pick up by the next day. |

| | | | | | |
|---|---|---|---|---|---|
| 99 | Jeffrey Glazer<br>Jason Malek | April 16, 2015 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Glazer communicated with Malek over text message to ask if Malek had talked to PruGen and to tell him he wanted to talk about Propranolol that day. Malek replied, "He emailed me last night and said send an invoice today and he will wire payment. Will send after I finish inventory priority and review capacity plan for EPL." |
| 100 | Jason Malek<br>Sean Lonergan | April 20, 2015 | Email Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and conceal fraudulent conduct through misrepresentations. | Lonergan from PruGen emailed Malek to ask for tracking information for a purchase order submitted to Heritage. Malek responded that he "just checked with Dorado" and then provided logistical details. |
| 101 | Jason Malek<br>Jeffrey Glazer | May 8, 2015 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Malek sent a text message to Glazer recapping his two conversations with Matt Raiff, the COO at PruGen, about the logistics of Dorado Pharma's repackaging of short-dated Doxy DR for PruGen. |
| 102 | Dorado Pharma LLC<br>Heritage Pharmaceuticals Inc. | May 11, 2015 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma wired $22,466.30 to Heritage to pay an outstanding invoice for an order of Doxy DR. |
| 103 | Jason Malek<br>Juliana White<br>Patrick Ford | May 14, 2015 | Email | Misappropriate Heritage resources to further unlawful enterprise and divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Malek instructed White to "prepare 2,100 units of short date [Doxy DR] for shipment to Dorado." |
| 104 | Jason Malek<br>Jeffrey Glazer | May 14, 2015 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Malek and Glazer exchanged text messages about a $280,000 order from PruGen, which Malek was going to ship. Glazer sent a text message to Malek saying, "need to load metro with Altro through TAL/MHC - let's make Denny [Smith] an offer and run the model at cost out to Masters for repack to MHC." Malek replied, "need to chat on it." |
| 105 | Jason Malek<br>Juliana White | June 16, 2015 | Email | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and misappropriate Heritage resources. | Malek asked White to release 2,700 units of Doxy DR "for a sale to Dorado." |

| | | | | |
|---|---|---|---|---|
| 106 | Juliana White<br>Karen Crutcher<br>Lauren Hillenbrand<br>Christina Steiner<br>Jason Malek<br>Rich Smith<br>Patrick Ford<br>Cara Lapolla<br>Nicole Gouzouassis<br>Idona Conley | June 16, 2015 | Email Exchange | Misappropriate Heritage resources to further unlawful enterprise. | Following Malek's direction, White, Heritage's Sales and Customer Service Manager, emailed Crutcher from RXTPL regarding order number 05464 for "DORADO c/o GENRX" and they discussed logistics of the transaction. |
| 107 | Dorado Pharma LLC<br>Heritage Pharmaceuticals Inc. | June 19, 2015 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma sent via wire transfer a payment of $34,577.05 to Heritage to pay an outstanding invoice for an order of Doxy DR. |
| 108 | Jeffrey Glazer<br>Jason Malek | June 27, 2015 | Text Message Exchange | Operate fraudulent enterprise. | Glazer sent a text message to Malek saying, "Transfer of majority interest in TAL is just a simple operating agreement. Only issue is we have to allocate some income to the girls or we get hit with a 12% self employment tax but we have time to do that. Looks like ISMN ER inventory is low - what is the estimate to get on govt contract and have to repack and load at MCK?" |
| 109 | Jeffrey Glazer<br>Jason Malek | July 1, 2015 | Text Message | Conceal fraudulent scheme. | Malek sent a text message to Glazer saying, "Need to take down the TAL pharma website. It shows [Heritage's address] as our address." |
| 110 | Jeffrey Glazer<br>John Copanos | July 4, 2015 | Text Message Exchange | Misappropriate Heritage's intellectual property in furtherance of fraudulent scheme; conceal fraudulent scheme; and facilitate illegal kickbacks. | Glazer sent a text message to Copanos, an old business partner, suggesting that Copanos' new company, ECI Pharmaceuticals LLC, purchase Heritage's Hydroxyzine ANDA at a below-market price in exchange for future kickbacks. Glazer said, "I'm thinking $250K wouldn't raise any eyebrows -- I'll partner with you on price and you can sell and kick me a profit share or some marketing rights so I have a basis when I'm done at Heritage . . . ." Copanos responded, "On same page.  You and I will always think alike and work together, so let's finalize this Monday." |

| 111 | Jeffrey Glazer<br>Jason Malek | July 14, 2015 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Glazer asked Malek to send Matt at PruGen a reminder about the payment on July 17th and to tell him that "Dorado wants a wire not a check." Malek replied, "done." |
|---|---|---|---|---|---|
| 112 | Dorado Pharma LLC<br>Heritage Pharmaceuticals Inc. | July 15, 2015 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma wired $61,431.30 to Heritage to pay an outstanding invoice. |
| 113 | Jason Malek<br>Michele Katz | July 16, 2015 | Email Exchange | Misappropriate Heritage resources. | Malek instructed Katz, Hertiage's Returns and Contracts Coordinator, to arrange a refrigerated truck to pick up a Dorado Pharma purchase. Katz made the arrangement. |
| 114 | Jeffrey Glazer<br>Jason Malek | July 16, 2015 | Text Message Exchange | Operate fraudulent enterprise. | Glazer asked what Dorado Pharma's profit was from GSMS's order of Calcitriol, and Malek replied that it was $52,000. |
| 115 | Jason Malek<br>Michele Katz<br>Juliana White | July 17, 2015 | Email | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and misappropriate Heritage resources. | Malek emailed White, Heritage's Sales and Customer Service Manager, to tell her that a Calcitriol shipment was going to GSMS from "our repackager." Malek said, "This is done through Dorado" and then explained how the shipments should be invoiced. |
| 116 | Jeffrey Glazer<br>Jason Malek | July 17, 2015 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Glazer expressed his intention to purchase an ANDA for Despiramine, sent a profit-loss analysis of the proposed deal to Malek's personal email address and explained that they would be able to sell the product to one of Heritage's largest customers "without a sales team." Glazer then concluded that with this new ANDA purchase, combined with their other schemes, they were "in the game." |
| 117 | Jeffrey Glazer<br>Jason Malek | July 17, 2015 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Glazer sent a text message to Malek telling him the "PruGen payment [was] received . . . $280K in profit." Malek asked, "Received to HPI?" and Glazer responded, "No[,] Dorado." |

| 118 | Jeffrey Glazer<br>Jason Malek | July 18, 2015 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and operate fraudulent enterprise. | Glazer asked Malek to send him "all of the Dorado invoices sent to prugen" to his talpharma.com email address for tax purposes. The two then discussed profits, with Glazer explaining, "made $700K @ 40% tax = $280K due or $140 K each." Malek questioned whether they would need to pay more than 40% in tax and suggested they speak with their accountant. |
| 119 | Jason Malek<br>Michele Katz | July 22-23, 2015 | Email Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and conceal fraudulent conduct through misrepresentations. | Malek pretended to be "Judy Jones" while corresponding with Katz, Heritage's Returns and Contracts Coordinator, in order to hide his affiliation with Dorado Pharma. |
| 120 | Jason Malek<br>Jeffrey Glazer | August 3, 2015 | Text Message | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and conceal fraudulent scheme. | Malek sent a text message to Glazer saying, "I think we should bill gsms for the calcitriol through Heritage and nix Tal/dorado this round. thoughts?" |
| 121 | Jason Malek<br>Jeffrey Glazer | August 5, 2015 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise; conspire to conceal fraudulent scheme; and misrepresent dummy corporation's affiliation with Heritage. | Malek asked Glazer how they should respond to inquiries received from Finio, Heritage's Senior Vice President of Finance, about an unconventional marketing deal with PruGen. Glazer responded, "he already has the agreement - should I just send the report?" Malek responded, "yes, just need to explain the cogs if he asks." Glazer asked, "So do we say he's buying through a wholesaler - we should set up through Cochrane - or would we have to say its Dorado?" Malek responded, "Dorado is the wholesaler that brokered the deal and will handle the repack." |
| 122 | Jason Malek<br>Jeffrey Glazer<br>Damian Finio | August 5, 2015 | Email Exchange | Conceal fraudulent scheme. | Finio emailed Malek to ask for "a little background on the [Doxy DR] deal" with PruGen. Malek forwarded the conversation to Glazer, who responded, "I'll handle it." |
| 123 | Jeffrey Glazer<br>Damian Finio | August 5-6, 2015 | Email Exchange | Conceal fraudulent scheme. | Finio asked Glazer to "clarify the arrangement that we have with PruGen." Glazer responded that "PruGen buys from wholesale (not Heritage) for repack…" |

| | | | | |
|---|---|---|---|---|
| 124 | Jason Malek<br>Jeffrey Glazer | August 6, 2015 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Malek and Glazer exchanged text messages about Malek's Tal Pharma email address. Malek explained that he could not access his Tal Pharma email and that it was automatically forwarding to Heritage. Glazer told Malek to type in talpharma.com and then enter his email name and password when prompted. Malek said he did not remember his password and it would not let him reset. Malek asked if Glazer could shut down his profile. Glazer asked if he was using "jay@[talpharma.com]." Glazer said he could reset Malek's password because he was the account administrator.  Glazer reset Malek's password. |
| 125 | Jason Malek<br>Jeffrey Glazer | August 8, 2015 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Malek sent a text message telling Glazer to check his Tal Pharma email and let him know if Glazer received an invoice due in August. Glazer responded, "got it." |
| 126 | Dorado Pharma LLC<br>Heritage Pharmaceuticals Inc. | August 17, 2015 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma wired $78,983.10 to Heritage to pay an outstanding invoice for an order of Doxy DR. |
| 127 | Jeffrey Glazer<br>Jason Malek | August 18, 2015 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and operate fraudulent enterprise. | Glazer sent Malek a text message saying he planned to distribute $100,000 to each of them. Malek replied, "that's it?" Glazer responded, "For today, it was a $466K profit can send more later after tax discussion." Malek responded, "Lol, only kidding." |

| 128 | Jeffrey Glazer Jason Malek | August 25, 2015 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise; operate fraudulent enterprise; and conceal fraudulent scheme. | Glazer and Malek discussed how to structure their illicit sales through Dorado Pharma. Glazer told Malek, "Sales need to go to Cochrane or Masters first and then from Dorado to prugen - decide who you trust and we'll give them a %." Malek said he had already had the conversation with Edelson the day before. Glazer said, "should do it direct - we give them a quarterly fee and keep going - how often do you think they'll have that order?" Malek responded, "Will know in September what post November will look like. Need to include Matt [Edelson], I don't want to deal with Andre [Patton]." Glazer responded that it would be "cleaner if you deal direct" but that they would "discuss and decide." |
| 129 | Jason Malek Jeffrey Glazer | August 31, 2015 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Malek told Glazer he was paying for a shipment with his Dorado Pharma credit card and asked if the billing address was Glazer's home address or the Freehold office address, where Dorado Pharma's virtual office space was located. Glazer replied that it was the Freehold address. |
| 130 | Jason Malek Jeffrey Glazer | August 31, 2015 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and operate fraudulent enterprise. | Malek sent a text message to Glazer telling Glazer to check his Tal Pharma email and asked him how much they had in the Dorado Pharma account. Glazer told Malek that there was $310,000 in the Dorado Pharma account. Malek and Glazer continued to exchange text messages about logistics related to a PruGen agreement and an order of Calcitriol. |
| 131 | Keith Fleming Jason Malek Michael Schmitt | September 2, 2015 | Email Exchange | Misappropriate Heritage resources and conceal fraudulent scheme. | Fleming, Heritage's Associate Director of Pricing and Contracts, forwarded Malek an email from Schmitt, Heritage's Controller of Finance, which said, "I wanted to give you a heads up that sales totals have been updated for the invoice to Dorado Pharma…" |

| 132 | Jason Malek<br>Jeffrey Glazer | September 2, 2015 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Malek sent a text message asking Glazer to send him the full financial report for July. Glazer responded that he would have to get to RDC and asked when he had to pay Heritage for Calcitriol and what the invoice number was. |
| --- | --- | --- | --- | --- | --- |
| 133 | Jason Malek<br>Jeffrey Glazer | September 4, 2015 | Text Message | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Malek sent a text message to Glazer saying, "Dorado invoice for short date Doxy [DR] is in the box. I will update [again] with details and send to your tal email." |
| 134 | Jeffrey Glazer<br>Jason Malek | September 10, 2015 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and operate fraudulent enterprise. | Glazer sent Malek a text message asking, "What's the $ per unit to Dorado? Seems like some healthy orders." Glazer then followed up, saying, "$2.85M to Dorado." Malek responded, "was just plugging it in….." Glazer said, "Fuck these sand niggers," referring to his fellow Heritage board members who are from India, and Malek responded, "At an even 30 per 100 ft profit, it's 2,565,000." |
| 135 | Jeffrey Glazer<br>Jason Malek | September 12, 2015 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and operate fraudulent enterprise. | Glazer told Malek, "After receipt of GSMS and schedule payments there is $242K left. I'm going to schedule another 50K out each…" Malek asked if the payments included the profits from Calcitriol and Doxy DR, and Glazer responded that they did, but that they needed to "lock down Andre [Patton]" to figure out details for Dorado Pharma's November order from GSMS. |
| 136 | Dorado Pharma LLC<br>Heritage Pharmaceuticals Inc. | September 15, 2015 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma wired $132,300 to Heritage to pay an outstanding invoice for an order of Doxy DR. |
| 137 | Dorado Pharma LLC<br>Heritage Pharmaceuticals Inc. | September 22, 2015 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma wired $72,615.41 to Heritage to pay an outstanding invoice for an order of Calcitriol. |
| 138 | Jason Malek<br>Jeffrey Glazer | September 28, 2015 | Text Message Exchange | Operate fraudulent enterprise and conceal fraudulent scheme. | Malek sent a text message to Glazer reminding him that Dorado Pharma should pay Heritage for shipping products to one of Dorado Pharma's customers. Glazer responded, "Won't that set off alarms?" |

| 139 | Dorado Pharma LLC<br>Heritage Pharmaceuticals Inc. | September 29, 2015 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma wired $3,900 to Heritage to pay an outstanding invoice for an order of Calcitriol. |
|---|---|---|---|---|---|
| 140 | Jeffrey Glazer<br>Jason Malek | October 8, 2015 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and operate fraudulent enterprise. | Glazer asked Malek to send him the total amount Dorado Pharma owed to Aphena and Globaltranz, and Malek responded that he sent the Aphena invoice to Glazer's Tal Pharma email address and would send the Globaltranz invoice shortly. |
| 141 | Matthew Edelson<br>Jason Malek | October 22, 2015 | Text Message Exchange | Misappropriate Heritage's intellectual property in furtherance of fraudulent scheme and bribe additional co-conspirators. | Edelson sent a text message to Malek saying, "I told Dre I would have something for him today brotha . . . Should i let him know tomorrow," to which Malek replied, "this is our show not his." Malek told Edelson that he and Glazer would pay Patton a $10,000 kickback and 1% of the order volume on each transaction he placed for them, in addition to $10,000 for each order Edelson coordinated through Patton. Edelson replied, "I know who's show it is money. That's fucking great!! Thanks homie!" |
| 142 | Jason Malek<br>Jeffrey Glazer | October 24, 2015 | Text Message Exchange | Misappropriate Heritage's intellectual property in furtherance of fraudulent scheme and conspire to steal Heritage's intellectual property and trade secrets. | Malek asked Glazer why they were not submitting an ANDA through Dorado Pharma for one of Heritage's best-selling products, Tetracycline. Glazer responded, "And you think I'm nuts lol" and then said, "We can probably get the complete ANDA electronically but it would be risky to do a submission prior to getting [the] fuck out of here." Malek replied, "true." Glazer then said, "I basically have every original ANDA on CD at my house but need to get some of the new ones and the USV ones. We should Doxy DR it also!" Malek responded, "agreed." |

| 143 | Jason Malek<br>Jeffrey Glazer | October 27, 2015 | Text Message Exchange | Misappropriate Heritage's intellectual property in furtherance of fraudulent scheme. | Malek asked Glazer to check his Tal Pharma email, and Glazer responded, "Sell to Cochrane at $85." Malek replied, "I'll run the model and send to you." Malek then asked, "Which model should we go with? need Cochran to place the order." Malek suggested, "I think it's fine if we say we have to go to that level because it's for a branded repack project and it adds profitable volume that we never would have." Glazer responded, "I think $85 if you don't think it raises red flags internally." |
| --- | --- | --- | --- | --- | --- |
| 144 | Dorado Pharma LLC<br>Heritage Pharmaceuticals Inc. | October 28, 2015 | Payment via Wire Transfer | Facilitate transfer of funds for fraudulent scheme. | Dorado Pharma wired $221,103.95 to Heritage to pay an outstanding invoice for an order of Doxy DR. |
| 145 | Andre Patton<br>Matthew Edelson | November 11, 2015 | Email | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and conceal fraudulent scheme. | Patton, of Cochran, sent Edelson a purchase order on behalf of Dorado Pharma, using Cochran to disguise the true source of the order. |
| 146 | Jason Malek<br>Rudy Perez | November 24, 2015 | Email | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise. | Perez, of GSMS, emailed Dorado Pharma a purchase order for Calcitriol. |
| 147 | Jeffrey Glazer<br>Jason Malek | November 24, 2015 | Text Message Exchange | Conceal fraudulent scheme. | Glazer and Malek exchanged text messages about changing the address for the virtual office space for Tal Pharma, which was previously in the same building as Heritage's office, in order to conceal their association with Tal Pharma. |
| 148 | Cochran Wholesale Pharmaceuticals<br>Heritage Pharmaceuticals Inc. | January 21, 2016 | Payment via Mail | Facilitate transfer of funds for fraudulent scheme. | Cochran sent Heritage a check in the mail for $890,970 (check #3553) for invoice FF13986 (10,490 units of Doxy DR), which Cochran later resold to PruGen on behalf of Dorado. |

| 149 | Bill McMahon<br>Bill Still<br>Andre Patton | January 26-27, 2016 | Email Exchange | Operate fraudulent enterprise. | McMahon, Heritage's Senior Accounting Manager, told Still, of Cochran, "We just received two payments from your company with no payment details . . . Can you please send me the remit detail so that I may record your payment properly," and Still forwarded the email to Patton, of Cochran. Patton then gave McMahon the invoice numbers for the checks they sent. |
|---|---|---|---|---|---|
| 150 | Cochran Wholesale Pharmaceuticals<br>Heritage Pharmaceuticals Inc. | March 7, 2016 | Payment via Mail | Facilitate transfer of funds for fraudulent scheme. | Cochran sent Heritage a check in the mail for $382,500 (check #3703) for invoice FF16836 (4,500 units of Doxy DR), which Cochran later resold to PruGen on behalf of Dorado. |
| 151 | Cochran Wholesale Pharmaceuticals<br>Heritage Pharmaceuticals Inc. | March 22, 2016 | Payment via Mail | Facilitate transfer of funds for fraudulent scheme. | Cochran sent Heritage a check in the mail for $765,000 (check # 3746) for invoice FF18081 (9,000 units of Doxy DR), which Cochran later resold to PruGen on behalf of Dorado. |
| 152 | Cochran Wholesale Pharmaceuticals<br>Heritage Pharmaceuticals Inc. | April 29, 2016 | Payment via Mail | Facilitate transfer of funds for fraudulent scheme. | Cochran sent Heritage a check in the mail for $850,000 (check #3843) for invoice FF19803 (10,000 units of Doxy DR), which Cochran later resold to PruGen on behalf of Dorado. |
| 153 | Jeffrey Glazer<br>Keith Fleming | July 13-18, 2016 | Email Exchange | Conceal fraudulent scheme. | Glazer requested reports from Fleming, Associate Director of Pricing and Contracts at Heritage, regarding historical Heritage sales data. Glazer directed Fleming to specifically exclude sales to Dorado Pharma and Cochran. |
| 154 | Jeffrey Glazer<br>Jason Malek | July 25, 2016 | Text Message Exchange | Divert profits away from Heritage to Glazer and Malek's unlawful enterprise and operate fraudulent enterprise. | Glazer told Malek, "for the Despiramine it is only 50% due now so its $185K which we split 50:50." Malek responded, "Lets do it. How do we accomplish without [f]ucking anything up," and Glazer replied, "Lets buy it first and figure it out - we can try to launch direct or sublicense." |

| 155 | Cochran Wholesale Pharmaceuticals Heritage Pharmaceuticals Inc. | August 4, 2016 | Payment via Mail | Facilitate transfer of funds for fraudulent scheme. | Cochran sent Heritage a check in the mail for $935,000 (check #4150) for invoice FF23688 (11,000 units of Doxy DR), which Cochran later resold to PruGen on behalf of Dorado Pharma. |